**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**---------------------------------------------------- x**

**18 Civ. 7253 (NG)(PK)**

**IN RE DENTSPLY SIRONA, INC.**
**SECURITIES LITIGATION**

**JURY TRIAL DEMANDED**

**---------------------------------------------------- x**

# AMENDED CLASS ACTION COMPLAINT OF LEAD PLAINTIFF STRATHCLYDE PENSION FUND

**BARRACK RODOS & BACINE**
A. Arnold Gershon
Michael A. Toomey
11 Times Square
640 Eighth Avenue, 10th Floor
New York, NY 10036
Telephone: 212.688.0782
Facsimile: 212.688.0783

**BARRACK RODOS & BACINE**
Jeffrey W. Golan
Robert A. Hoffman
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: 215.963.0600
Facsimile: 215.963.0838

*Attorneys for the Strathclyde Pension Fund*
*and Lead Counsel for the Putative Class*

# Table of Contents

Page

I. NATURE OF THE ACTION ....................2

A. Preliminary Statement .................... 2

B. The Claims Asserted in the Complaint .................... 5

II. JURISDICTION AND VENUE ....................6

III. PARTIES ....................6

IV. OVERVIEW OF THE COMPANY AND THE MERGER OF DENTSPLY INTL. AND SIRONA ....................9

V. FACTUAL BACKGROUND ....................12

A. The Company's Exclusive Distribution Agreements With Patterson.................... 12

1. The Exclusive Distribution Agreements .................... 12

2. Patterson Terminates the Exclusive Distribution Agreements .................... 23

B. The Anti-Competitive Scheme Concerning Dental Products .................... 28

1. Background of the Dental Products Market.................... 28

2. The Distributors Recognize GPOs Will Harm Prices and Margins .................... 30

3. The Distributors' Illegal Agreements and Conspiracy .................... 30

4. Dentsply Sirona's Knowledge of the Conspiracy.................... 33

5. The Conspiracy Buoys Dentsply Sirona's Financial Results .................... 38

C. Dentsply Sirona's Issuance of Overstated Goodwill and Financial Guidance .................... 40

D. The Truth Concerning Dentsply Sirona's Financial Condition Is Gradually Revealed.................... 43

VI. CLASS ACTION ALLEGATIONS ....................47

VII. ALLEGATIONS PERTAINING TO LEAD PLAINTIFF'S CLAIMS UNDER SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT ............................48

A. False and Misleading Statements Pertaining to the Favorable Results that Dentsply Sirona and Its Predecessor Dentsply Intl. Achieved as a Result of the Distributors' Anticompetitive Scheme ........................................ 48

1. False and Misleading Statements Regarding Competition ....................... 49

2. False and Misleading Statements Regarding the Company's Reported Financial Results and Primary Drivers of Internal Growth ........................................................................................ 51

3. False and Misleading Statements Regarding Product Pricing ................. 54

B. False and Misleading Statements Pertaining to the Exclusive Distribution Agreements and Patterson's Decision Not to Renew the Agreements ........................................................................................ 55

C. False and Misleading Statements and Omissions of Fact Regarding Goodwill and the Value of Indefinite-Lived Intangible Assets ........................... 67

VIII. PARTIAL DISCLOSURES, FURTHER MISLEADING STATEMENTS, AND THE GRADUAL EMERGENCE OF THE FULL SCOPE OF THE FRAUD ........................................................................................................76

IX. SUMMARY OF SCIENTER ALLEGATIONS ...........................................................87

X. LOSS CAUSATION....................................................................................................97

XI. INAPPLICABILITY OF STATUTORY SAFE HARBOR .........................................107

XII. PRESUMPTION OF RELIANCE ..............................................................................108

XIII. CLAIMS BROUGHT PURSUANT TO SECTIONS 10(b) AND 20(a) OF THE EXCHANCE ACT ..............................................................................................109

FIRST CLAIM FOR RELIEF ...................................................................................... 112

SECOND CLAIM FOR RELIEF ................................................................................. 113

XIV. ALLEGATIONS RELATING TO CLAIMS BROUGHT PURSUANT TO SECTION 14(a) OF THE EXCHANGE ACT AND SECTIONS 11, 12(a)(2) AND 15 OF THE SECURITIES ACT .........................................................114

A. The Merger and the Offering Documents ......................................................... 115

B. The Registration Statement Contained Untrue Statements and Material Omissions About Product Demand and Inventory, and Sirona's Exclusive Distribution Agreements with Patterson ............................. 118

C. Material Misrepresentations and Omissions About Industry Competition, Sources of Revenue, Financial Results, and Forecasts ...................................... 126

1. Failure to Disclose the Distributors' Anticompetitive Scheme and Its Impact and Potential Impacts on Sirona, Dentsply Intl. and Dentsply Sirona ................................................................ 126

2. False Statements Regarding Goodwill and Impairment ......................... 131

D. False Statements Regarding the Fairness Opinion............................................ 135

E. The Registration Statement Failed to Disclose the Information Required by Items 303 and 503 of Regulation S-K, and Did Not Otherwise Disclose Information Concerning Trends, Uncertainties, Events or Risks ....................... 138

XV. CLAIMS BROUGHT PURSUANT TO SECTIONS 11, 12(a)(2), AND 15 OF THE SECURITIES ACT AND SECTION 14(a) OF THE EXCHANGE ACT ........................................................................................................................140

THIRD CLAIM FOR RELIEF ........................................................................... 141

FOURTH CLAIM FOR RELIEF ........................................................................ 143

FIFTH CLAIM FOR RELIEF ............................................................................ 145

SIXTH CLAIM FOR RELIEF............................................................................ 146

SEVENTH CLAIM FOR RELIEF ..................................................................... 147

XVI. PRAYER FOR RELIEF ..................................................................................................148

XVII. JURY DEMAND ..............................................................................................................148

Lead Plaintiff, Strathclyde Pension Fund ("Lead Plaintiff"), by and through its counsel, brings this action for violations of the federal securities laws on behalf of itself and all other similarly situated persons or entities (the "Class") who: (1) purchased or otherwise acquired the common stock of Dentsply International, Inc. ("Dentsply Intl.") and its successor-in-interest Dentsply Sirona, Inc. (together "Dentsply Sirona" or the "Company") between February 20, 2014 and August 7, 2018 (the "Class Period"); (2) acquired shares of the common stock of Dentsply Sirona in exchange for their shares of common stock of Sirona Dental Systems, Inc. ("Sirona") in connection with the merger of Dentsply Intl. and Sirona on or about February 29, 2016 (the "Merger"); or (3) are former Dentsply Intl. shareholders who held shares as of December 2, 2015 and were entitled to vote with respect to the Merger; and were damaged by the conduct asserted herein.

The allegations in this Complaint are based on Lead Plaintiff's personal knowledge as to itself, and on information and belief, including the investigation of counsel, as to all other matters. The investigation of counsel is predicated upon, among other things, review and analysis of public filings made by Dentsply Intl., Sirona and Dentsply Sirona with the United States Securities and Exchange Commission ("SEC"), including Forms 10-K, 10-Q, and 8-K, registration statements and prospectuses; press releases issued and disseminated by the Company; media reports about the Company; reports issued by securities analysts who followed the Company; transcripts of Dentsply Sirona's investor conference calls and presentation materials; pleadings and evidence cited in the enforcement action brought by the Federal Trade Commission against the Company's distribution partners, as well as in other litigation involving Dentsply Sirona and/or its distribution partners; and the SEC order titled *In the Matter of Dentsply Sirona Inc.*, File No. 3-20170, Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and

Imposing a Cease-Desist-Order issued by the Securities and Exchange Commission on December 16, 2020 (the "Cease and Desist Order"). Lead Plaintiff believes that substantial, additional evidentiary support for the allegations set forth in this Complaint will be obtained after a reasonable opportunity for discovery.

# I. NATURE OF THE ACTION

## A. Preliminary Statement

1. This case arises from a years-long scheme perpetrated by Dentsply Sirona – the world's largest manufacturer of professional dental products – and its most senior officers to conceal from the market the Company's true financial and operating condition, which was plagued by (i) a massive build-up of inventory at one of its major distributors that threatened the Company's ability to maintain (let alone grow) sales of its key product lines, and (ii) anticompetitive conduct perpetrated by the Company's distributors, which, as the Company knew, artificially inflated the Company's stated revenues, earnings and margins.

2. Dentsply Sirona distributed certain dental equipment products through a series of exclusive distribution agreements with Patterson Companies, Inc. ("Patterson"). These agreements (the "Exclusive Distribution Agreements") helped Dentsply Sirona maintain its dominant position in the U.S. dental products market and contributed to the Company's goodwill and intangible asset valuations. Unknown to investors, the Exclusive Distribution Agreements required Patterson to regularly make large minimum purchases of products regardless of demand from end-user dentists. Because these minimum purchase requirements were substantially in excess of end-user demand, Patterson had a backlog of Company inventory that it could not sell to dentists. Faced with the prospect of continuing to purchase products that it could not re-sell, in November 2016 Patterson announced that it would not renew the Exclusive Distribution

Agreements when they expired in September 2017. Thereafter, Patterson began to purchase less products from the Company (referred to as "destocking" inventory).

3. Instead of informing investors of the scope and full impact of the inventory backlog, Dentsply Sirona falsely assured the market that any effect of Patterson's reduced purchases and destocking on the Company's financial results would be mitigated by the addition of a new distributor, Henry Schein, Inc. ("Schein"), who began to make purchases of Company products that had been exclusively distributed by Patterson.

4. But, as the Company knew, these purchases of initial stocking inventory by Schein could not nearly make up for the substantial sales that Dentsply Sirona had previously been making to Patterson pursuant to the minimum purchase requirements of the Exclusive Distribution Agreements. And the Company and its executives knew that since there was insufficient end-user dentist demand for these products, Schein's initial stocking purchases could not be a consistent source of revenue as these purchases amplified and increased the backlog of inventory in the distribution channel.

5. In addition, Dentsply Sirona knew that its reported financial results had been further propped-up by an illegal and anti-competitive conspiracy among the three largest distributors of dental products in the United States – Patterson, Schein and Benco Dental Supply Co. ("Benco") (collective, the "Distributors"). The Distributors' conspiracy consisted of an illicit agreement to foreclose price competition for dental consumable supplies and dental equipment and, with the assistance of Dentsply Sirona and its predecessor companies, to block lower-priced distributors from entering the market.

6. For years, the Company and its executives reported sales and other financial results and metrics, including the value of goodwill which represented over 50 percent of the Company's assets, that were boosted by these schemes. These inflated results and valuations,

combined with Defendants' misleading statements and omissions regarding the impact of the Exclusive Distribution Agreements' minimum purchase requirements and the Distributors' conspiracy, falsely portrayed Dentsply Sirona as a booming growth company.

7. But the Company's false and misleading statements led to stock gains that were unsustainable. Investors learned the truth about Dentsply Sirona's financial condition through a series of corrective disclosures that revealed, over the course of a year, (a) the dire impact of the inventory backlog caused by the minimum purchase requirements on the Company's revenues, margins and earnings; (b) the SEC had opened an investigation into the Company's accounting and disclosures "relating to transactions with a significant distributor of the Company"; and (c) billion dollar impairments to the Company's goodwill that resulted from the inventory backlog that was substantially in excess of end-user demand as well as an increase in competition, unfavorable changes in the end-user business model, and changes in channels of distribution for the Company and its competitors following the end of the Distributors' conspiracy. All told, following the disclosures of the fraud, Dentsply Sirona's stock price declined over 45% from its Class Period high.

8. In its Form 10-Q for the second quarter 2017, Dentsply Sirona announced that it had received a request from the SEC for documents and information on its "accounting and disclosures relating to transactions with a significant distributor of the Company." On December 16, 2020, the SEC announced the settlement of its investigation of Dentsply Sirona with the issuance of the Cease and Desist Order, a copy of which is attached hereto as Appendix A. The Cease and Desist Order contains numerous factual findings by the SEC confirming that between 2013 and 2016, Sirona (and then Dentsply Sirona) knew that its exclusive distribution partner in the U.S. (Patterson) was massively overstocking Sirona/Dentsply Sirona inventory and that by the end of the first quarter of 2016 at the very latest, Dentsply Sirona's top executives – several

of whom are Defendants here – were aware of, but failed to disclose, this massive build-up of inventory in the distribution channel arising from minimum purchase requirements that were in excess of end-user demand, and which posed a material risk to Dentsply Sirona's financial condition.

**B. The Claims Asserted in the Complaint**

9. Lead Plaintiff asserts three sets of claims in this Complaint. The first set are fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against the defendants who made materially false and misleading statements that caused the price of Dentsply Sirona stock to be artificially inflated during the Class Period and/or were control persons with respect to such material misstatements and omissions. These claims are made on behalf of all persons, other than Defendants or their affiliates, who purchased the common stock of Dentsply Intl. and Dentsply Sirona on the open market throughout the Class Period, and were damaged as a result.

10. The second set of claims are strict liability and negligence claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") against those defendants who are statutorily liable for materially untrue statements and misleading omissions made in connection with the Merger. These claims are made on behalf of all persons, other than Defendants and their affiliates, who acquired the common stock of Dentsply Sirona in exchange for their shares of Sirona stock in the Merger.

11. The third set of claims, which are brought on behalf of holders, other than Defendants and their affiliates, of Dentsply Intl. stock as of the record date for voting on the Merger, assert negligence under Sections 14(a) and 20(a) of the Exchange Act against the defendants who made material misstatements and omissions in soliciting the approval of

Dentsply Intl. shareholders for the Merger and/or were control persons with respect to such material misstatements and omissions.

## II. JURISDICTION AND VENUE

12. The claims asserted in this Complaint arise pursuant to Sections 10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a), and 78t(a)), and SEC Rules 10b-5 and14a-9 promulgated thereunder (17 C.F.R. §§ 240.10b-5 and 240.14a-9), and Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and Section 22 of the Securities Act (15 U.S.C. § 77v(a)), because Dentsply Sirona maintains offices in this District and many of the acts giving rise to the violations complained of herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

15. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

16. Plaintiff Strathclyde Pension Fund ("Strathclyde") is a public pension fund in the United Kingdom with over 230,000 members and over £20 billion of investments. Strathclyde purchased or otherwise acquired 617,824 shares of Dentsply Sirona stock during the

Class Period, including 306,418 shares that it received in exchange for Sirona stock in the Merger, as reflected in the Certification filed by Strathclyde on February 19, 2019, in this case. Strathclyde suffered damages as a result of the violations of the federal securities laws alleged herein.

17. Defendant Dentsply Sirona is a Delaware corporation headquartered in York, Pennsylvania, that designs, develops, manufactures and markets dental products and services for use by dentists. Dentsply Sirona is effectively the successor-in-interest to Dentsply Intl. and resulted from the merger of Dentsply Intl. and Sirona.

18. Defendant Jeffrey T. Slovin ("Slovin") was, at the time of the Merger, the President and CEO of Sirona, and became CEO and a member of the Board of Directors of Dentsply Sirona in connection with and immediately following the Merger. Slovin had served as Sirona's CEO from February 2013 through February 2016, and as its President from September 20, 2010 through February 28, 2016. Slovin's resignation from all of his positions at Dentsply Sirona was announced on October 2, 2017.

19. Defendant Bret W. Wise ("Wise") was, at the time of the Merger, Dentsply Intl.'s CEO and Chairman of its board and became the Chairman of the board of Dentsply Sirona in connection with and immediately after the Merger. Wise had served as a member of Dentsply Intl.'s board since 2006, as its Chairman since 2007, and as Dentsply Intl.'s CEO since January 1, 2007. Wise's resignation from all of his roles at Dentsply Sirona was announced on October 2, 2017.

20. Defendant Christopher T. Clark ("Clark") was, at the time of the Merger, the President and Chief Financial Officer of Dentsply Intl. and became the President and COO – Technology of Dentsply Sirona in connection with and immediately after the Merger. Clark had

held the role of President and CFO of Dentsply Intl. since April 2013. Clark's resignation from all of his roles at Dentsply Sirona was announced on October 2, 2017.

21. Defendant Donald M. Casey ("Casey") is the current CEO of Dentsply Sirona. Casey is also a member of Dentsply Sirona's board of directors. The Company announced Casey's appointment as CEO on January 14, 2018, effective February 12, 2018.

22. Defendant Ulrich Michel ("Michel") was, at the time of the Merger, the CFO of Sirona, and became the CFO of Dentsply Sirona in connection with and immediately following the Merger. Michel had served as Sirona's CFO since October 2013. Michel's resignation from his position at Dentsply Sirona was announced on November 2, 2017, effective as of November 10, 2017.

23. Defendant Mark A. Thierer ("Thierer") served as the Interim CEO of Dentsply Sirona from September 28, 2017 until the appointment of Defendant Casey as CEO on February 12, 2018. Thierer followed Defendant Slovin as CEO, upon his leaving the position.

24. Defendant Nicholas W. Alexos ("Alexos") is the current CFO of Dentsply Sirona. Alexos has served in this role since November 10, 2017. Previously, Alexos had been on the board of directors of Sirona from 2005 until 2012.

25. Defendants Slovin, Wise, Clark, Casey, Michel, Thierer and Alexos are collectively referred to as the "Officer Defendants." The Officer Defendants, because of their positions with Company, possessed the power and authority to control the contents of Dentsply Sirona's reports to the SEC, press releases, and presentations to securities analysts, investment managers and investors. The Officer Defendants were provided with copies of the Company's reports and press releases alleged in this Complaint to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to

them, the Officer Defendants knew that the adverse facts and omissions specified in this Complaint had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

26. Defendants Michael C. Alfano, Eric K. Brandt, Paula H. Cholmondeley, Michael J. Coleman, Willie A. Deese, William F. Hecht, Francis J. Lunger, John L. Miclot, and John C. Miles II were members of the Dentsply Intl. board of directors who signed the Registration Statement (defined below), and are collectively referred to herein as the "Dentsply Director Defendants."

27. The Officer Defendants and the Dentsply Director Defendants identified in paragraphs 18-24 and 26 above are collectively referred to as the "Individual Defendants."

## IV. OVERVIEW OF THE COMPANY AND THE MERGER OF DENTSPLY INTL. AND SIRONA

28. Prior to the Merger, Dentsply Intl. was a global dental equipment and consumables designer, developer and manufacturer, which had factories located in 21 countries and marketed its products in over 120 countries. Dentsply Intl. sold dental equipment such as computer-aided design/computer-aided manufacturing ("CAD/CAM") systems, 3D digital scanning and treatment planning products, drills and other dental consumable products used in dental offices for the treatment of patients.

29. Sirona was a designer, developer, manufacturer, and marketer of technologically-advanced dental equipment. More recently, and by the time of the Merger, Sirona developed, manufactured and marketed several lines of dental products including: CAD/CAM restoration systems; digital intra-oral, panoramic and 3D imaging systems; dental treatment centers; and dental instruments. At the time of the Merger, Sirona had four reporting segments: (1) dental

CAD/CAM; (2) imaging systems; (3) treatment centers; and (4) instruments, as further described below:

(a) With respect to its CAD/CAM segment, Sirona pioneered the application of high-tech CAD/CAM techniques to the traditional lab-based restoration process with the commercialization of the Chairside Economical Restorations of Esthetic Ceramics, or CEREC, method in 1987. The CEREC system is an in-office application that enables dentists to produce high quality restorations from ceramic material utilizing digital images taken from an intraoral camera. Among other things, the CEREC technology gave dentists the ability to do a crown in a single visit. At the time of the Merger, a CEREC system cost well over six figures, with higher end units costing as much as $200,000.

(b) Sirona's Imaging Systems segment included a broad range of systems for diagnostic imaging in the dental practice. In 2005, Sirona cemented its place as a leader in the dental imaging market when it purchased Schick Technologies, Inc. ("Schick") for $1.46 billion. Schick continued operating under the business name Schick Technologies, Inc. until October 1, 2012, when it was changed to Sirona Dental, Inc.

(c) Sirona's Treatment Centers segment included a broad range of products from basic dentist chairs to sophisticated chair-based units with integrated diagnostic, hygiene, and ergonomic functionalities.

(d) Sirona's Instruments segment designed and manufactured a wide range of instruments, including handheld and power-operated hand-pieces for cavity preparation, endodontics and periodontology.

30. According to Sirona's FY 2015 Form 10-K, Patterson accounted for 33% of Sirona's revenue for the fiscal year ended September 30, 2015. An Evercore ISI research report of February 8, 2016, stated that Patterson was Sirona's largest customer, representing anywhere

from 28% to 38% of any given quarter's revenue (primarily in Sirona's CAD/CAM and imaging segments). The report stated that in Sirona's fiscal year 2016 first quarter, Patterson accounted for approximately 36% of Sirona's total revenue.

31. On September 15, 2015, Dentsply Intl. and Sirona announced that the companies had approved a definitive merger agreement under which Dentsply Intl. and Sirona would combine in an all-stock merger of equals that valued Sirona at $5.5 billion. Under the terms of the Merger, Sirona shareholders would receive 1.8142 shares of Dentsply Intl. common stock in exchange for each share of Sirona common stock they held and the combined company was renamed Dentsply Sirona. The Merger was completed on February 29, 2016. The Merger enabled Dentsply Intl. to expand its footprint in the dental equipment market, including by marketing higher-priced, higher-margin products such as x-ray machines, dental chairs, imaging equipment, and CAD/CAM systems.

32. Under the terms of the Merger, approximately 101.8 million shares of Dentsply Intl. common stock were issued to former shareholders of Sirona common stock, representing about 42% of the approximately 242.2 million total shares of Dentsply Intl. common stock outstanding on the Merger date. Dentsply Intl. common stock closed at $60.96 per share on February 29, 2016. The Company and its common stock were thereafter identified as Dentsply Sirona.

33. The Merger created the world's largest manufacturer of professional dental products. After the Merger, the Company reported its results in two business segments: Dental and Healthcare Consumables, which include preventative, instruments, and laboratory dental products like root canal instruments, dental sealants, and tooth whiteners; and Technologies, which include high-tech dental implants and related scanning equipment and treatment software, among other things.

## V. FACTUAL BACKGROUND

### A. The Company's Exclusive Distribution Agreements With Patterson

#### 1. The Exclusive Distribution Agreements

34. In the United States and Canada, Patterson was the exclusive distributor for Sirona's CAD/CAM products since 1998 and for all Schick and Sirona-branded imaging products since 2005. The Agreements that governed the exclusive distribution arrangement between Patterson and Sirona and, subsequently, between Patterson and Dentsply Sirona during the Class Period are described below.

35. In June 2005, Sirona and Patterson entered into a Consolidated and Restated Amendment to Distributorship Agreement concerning all current and future Sirona CAD-CAM equipment sold in the United States and Canada ("2005 CAD-CAM Distributorship Agreement") for which Patterson made a one-time payment to Sirona of $100 million. This agreement amended and consolidated an April 1998 Distributorship Agreement entered into by Sirona and Patterson and five agreements that had amended the April 1998 Distributorship Agreement since that time. On May 31, 2012, Patterson and Sirona entered into the Amended and Restated U.S. Distributorship Agreement and the Amended and Restated U.S. CAD-CAM Distributorship Agreement ("2012 CAD-CAM Distributorship Agreement"), which amended the 2005 Agreement for purposes of selling products in the United States, but which left the 2005 Agreement in place for sales in Canada.

36. On May 5, 2010, Schick, which was owned by Sirona as of 2005, and Patterson entered into an Amendment to Distributorship Agreement ("2010 Schick Distributorship Agreement"), which amended the Distributorship Agreement entered into between Schick and Patterson on April 6, 2000. The 2010 Schick Agreement required Patterson to buy certain quantities of Schick products – undisclosed to investors – including Schick x-ray systems and

software. On May 31, 2012, Sirona and Patterson entered into an Amended and Restated U.S. Distributorship Agreement ("2012 Schick/Sirona Distributorship Agreement") that continued "in full force and effect" the 2010 Schick Agreement "solely with respect to Canada," and amended the 2010 Schick Agreement for purposes of Schick products sold in the United States. The 2012 Schick/Sirona Distributorship Agreement also concerned Sirona products sold in the United States including Sirona "branded imaging products and equipment … together with SIRONA branded treatment centers and instruments."

37. Collectively, the 2005 CAD-CAM Distributorship Agreement, 2012 CAD-CAM Distributorship Agreement, 2010 Schick Distributorship Agreement, and 2012 Schick/Sirona Distributorship Agreement are referred to in this Complaint as the "Exclusive Distribution Agreements." These Agreements were set to expire on September 30, 2017 unless renewed.

38. The effect of the Exclusive Distribution Agreements was two-fold: (1) Patterson had to buy inventory whether or not it could sell it to end-users in order for Patterson to retain the exclusive right to sell Sirona and Schick products in the United States and Canada; and (2) the Agreements required – ***on a monthly basis*** – that Patterson report its buying and inventory to Sirona and, thereafter, Dentsply Sirona such that the Company was well aware of any overstocking by Patterson, but investors were not.

39. Having a single distributor was extremely important to Sirona. As an analyst at Northcoast Research explained in an October 6, 2015 report concerning Patterson: "In particular, when [Sirona] has sold through multiple distributors in the past (either in the United States or Europe), our research suggests the dealers got into price wars and eventually lost interest in selling the products. Specifically, dealer reps would work hard to generate a lead and when it came time to close the sale a competitor would rush in at the last minute and try to undercut on price. After a while, reps got tired of putting in the effort to generate leads only to lose the sale at

the last minute. As a result, [Sirona] has moved toward exclusive territories in Europe and chose [Patterson] as its exclusive dealer in the United States."

40. The Exclusive Distribution Agreements provided a clear benefit to Patterson because its ability to sell CEREC systems and other Sirona products in the United States differentiated Patterson from other distributors, and was part of its customer acquisition and retention strategy. While the Exclusive Distribution Agreements did not inform investors of the amount of product Patterson was required to buy (such information is redacted from the publicly filed versions of the Exclusive Distribution Agreements), they do state that Sirona could cancel the Agreements if Patterson failed to maintain the agreed-to purchasing levels.

41. The 2005 CAD-CAM Distributorship Agreement stated that "if Patterson fails to satisfy the Minimum Purchase Requirement … then Sirona, and only Sirona, may exercise its termination rights…." The amount of the Minimum Purchase Requirement is redacted from the public version of this document and was unknown to investors.

42. The 2012 CAD-CAM Distributorship Agreement stated that if Patterson failed to meet "any one or more of the Overall Growth Target or the three Product Targets" concerning the "Minimum Purchase Requirements" for three years, "SIRONA may terminate this Agreement." The amount of the Overall Growth Target or the Product Targets is redacted from the public version of this document and was unknown to investors.

43. The 2012 Schick/Sirona Distributorship Agreement stated that "[i]f Patterson fails to satisfy any one or more of the Overall Growth Target or the three Product Targets" for three years, "SIRONA may terminate this Agreement." Sirona could also "terminate the Agreement on a product by product basis with respect to either the so called 'Schick Products' or 'SIRONA products,' where Patterson has failed to satisfy the applicable Product Target" for three years.

The amount of the Overall Growth Target or the three Product Targets is redacted from the public version of this document and was unknown to investors.

44. As such, the Exclusive Distribution Agreements placed Patterson in a difficult position if it could not sell the product it was required to buy. Its choices were (1) stop buying and lose exclusivity or (2) keep buying and overstock Sirona and Schick products. As it became clear after the Agreements expired on September 30, 2017, Patterson opted for the latter option – overstocking – and because of the reporting requirements of the Exclusive Distribution Agreements, Sirona and Dentsply Sirona were well aware of this overstocking as it was occurring.

45. The Exclusive Distribution Agreements required Patterson to report an enormous amount of information – ***on a monthly basis*** – to Sirona and, thereafter, to Dentsply Sirona concerning the products that Patterson was purchasing from the Company and Patterson's ability, or inability, to sell such products to end purchasers.

46. The 2012 CAD-CAM Distributorship Agreement required that:

> Patterson shall make regular reports ***in the manner and at the intervals*** reasonable [sic.] ***requested by SIRONA***, in any event ***on a monthly basis***, at the beginning of each month, ***concerning the business with respect to Contractual Products in the Territory, the market situation, economic situation and forecast, trade policies, business prospects, activities of competitors*** (provided no legal prohibition on providing such information) ***and other pertinent developments***. In particular Patterson shall, at the beginning of each quarter, report to SIRONA on:
>
> - ***order entry/turnover and backlog, sorted out as to number of units and value, relative to sale regions,***
> - ***stock of Contractual Products relative to sale branches,***
> - market conditions, competitive conditions, competitive products; and

- personnel changes as regards employees trained by SIRONA for the sale and service of Contractual Products.[1]

47. This Agreement also required that:

> The Parties will meet on a quarterly basis for the purpose of evaluating, in good faith, whether the volume of purchases made by Patterson hereunder, during the most recent quarter and year-to-date, is consistent with, and likely to result in the satisfaction of, Patterson's annual minimum purchase requirements. In addition, without limiting Section 5 hereof, ***on a monthly basis, Patterson will provide SIRONA with detailed information relating to its purchases of Contractual Products from SIRONA including, without limitation, the sales targets and results for each of Patterson's branch offices for that month; a schedule of Patterson's sales for that month with respect to each product included within the Contractual Products***, and any other materials reasonably necessary for SIRONA to ascertain whether Patterson is "on target" to meet its annual and quarterly purchase requirements hereunder.

47. The 2012 CAD-CAM Distributorship Agreement also required that "Patterson shall provide SIRONA with ***a rolling twelve month forecast on a monthly basis***, the first three months reflecting fixed and binding quantities, the following nine months being the non-binding forecast." It also required that "Patterson shall establish a ***list of customers of Contractual Products*** and shall, at the request of SIRONA, ***allow SIRONA to review and copy such list***."

48. Defendant Slovin and Sirona's general counsel were listed as the points of contact for all notices from Patterson under the 2012 CAD-CAM Distributorship Agreement. Defendant Slovin also signed this agreement.

49. Similar to the 2012 CAD-CAM Distributorship Agreement, the 2012 Schick/Sirona Distributorship Agreement required that:

> Patterson shall make regular reports ***in the manner and at the intervals*** reasonable [sic.] ***requested by SIRONA***, in any event ***on a monthly basis***, at the beginning of each month, ***concerning the business with respect to Contractual Products in the Territory, the market situation, economic***

---

[1] Unless otherwise noted, emphasis has been added in this Complaint through bolded and italicized type.

> ***situation and forecast, trade policies, business prospects, activities of competitors*** (provided no legal prohibition on providing such information) and other pertinent developments. In particular Patterson shall, at the beginning of each quarter, report to SIRONA on:
>
> - ***order entry/turnover and backlog, sorted out as to number of units and value, relative to sale regions,***
> - ***stock of Contractual Products relative to sale branches,***
> - market conditions, competitive conditions, competitive products; and
> - personnel changes as regards employees trained by SIRONA for the sale and service of Contractual Products.

The 2012 Schick/Sirona Distributorship Agreement also required that:

> The Parties will meet on a quarterly basis for the purpose of evaluating, in good faith, whether the volume of purchases made by Patterson hereunder, during the most recent quarter and year-to-date, is consistent with, and likely to result in the satisfaction of, Patterson's annual minimum purchase requirements. In addition, without limiting Section 5 hereof, ***on a monthly basis, Patterson will provide SIRONA with detailed information relating to its purchases of Contractual Products from SIRONA including, without limitation, the sales targets and results for each of Patterson's branch offices for that month; a schedule of Patterson's sales for that month with respect to each product included within the Contractual Products***, and any other materials reasonably necessary for SIRONA to ascertain whether Patterson is "on target" to meet its annual and quarterly purchase requirements hereunder.

50. It also required that for orders of Contractual Products, "Patterson shall provide SIRONA with a rolling twelve month forecast on a monthly basis, the first three months reflecting fixed and binding quantities, the following nine months being the non-binding forecast." Defendant Slovin signed this agreement.

51. As a result of all of these reporting requirements, Sirona and, after the Merger, Dentsply Sirona knew, on a monthly basis, that there was insufficient end-user demand for the products Patterson was buying from the Company, and they knew whether Patterson was overbuying Sirona and Schick products and by how much. The Company and its senior

executives also knew that as a result of this excess inventory and lack of end-user demand, the Company's sales, earnings, margins and other reported financial results would be drastically impacted going forward.

52. Patterson's excess inventory of Sirona products is clear.

53. In the year leading up to the announcement of the Merger, when Dentsply Intl. and Sirona were conducting their due diligence for the Merger, Patterson's inventory level was building to excessive levels. The following chart, which is based on Patterson quarterly results, shows the increase from early 2015 through the balance of that year (i.e., before the Merger) and in the three quarters following the Merger of Dentsply Intl. and Sirona on February 29, 2016:

**Patterson Companies Inventory (in $ Million):**

| **Quarter End** | **Inventory**[2] |
|---|---|
| 4/25/15 | 408.4 |
| 8/1/15 | 716.7 |
| 10/31/15 | 752.8 |
| 1/30/16 | 814.4 |
| 4/30/16 | 722.1 |
| 7/30/16 | 799.2 |
| 10/28/16 | 795.5 |

54. On Patterson's calls with analysts during 2015 and 2016, Patterson executives acknowledged that at least a portion of the inventory changes over the time period were attributable to the company's inventory of CEREC systems and other products that it purchased from Sirona. On its November 24, 2015 conference call, Patterson said that it had invested in inventories for the Animal Health business "and to support new equipment product launches in

[2] Patterson's 2015 fiscal year ended April 25, 2015 and its 2016 fiscal year ended April 30, 2016. During the quarter ended August 1, 2015, Patterson Companies completed the acquisition of a privately-held company, Animal Health International, for $1,100,000,000 in cash, which more than doubled the size of Patterson's Animal Health segment. According to Patterson's Form 10-Q filed September 10, 2015, the acquisition price included $195.367 million in inventory. Without that amount, Patterson's inventory increased by ***$112.9 million*** in the quarter ended August 1, 2015.

preparation for the peak selling season in the Dental business." On a February 25, 2016 conference call, after Patterson had disclosed that its inventory level had reached $814.4 million as of January 30, 2016, Patterson's CFO stated: "Part of it is the CEREC build." Further, on Patterson's conference call on August 25, 2016, after Patterson had disclosed that its inventory level stood at $799.2 million as of July 30, 2016, an analyst noted "it does sound like dental equipment inventory was up," and asked, "as we're all trying to figure out end markets here, is any of that inventory moving up a reflection of the equipment sales out the door have slowed here in the last month of two?" Patterson's CEO admitted in his response to this question that the inventories "are up," but sought to describe why that would not prove detrimental to Patterson.

55. As of the quarter ended October 28, 2016, Patterson's inventory stood at $795.5 million – nearly twice the amount of inventory that Patterson held a year and a half earlier on April 25, 2015, and 10 percent (***$78.8 million***) more than the level on August 1, 2015, which reflected the inventory brought into Patterson with the acquisition of Animal Health International. Thus, not counting the inventory brought to Patterson through the June 2015 acquisition of Animal Health International, from April 25, 2015 to October 28, 2016 (which was just before Patterson announced that it would not renew the Exclusive Distribution Agreements), Patterson's inventory increased by ***$191.7 million***.

56. The build-up in Patterson's inventory, excluding the inventory that came over in Patterson's acquisition of Animal Health International, very closely matches the massive destocking that Patterson commenced in conjunction with its announcement in November 2016 that it would not renew the Exclusive Distribution Agreements.

57. According to Dentsply Sirona's Form 10-K for the year ended December 31, 2016, along with the change of the relationship with Patterson from an exclusive to a non-

exclusive distribution arrangement, "Patterson began to reduce inventories in both the United States and Canada." The Company stated that this "negatively impacted the Company's reported sales in the fourth quarter ***by approximately $30 million***."

58. In Dentsply Sirona's first quarter 2017 filings with the SEC and conference call with analysts and investors, the Company reported that Patterson reduced its inventory of Sirona and Dentsply Sirona equipment by ***$9 million in the first quarter of 2017***, and Dentsply Sirona projected then that Patterson would further reduce its inventory of Sirona products by another ***$50 million to $60 million in the second and third quarters of 2017***. The Company's 2017 Form 10-K confirmed that the reduction of inventory by Patterson "continued throughout 2017." It further stated that the Company's anticipated decreases in inventory levels held by the distributors would negative impact the Company's sales by approximately $40 million during 2018.

59. Dentsply Sirona commenced sales to Schein of the products previously covered by Patterson's Exclusive Distribution Agreements in the second and third quarters of 2017, and Dentsply Sirona thereafter referred in its SEC filings and on its conference calls to inventory being held by the two distributors (Patterson and Schein), and increases or decreases in the inventory being held by the two distributors, rather than specifically citing to Patterson inventories. However, given that Schein was building up its inventory of products that previously had been sold by Sirona and Dentsply Sirona exclusively to Patterson for the U.S. market, and given that Schein did not have minimum purchase conditions in its non-exclusive distribution agreements with Dentsply Sirona, it is reasonable to assume that all or nearly all of the destocking that Dentsply Sirona thereafter described in its SEC filings and on conference calls reflected destocking by Patterson.

60. Moving into 2018, on Dentsply Sirona's conference call on May 6, 2018, it stated that its first quarter results had been impacted by approximately $8 million of dealer inventory reductions, and that it anticipated $40 million of total destocking in 2018, most of which would take place in the second quarter of 2018. However, on its conference call on August 7, 2018 – the end of the Class Period – the Company shocked the market and announced that it anticipated an additional $66 million to $76 million in destocking, and that the total anticipated destocking in 2018 was between $100 million and $110 million. This estimate was confirmed in the Company's Form 10-K for the year ended December 31, 2018, which stated that distributor inventories had decreased by ***approximately $100 million for the full year 2018***.

61. Thus, Patterson's destocking of Sirona products from the end of 2016 through the second quarter of 2018 was, ***at a minimum, $189 million***. Because Patterson could not destock from inventory that it did not have, Patterson's excess inventory was at least that amount, which nearly matches Patterson's overall ***$191.7 million inventory build-up*** (excluding the inventory that came with the acquisition of Animal Health International).

62. The build-up in Patterson's inventory clearly resulted from the minimum purchase requirements of its Exclusive Distribution Agreements with Sirona, which caused Patterson to amass vastly excessive inventories of Sirona products by the time of the Merger between Dentsply Intl. and Sirona, and thereafter. However, when asked about this during conference calls, Dentsply Sirona executives failed to inform the market of the glut of inventory being held by Patterson. For example, during the Q&A portion of a May 5, 2016 conference call, a Goldman Sachs analyst asked,

> Was wondering if you could comment on the sales of CAD/CAM specifically? ***As your channel partner in North America had talked about carrying a higher level of inventory coming into this year, I'm just trying to get a balance between what may be they're holding versus what the end-market's really doing.***

Although Defendant Slovin and other senior Dentsply Sirona officers clearly knew, from the required reporting in the Exclusive Distribution Agreements, (a) what inventory of Sirona products that Patterson was holding, (b) what Patterson was obligated to buy under the Exclusive Distribution Agreements, and (c) the sales that were actually being made to end-users of the Company's products, he and Defendant Michel misled investors into believing that CEREC sales were poised for strong future growth, stating:

> Well, certainly, Technology led the way at 6.5% for the quarter and certainly was leading the way in the U.S. as well, and that was led by CAD/CAM. And so the proposition has not changed with regard to us believing that along with Patterson that CEREC will become a standard-of-care, and we're on the appropriate trajectory for that. Keep in mind also that we launched the new Zirconia Blocks, but more critical to that was our SpeedFire. So there was a lot of interests ahead of that, and I think that it's a situation where we've got a lot of opportunities for CEREC in North America and we'll continue to. Uli, do you want to comment …

Following that response, Defendant Ulrich Michel, the Company's CFO, similarly stated:

> No, thank you. You mentioned it with the launch of the SpeedFire, I think people geared up to be ready to deliver, right? And we had a really good growth in CAD/CAM. I think there was nothing to be ashamed of, right? Very solid growth.

63. Dentsply Sirona's knowledge of the excess inventory being held by Patterson is further borne out by the disclosure that the Company made ***for the first time*** in its Form 10-Q for the third quarter 2016 – just before Patterson would announce publicly that it would not be renewing the Exclusive Distribution Agreements – as follows: "***Required minimum purchase commitments under agreements with key distributors may increase inventory levels at those distributors to the extent that future purchase commitments may not be met and could impact the Company's consolidated net sales and net income in a given period or over multiple periods***." It was not coincidental that Dentsply Sirona added this disclosure in its November 4, 2016 filing with the SEC but, notably, even when adding this statement to its Form 10-Q the Company failed to disclose what it knew was the massive glut of inventory that Patterson had

amassed on account of the minimum purchase requirements in the Exclusive Distribution Agreements leading into the Merger and thereafter.

**2. Patterson Terminates the Exclusive Distribution Agreements**

64. On November 22, 2016, Patterson announced that it had decided not to renew the Exclusive Distribution Agreements, which would therefore expire by their terms on September 30, 2017. Dentsply Sirona misleadingly cast the end of the Exclusive Distribution Agreements as a net positive for the Company since (a) Patterson would continue to buy Sirona and Schick products at high levels, and (b) Dentsply Sirona would also be able to sell its products through other distributors. Dentsply Sirona entered into a new and non-exclusive distributorship agreement with Schein on September 1, 2017. But Schein's product purchases could not begin to substitute for the lost Patterson sales. Thus, bringing on additional distributors was of little help and in fact, amplified the inventory problem as the inventory held by Patterson and then by Schein was drastically in excess of end-user demand.

65. The market was unaware of the massive glut of CEREC and other Sirona product inventory being held by Patterson, before and even after Patterson announced that it was terminating the Exclusive Distribution Agreements, as shown in the following analyst reports:

> Northcoast Research report of August 2, 2016 ("The company has more CEREC demand than it can currently service.");
>
> William Blair report of January 19, 2017 (casting termination of Exclusive Distribution Agreements as "short-term" and "near-term" disruption for Dentsply Sirona and Patterson);
>
> JP Morgan report of February 17, 2017 (stating that destocking dynamic "should be temporary" and describing market demand as "healthy");
>
> Morgan Stanley report of August 10, 2017 (referring to sales to Schein "as a new leg for growth" and stating that its "greater conviction in [Schein's] potential contribution to CEREC sales give us confidence in >10% organic growth in US in US in "18"); and

> Morgan Stanley report of November 5, 2017, entitled "3Q De-Risks the Story; Clear Commitment to Unlocking Value (stating that "recent headwinds were temporal").

66. The loss of the predictable revenue stream from the minimum purchase requirements, coupled with the lack of end-user demand, had a disastrous impact on Dentsply Sirona's growth prospects as well as its margins, goodwill valuation and certain of its other reported financial metrics.

67. As a result of the fallout from the termination of the Exclusive Distribution Agreements, Dentsply Sirona disclosed in its Form 10-Q for the second quarter 2017 that it had received a request from the SEC for documents and information on its "accounting and disclosures relating to transactions with a significant distributor of the Company."

68. On December 16, 2020, the SEC announced the settlement of its investigation of Dentsply Sirona with the publication of the Cease and Desist Order (Appendix A hereto). The Cease and Desist Order contains numerous factual findings by the SEC that confirm Defendants' knowledge of the excess inventory carried by Patterson as a result of the minimum purchase requirements of the Exclusive Distribution Agreements. Specifically, the Cease and Desist Order confirms that by the end of the first quarter of 2016, at the latest, Dentsply Sirona's top executives were aware of, but failed to disclose, a massive build-up of inventory in the distribution channel arising from minimum purchase requirements that were in excess of end-user demand and the material risks to Dentsply Sirona's financial condition arising from this inventory build-up.

69. The SEC summarized its findings as follows:

> [Dentsply Sirona] failed to make required disclosure of known trends and uncertainties in its periodic filings for the first three quarters of 2016 (the "Relevant Period"). [Dentsply Sirona] sold more of its dental technologies equipment to its Exclusive Distributor for the United States (the "Exclusive Distributor") [*i.e.*, Patterson] than the distributor could sell to retail purchasers. [Dentsply Sirona] knew during the Relevant Period that retail demand for certain

> of its technology products was not keeping pace with the Exclusive Distributor's purchases and that inventory levels at the Exclusive Distributor were at an all-time high. By second quarter of 2016, [Dentsply Sirona] also knew that the Exclusive Distributor wanted to negotiate key terms of its next contract to reduce its inventory levels. In third quarter 2016, [Dentsply Sirona] was negotiating with the Exclusive Distributor to minimize the financial impact of the excess inventory on [Dentsply Sirona's] net sales in the future, but knew the outcome of those negotiations was uncertain. Each quarter, [Dentsply Sirona] knew the trends or uncertainties were reasonably likely to have a material unfavorable impact on net sales or revenues. When preparing its quarterly filings, however, [Dentsply Sirona] did not disclose these known trends and uncertainties to investors in its Forms 10-Q for the first three quarters of 2016. By failing to disclose these known trends and uncertainties, [Dentsply Sirona] violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder.

Cease and Desist Order, ¶ 1.

70. Other pertinent findings by the SEC include, but are not limited to the following:

- The minimum purchase requirements that Patterson had to meet to maintain its exclusive ability to sell Dentsply Sirona products in the United States – and which were redacted from the publicly filed Exclusive Distribution Agreements – "increased annually by ten percent for each product line." Cease and Desist Order, ¶ 4.

- Patterson provided Sirona, and later Dentsply Sirona, "with detailed reports concerning inventory" and, at times, "sales reports for each technology product for which it had exclusive distribution rights." That information was provided to Dentsply Sirona's executives and business leaders "on a quarterly and annual basis." Cease and Desist Order, ¶ 5.

- From 2013 to 1Q 2016, Patterson's inventory increased by 163%, to $195 million. Throughout the first three quarters of 2016, there was approximately $85-$100 million of excess inventory that had accumulated in the channel. Dentsply Sirona's first quarter 2016 sales "would have been materially lower" but for Patterson's purchase of additional excess inventory pursuant to its minimum purchase requirements. Cease and Desist Order, ¶ 6.

- By the end of the first quarter of 2016, Dentsply Sirona knew that Patterson carried large amounts of excess Dentsply Sirona inventory, and that Patterson's "inventory levels were at all-time highs." Sirona, and later Dentsply Sirona, knew that sales of certain products were not keeping pace with Patterson's purchases and that Patterson was "buying more product … than it could sell." Dentsply Sirona also knew by the end of the first

quarter than Patterson's "efforts to boost retail sales … had not materialized." Cease and Desist Order, ¶ 6.

- In the second quarter of 2016, Patterson informed Dentsply Sirona that it was "no longer committed to achieving" the minimum purchase requirements of the Exclusive Distribution Agreements, and that it "wanted to renegotiate" these agreements and reduce its excess inventory. Excess inventory in the channel represented 8%-10% of Dentsply Sirona's reported net sales in the second quarter of 2016. Cease and Desist Order, ¶ 7.

- In June 2016, Dentsply Sirona's senior executives updated the Company's board of directors on developments with Patterson. The presentation acknowledged that Patterson held approximately "seven to nine months of inventory of major [Dentsply Sirona] product lines and concluded that the 'likely scenario' was that" Patterson would miss the overall minimum purchase target for 2016 and that the Exclusive Distribution Agreements would contractually end on September 30, 2017. The presentation recognized that the minimum purchase requirements, and not end-user demand, were driving sales and that Patterson "'will likely significantly reduce purchases to burn inventory.'" Thus, by the end of the second quarter of 2016, Dentsply Sirona's board and senior executives knew about Patterson's large inventory build, that retail sales were not keeping pace with the growth rates in the Exclusive Distribution Agreements, that Patterson would not achieve the minimum purchase requirements for 2016, that it would not achieve automatic extension of exclusivity beyond September 2017, that Patterson would attempt to sell off its excess inventory before the end of September 2017, and that Dentsply Sirona's sales would be negatively impacted by these events. Cease and Desist Order, ¶¶ 8-9.

- By the end of the third quarter of 2016, Dentsply Sirona knew that Patterson held approximately five to eleven months of inventory (depending on the product line) and that it wanted to reduce excess inventory by at least $60-$80 million. Dentsply Sirona was negotiating with Patterson concerning the renewal of the exclusive distribution agreements and knew that there was uncertainty as to whether the agreements would be renewed. During the third quarter of 2016, excess inventory in the channel represented 9%-10% of Dentsply Sirona's reported net sales. Cease and Desist Order, ¶ 10.

- By the end of September 2016, Dentsply Sirona and Patterson entered into a "stand-still" agreement to give Patterson time to decide whether it would satisfy the requirements to extend exclusivity while the parties attempted to negotiate a solution that would minimize the inventory sell-off's effect on Dentsply Sirona's future sales. Cease and Desist Order, ¶ 10.

- The expected negative impact of Patterson selling its excess Dentsply Sirona inventory began to be realized in the fourth quarter of 2016 and continued into 2017. Patterson's sales of the nearly $85-$100 million in excess inventory it had accumulated materially reduced Dentsply Sirona's reported net sales for the U.S. region in the fourth quarter of 2016 and the first two quarters of 2017. Dentsply Sirona's internal analysis conducted in mid-2017 showed that without $100 million in excess inventory that was sold to Patterson, its average growth rates for the years 2014 through 2016 would have been materially lower. Dentsply Sirona's reevaluation of its future growth rates contributed to the $1.2 billion impairment charge recorded in the second quarter of 2017. Cease and Desist Order, ¶ 11.

71. The SEC stated that as a result of Dentsply Sirona's failure to properly disclose the above material facts to investors, it had violated Item 303(b) of Regulation S-K. Specifically, the SEC noted:

- During the first three quarters of 2016, Dentsply Sirona "failed to disclose known trends and uncertainties as required by Item 303." Cease and Desist Order, ¶ 14.

- Dentsply Sirona's Disclosure Committee, which "included key members of management" who knew of the inventory build at Patterson and retail sales trends, and the likely failure to achieve automatic extension of the Exclusive Distribution Agreement, reviewed Dentsply Sirona's quarterly reports for 2016, but did not disclose these trends as required by Item 303. Cease and Desist Order, ¶ 14.

- Dentsply Sirona's "Form 10-Q for the first quarter of 2016 reported 'positive internal sales growth … led by the Technologies segment,' in the United States due to 'increased demand,'" but this statement omitted that internal sales growth was driven by Patterson's "desire to maintain exclusivity rather than end-user market demand alone." This statement also omitted to disclose that the inventory build at Patterson would likely materially impact future revenue growth. Cease and Desist Order, ¶ 15.

- Dentsply Sirona's "Form 10-Q for the second quarter of 2016 reported 'positive internal sales growth' in the technologies segment in the United States." This statement omitted to disclose that future sales would likely be "negatively impacted by flat retail sales, high inventory at [Patterson], and contract negotiations" with Patterson concerning the Exclusive Distribution Agreements. Cease and Desist Order, ¶ 16.

- Dentsply Sirona's "Form 10-Q for the third quarter of 2016 reported that the technologies segment in the United States 'generated … positive internal sales growth … as a result of higher demand in this region.' It also reported that '[i]nternal sales growth was positive in [the U.S.] region … and was the result of higher demand.'" But these statements omitted that internal sales growth was driven by Patterson's "desire to maintain exclusivity rather than end-user market demand," that the resulting inventory build at Patterson was likely to impact future revenue growth, and that this was especially the case given the likely non-extension of the Exclusive Distribution Agreements. Cease and Desist Order, ¶ 17.

72. As a result of these violations, the SEC required Dentsply Sirona to cease and desist in these violations and any future violations and pay a monetary penalty of $1,000,000 to the SEC.

**B. The Anti-Competitive Scheme Concerning Dental Products**

**1. Background of the Dental Products Market**

73. There are close to 200,000 dentists practicing in the United States. Dentists require a broad range of products in the course of treating patients and operating a dental practice. Dental products include dental supplies and dental equipment used by dentists. Dental supplies are consumable items such as gloves, instruments, toothbrushes, composites, bonding agents and bibs. Dental equipment includes imaging devices, dental chairs, lights and CAD/CAM systems. *See In the Matter of Benco Dental Supply Co., Henry Schein, Inc. Patterson Companies, Inc.*, Before the Federal Trade Commission Office of Administrative Law Judges, Complaint Counsel's Post-Trial Proposed Findings of Fact and Conclusions of Law (Docket No. 9379 April 17, 2019) ("FTC Findings") at ¶¶ 79-81. Dentsply Sirona (and its predecessor companies Dentsply and Sirona) manufactures and sells both consumable dental supplies and dental equipment.

74. In the United States, most dental consumable supplies and equipment is purchased through distributors. Patterson, Schein and Benco are the largest dental products distributors and

have a market share of approximately 80-85 percent. The vast majority (75%) of dental products in the United States go through Patterson and Schein. Manufacturers of dental products, such as Dentsply Sirona, typically do not sell most products directly to end-users. Instead, they rely on dental distributors. FTC Findings at ¶¶ 1447-49, 1458, 1509, 1577.

75. Historically, a substantial portion of Dentsply Sirona's revenue has come from two of the Distributors – Patterson and Schein. According to its 2016 Form 10-K, "Dentsply Sirona distributes approximately half of its dental consumable and technology products through third-party distributors." In 2016, Patterson and Schein each accounted for approximately twelve percent of the world-wide annual revenue of Dentsply Sirona. For the year ended 2015, Schein accounted for more than ten percent of the Company's world-wide consolidated net sales. And for 2016, Patterson accounted for more than ten percent of the Company's world-wide consolidated accounts receivable balance. In the United States, the Company was especially reliant on these distributors for revenue and ultimately to drive growth by increasing demand for these products by dentists.

76. Independent dentists are solo practitioners who own their own dental practices with one or few locations. Most dentists in the United States are independent dentists. Over the past decade, independent dentists have faced economic challenges due to decreasing insurance reimbursements and the growth of multi-location corporate dentistry. To deal with these economic pressures, independent dentists have tried to join Group Purchasing Organizations ("GPOs") or dental buying groups. GPOs are organizations of independent dentists that seek to aggregate and leverage the collective purchasing power of separately owned and managed dental practices in exchange for lower prices on dental products. These buying groups are different from Dental Service Organizations ("DSOs") which consist of large group practices that have

multiple locations combined under a single ownership structure and are part of a corporation. FTC Findings at ¶¶ 57-76, 114-115, 126.

### 2. The Distributors Recognize GPOs Will Harm Prices and Margins

77. GPOs have successfully entered other medical product supply industries as a means for practitioners to save money. The GPOs have been able to leverage members buying power to lower prices paid by practitioners for medical products. Typically, an industry's profitability decreases as customers' buying power increases. Accordingly, as these buying groups were able to extract lower prices, medical product distributors suffered reduced margins and profits. FTC Findings at ¶¶ 130, 150-1, 205.

78. Executives from each of the Distributors were aware that the successful entry of buying groups and GPOs in related medical supplies markets had led to lower margins for distributors. Not surprisingly, these executives feared that the successful entry of dental buying groups would reduce their profits and possibly lead to a price war between the distributors. In fact, the Distributors projected that buying groups could lead to a **more than 50% drop in gross margins** if the distributors dealt with and provided discounts to GPOs. FTC Findings at ¶¶ 129, 196-268.

### 3. The Distributors' Illegal Agreements and Conspiracy

79. Not only would dental GPOs lead to lower prices, but any new lower-cost distributor who entered the dental products market and agreed to provide discounted prices to GPOs would significantly drive down the Distributors' revenues and profit margins. In order to thwart this threat as set forth in the FTC proceedings and other related litigation, the Distributors entered into an illegal and anticompetitive conspiracy to (1) prevent price competition and erosion by agreeing not to provide discounts to or otherwise deal with GPOs and (2) block lower-margin, lower-priced, rival distributors from entering the dental products market and selling to

GPOs and others. Through their illegal conspiracy, the Distributors were able to foreclose new competition, keep prices high and enjoy extraordinary profit margins.

80. Industry participants – such as Dentsply Sirona – were aware of this conspiracy, but investors were in the dark. Also hidden from investors was the assistance provided by the Company to the Distributors' conspiracy, and even more significant, the impact that the conspiracy had on Dentsply Sirona's reported financial results. Indeed, the full scope of the conspiracy was not revealed until February 12, 2018, when the Federal Trade Commission ("FTC") filed a complaint against Patterson, Schein and Benco.

81. The FTC Complaint alleged that the Distributors conspired to "prevent price competition for the business of independent dentists purchasing through buying groups, and the erosion of prices charged to such independent dentists if such buying groups became more prevalent. By entering into a horizontal agreement to restrain price competition, [the Distributors] have engaged in a per se violation of Section 5 of the Federal Trade Commission Act." As further detailed in the FTC Complaint, the Distributors entered into an agreement to refuse to provide discounts to or compete for the business of GPOs. The Distributors entered into, ensured compliance with and monitored their illegal agreement through a series of emails, texts and other communications. The Distributors' conduct unreasonably restrained competition by excluding potentially competing distributors, distorting prices, and undermining the ability of independent dentists to obtain lower prices and discounts for dental products. The FTC Findings include hundreds of emails, texts and telephone calls exchanged by and among the conspirators in furtherance of their scheme.

82. Pursuant to their conspiracy, the Distributors illegally boycotted trade shows sponsored by state dental associations who had agreed to start GPOs for their members that would be supplied by a low-priced distributor. According to the FTC complaint, in October

2013, the Texas Dental Association ("TDA") created TDA Perks, a buying group that would offer its participants lower prices for dental supplies than the Distributors offered. Recognizing this buying group and its low-priced distributor as potential competitive threats, the Distributors illegally agreed to boycott the 2014 TDA annual trade show.

83. In pulling out of the trade show, the Distributors wanted to send a strong message to the TDA and others that state dental associations risked losing the Distributors' support and money if they created buying groups or endorsed the lower-cost distributor. Scores of emails, texts and phone calls show that the Distributors threatened and/or subsequently boycotted other trade shows such as the Arizona Dental Association ("AZDA") Western Regional Conference. Because revenues from these trade shows make up a substantial portion of the operating income of state dental associations, the Distributors' boycotts – and subsequent threats and actual boycotts of other state dental association trade shows – were effective in deterring these associations from pursuing programs similar to TDA Perks and endorsing the lower-cost distributor. FTC Findings at ¶¶ 1149-1158.

84. The conspiracy slowed the formation and growth of dental GPOs enabling the Distributors to charge supra-competitive prices for dental products to end-users which allowed the Distributors to maintain high profit margins. But by 2017, the Distributors could no longer thwart the rise of dental GPOs in the dental product market. Unable to ignore the purchasing power of these buying groups, the Distributors started to do business with the dental GPOs. Schein, for example, entered into a contract with a GPO effective March 1, 2017. And just as the Distributors had feared, the buying groups were able to negotiate discounts for their members. When Distributors had to start providing these discounts to buying groups, the Distributors were forced to offer lower prices that reduced their profit margins. FTC Findings at ¶¶ 1335-1336, 1423, 1432.

**4. Dentsply Sirona's Knowledge of the Conspiracy**

85. Dentsply Sirona, including its predecessor companies Dentsply Intl. and Sirona, was well aware of the Distributors' illegal and anticompetitive conspiracy. As illustrated by the following emails found in the public domain, the Company was both aware of the conspiracy and acquiesced in the Distributors' boycotts of meetings of the Arizona and Texas dental associations:

(a) In December of 2013, Schein's vice president of sales sent an email that suggested "we should get together with a group of other dealers and manufacturers and send [the TDA] a petition." The Schein vice president received and/or shared information from manufacturers, including Dentsply, about participation with the TDA. *In the Matter of Benco Dental Supply Co., Henry Schein, Inc. Patterson Companies, Inc.*, Before the Federal Trade Commission Office of Administrative Law Judges, Complaint Counsel's Post-Trial Proposed Finding of Fact and Conclusions of Law, CX0310052 (Docket No. 9379) (filed April 17, 2019).

(b) On March 6, 2014, Schein's director of merchandise sent an email to a Dentsply national account manager regarding the TDA Perks program. In response the Dentsply manager stated: "Really a state dental association is trying to do this?" The Schein director responded: "Apparently. Need to boycott Texas!" *SourceOne Dental v. Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company,* No.15-cv-05440-BMC, Declaration of Abby L. Bilkiss in Support of SourceOne's Opposition to Patterson Companies Inc.'s and Benco Dental Supply Company's Motions for Summary Judgment, Document 218-2, page 79 of 205 (filed Dec. 1, 2017).

(c) Two Schein emails dated April 9, 2014 regarding the 2014 TDA meeting note that Sirona had "pulled out" of the meeting. *SourceOne Dental v. Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company*, Declaration of Abby L. Bilkiss in

Support of SourceOne's Opposition to Patterson Companies Inc.'s and Benco Dental Supply Company's Motions for Summary Judgment, No.15-cv-05440-BMC, Document 218-2, page 118 of 205 (filed Dec. 1, 2017); *In the Matter of Benco Dental Supply Co., Henry Schein, Inc. Patterson Companies, Inc.*, Before the Federal Trade Commission Office of Administrative Law Judges, Complaint Counsel's Opposition To Respondent Patterson Companies, Inc.'s Motion For Summary Decision [Redacted Public Version], CX2306-003 (Docket No. 9379) (filed Oct. 10, 2018).

(d) An April 24, 2014 email from a Schein vice president & general manager summarizes a call that he had with Dentsply where he was told that Dentsply would inform the TDA that "they feel the TDA has put all manufacturers in a very difficult place and that going forward they won't participate if their dealers don't." *SourceOne Dental v. Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company,* Declaration of Abby L. Bilkiss in Support of SourceOne's Opposition to Patterson Companies Inc.'s and Benco Dental Supply Company's Motions for Summary Judgment, No.15-cv-05440-BMC, Document 218-2, page 181 of 205 (filed Dec. 1, 2017).

(e) A July 30, 2014 email from a Benco regional manager to a Dentsply senior territory manager stated: "Wanted to keep you apprised of our newest competition in AZ. AZDA! They have partnered with Source One Dental to provide dental supplies. Can you let me know if Source One is an authorized dealer of Dentsply? I have communicated with our competition at Schein and Patterson and we are all of the same mind that we will not be supporting a competitor's [AZDA] meeting next year." *In the Matter of Benco Dental Supply Co., Henry Schein, Inc. Patterson Companies, Inc.*, Before the Federal Trade Commission Office of Administrative Law Judges, Complaint Counsel's Pre-Trial Brief, CX1331-001 (Docket No. 9379) (filed Oct. 10, 2018).

(f) An August 28, 2014 email from a Sirona director of special markets to Patterson states: "Historically, at Patterson's direction we have not included buying groups as part of special markets." *In the Matter of Benco Dental Supply Co., Henry Schein, Inc. Patterson Companies, Inc.*, Before the Federal Trade Commission Office of Administrative Law Judges, Complaint Counsel's Memorandum of Law in Opposition to Respondent Patterson's Motion to Dismiss the Case Against Patterson in its Entirety, RX0333-00001 (Docket No. 9379) (filed Feb. 12, 2019).

(g) A September 11, 2014 internal Patterson email states: "I called Steven at Sirona w/a product question and he mentioned there is an issue with whether or not [a customer] would qualify since they are a buying group vs. a Dr. owned practice…." *In the Matter of Benco Dental Supply Co., Henry Schein, Inc. Patterson Companies, Inc.*, Before the Federal Trade Commission Office of Administrative Law Judges, Complaint Counsel's Memorandum of Law in Opposition to Respondent Patterson's Motion to Dismiss the Case Against Patterson in its Entirety, RX0342-000002 (Docket No. 9379) (filed Feb. 12, 2019).

86. Not only was the Company complicit in the Distributors' boycott of organizations that forged alliances with buying groups, it also took affirmative steps to assist the Distributors in eliminating on-line distributors who sold so-called "gray market" dental products at discounted or reduced prices. Specifically, in coordination with the Distributors, Dentsply Sirona: (i) engaged in a misinformation campaign telling dentists not to purchase discounted products from unauthorized on-line distributors because the products were purportedly of a lower quality and dangerous for patients – even though the Company knew the products were identical to those sold by the Distributors; and (ii) threatened and filed vexatious trademark and tortious interference litigation for the purpose of injuring these unauthorized dealers and preventing them from selling its products.

87. Dentsply Sirona maintained a system known as SIEBEL that it used to coordinate with the Distributors in efforts to police gray market sales. The database contains the purchasing history of end user dental offices. Pursuant to their agreements with the Company, the Distributors were required to provide on a weekly basis actual transactional purchase data by end user customers, including the customer's name, address, SKU number, product description, date sold, units sold, price and sale value. The information is maintained on the SIEBEL database. The database also includes reports by Dentsply Sirona field sales representatives about their visits to end users and the end users' purchase of gray market products. Dentsply Sirona's senior management have access to the SIEBEL database. Among other uses of the system, Dentsply Sirona used the SIEBEL database to target end users about the purported dangers of using gray market products and to direct the Distributors to pursue face-to-face meetings with dental offices purchasing such products.

88. Dentsply repeatedly conveyed to the Distributors that it was actively engaged in efforts to eliminate gray market sales, including:

(a) An April 1, 2013 email from a Dentsply senior territory manager to Team Patterson stating: "Dentsply is doing more than any other manufacturer to limit the spread of our products thru gray market/low cost/ unauthorized dealers…Gray market severely hurts both of our bottom lines! Finally, remember Dentsply representatives are paid on your sell price; not by wholesale price or units sold!" *Dentsply International Inc. v. Dental Brands for Less LLC*, Declaration of Arnold I. Kalman and Exhibits in Support of Dental Brands for Less LLC's Motion for Summary Judgment, Exhibit 55 at FK006508 (Document No. 318-4) (filed Nov. 29, 2018).

(b) An October 21, 2014 email from a Dentsply national account manager to the Henry Schein Leadership Team and another email to the Patterson Leadership Team state:

"As you all know, Dentsply is leading the industry with our efforts to combat gray market products … Together we will stamp out gray market sellers and ensure that our teams and our customer get the credit and quality products they deserve." *Dentsply International Inc. v. Dental Brands for Less LLC*, Declaration of Arnold I. Kalman and Exhibits in Support of Dental Brands for Less LLC's Motion for Summary Judgment, Exhibit 55 at FK006510 (Document No. 318-4) (filed Nov. 29, 2018).

(c) A May 9, 2016 email from a Dentsply Sirona senior regional sales manager to Schein states: "Thought this might be of interest as Dentsply continues to lead the way in eliminating gray market sales. The attached letter and default judgment against Dental Discount Brands strikes directly at Net32 – a consistent source of irritation for both our companies." In response, the Schein employee states: "THANK YOU DENTSPLY FOR HELPING US HOLD OUR MARGINS AND KEEP OUR BUSINESS STRONG." *Dentsply International Inc. v. Dental Brands for Less LLC*, Declaration of Arnold I. Kalman and Exhibits in Support of Dental Brands for Less LLC's Motion for Summary Judgment, Exhibit 21 at FK005727 (Document No. 318-14) (filed Nov. 29, 2018).

(d) A May 12, 2016 email from a Dentsply Sirona vice president of sales to Schein that states: "As your largest consumable partner, we are on a mission to eliminate gray that only helps keep our mutual doctors and patients safe and assured that our products only go through our authorized dealer network…This news only helps the partnership." *Dentsply International Inc. v. Dental Brands for Less LLC*, Declaration of Arnold I. Kalman and Exhibits in Support of Dental Brands for Less LLC's Motion for Summary Judgment, Exhibit 17 at FK005710 (Document No. 318-11) (filed Nov. 29, 2018).

(e) A May 12, 2016 email from a Dentsply Sirona vice president of sales to Patterson that states: "We share a common mission of eliminating gray…Looking forward to our

mutual mission of eliminating it once and for all." *Dentsply International Inc. v. Dental Brands for Less LLC*, Declaration of Arnold I. Kalman and Exhibits in Support of Dental Brands for Less LLC's Motion for Summary Judgment, Exhibit 18 at FK005711 (Document No. 318-12) (filed Nov. 29, 2018).

(f) A May 26, 2016 email from a Dentsply Sirona caulk restorative representative to Distribution Partners states: "No other manufacturer is doing what we have done and continue to do in shutting down gray dealers…You are less vulnerable to getting picked off by gray dealers when you sell and support Dentsply Sirona." *Dentsply International Inc. v. Dental Brands for Less LLC*, Declaration of Arnold I. Kalman and Exhibits in Support of Dental Brands for Less LLC's Motion for Summary Judgment, Exhibit 13 at FK006891 (Document No. 318-13) (filed Nov. 29, 2018).

**5. The Conspiracy Buoys Dentsply Sirona's Financial Results**

89. Dentsply Sirona assisted the Distributors because the Company benefitted from the conspirators' sales of products at supra-competitive prices. The Company was able to sell products to the Distributors at inflated prices and high profit margins because the aim and effect of the conspiracy – to eliminate competition from low-priced distributors and GPOs that would have demanded lower prices on the dental products they would have purchased for their member dentists – allowed the Distributors to, in turn, resell Dentsply Sirona (and earlier resell Dentsply Intl. and Sirona) products at inflated prices and margins. As long as the Distributors were able to re-sell Dentsply Sirona's products at prices where they could maintain large profit margins, the Distributors would not seek significant discounts from or oppose the Company's pricing and price increases. If the low-priced potential distributors and GPOs were allowed to enter the market, the Distributors' prices and margins would be reduced thereby negatively impacting Dentsply Sirona's own prices and margins.

90. In a July 2018 report concerning Schein, William Blair noted that investor "fears have grown over the past year about the structural challenges facing dental distributors, such as sluggish end-market growth, customer consolidation, and the threat of leakage to ecommerce platforms." The report went on to state: "Further increases in pricing transparency and awareness of alternative distribution models will likely drive dentists into buying groups to consolidate buying power and force pricing of the traditional distributors down. We expect that transparency and the increase in buying groups over time will force distributors to offer better pricing to retain current customers and win new customers…" In a report the same day on Dentsply Sirona, William Blair adjusted its model based on its buying group analysis. Specifically, the report explained that: "[a]lthough the analysis we performed directly relates to Henry Schein, we believe that there could be corresponding impact to manufacturers as distributors may seek to offset any pricing erosion through updated purchasing arrangements with manufacturers. As a result of both this factor and continued soft end-market fundamentals, we are lowering our consumables top-line growth targets in 2018 and beyond for Dentsply Sirona."

91. While the conspiracy continued, Dentsply Sirona was able to report inflated revenues, earnings and profit margins. Dentsply Sirona misled investors about the impact of the scheme on the Company's financial condition and results. But when the effects of the Distributors' conspiracy waned, Dentsply Sirona's reported sales, profits and earnings could no longer be buoyed by the conspiracy. Faced with pricing pressures, Dentsply Sirona's sales, earnings and margins eroded. And to address its lack of growth and decline in margins, Dentsply Sirona announced a restructuring program at the end of the Class Period. The restructuring program included, among other things, a sales force effectiveness component and supplemental sales efforts to address dwindling margins and diminished product demand.

### C. Dentsply Sirona's Issuance of Overstated Goodwill and Financial Guidance

92. In connection with the Merger, the Registration Statement stated that Dentsply Intl. and Sirona had $1.9 billion and $585 million in net goodwill, respectively, as of September 30, 2015. The Registration Statement further stated that the Merger would create $3.5 billion in new goodwill, leading Dentsply Sirona to report a net goodwill of approximately $6 billion for the combined company. The Registration Statement also stated that Dentsply Intl. and Sirona had intangible assets valued at $600 million and $216.8 million, respectively, and that the combined company would have intangible assets valued at nearly $3.1 billion.

93. Significantly, Dentsply Sirona's goodwill and indefinite-lived asset valuations depended in large part on the Company's distribution arrangements with the Distributors, including the Exclusive Distribution Agreements with Patterson for U.S. sales of its technology and equipment products, as well as results and forecasts that were predicated, in part, on the anticompetitive scheme.

94. The goodwill and intangible asset valuations in the Company's quarterly and annually reported financial results after the Merger, as well as in the Registration Statement, were materially false and misleading because Defendants knew or recklessly disregarded that prior to the Merger, Dentsply Intl.'s and Sirona's goodwill and intangible assets had been inflated artificially by the anticompetitive scheme described above; that Sirona had supplied Patterson with a continuing level of excess inventory that made it highly likely that Patterson would not renew its exclusive distribution relationship resulting in the loss of a steady and predictable stream of high-margin revenue; and that end-user demand for the products that had been subject to the Exclusive Distribution Agreements with Patterson would inevitably be adversely affected by the existing and growing inventory backlog. These latter two points have

since been confirmed by the SEC's findings in the Cease and Desist Order, ¶¶ 5-11. In the first quarter of 2016, Dentsply Sirona's executives were aware that Patterson's inventory levels were at an "all-time high[]", which was likely to negatively impact Dentsply Sirona's sales. Cease and Desist Order, ¶ 6. Defendants also knew that the Exclusive Distribution Agreements, not end-user demand, were driving sales, that Patterson held $85-100 million of excess inventory, and that Dentsply Sirona sales in the U.S. would have been materially lower if Patterson had not been required to purchase excess inventory. *Id.* These same executives knew that the excess inventory represented 8-10% of Dentsply Sirona's net sales for the second quarter of 2016, that Patterson held seven to nine months of Dentsply Sirona inventory by that time, that Patterson would likely miss its minimum purchase requirement for 2016, that Patterson would not attempt to retain exclusivity past the end of the termination date of the Exclusive Distribution Agreements (9/30/17), and that the contractual requirements of the Exclusive Distribution Agreements were disconnected from end user demand due to the requirement that Patterson "purchase 10% above 2011 base, compounded annually." Cease and Desist Order, ¶¶ 7-9. This information was also specifically presented to the Dentsply Sirona board in June 2016. Cease and Desist Order, ¶ 8. By the end of the third quarter, Dentsply Sirona's executives knew Patterson was carrying five to eleven months of excess inventory (depending on the product line), that Patterson wanted to reduce this inventory by $60-$80 million, and at the end of September 2016, Dentsply and Patterson executed a stand-still agreement to give Patterson time to decide whether it would satisfy the contractual requirements of the Exclusive Distribution Agreements. Cease and Desist Order, ¶ 10.

95. In the second quarter of 2017, as more fully described below, as part of the first partial corrective disclosure, the Company took charges of approximately $1.17 billion, consisting of $1.0929 billion for goodwill and $79.8 million for indefinite-lived intangibles. It

further took charges of $581 million in goodwill and $346.7 in indefinite-lived intangibles in the fourth quarter of 2017. However, when asked at a conference call on March 2, 2018 whether there would be any further impairments during 2018, Defendant Alexos, the Company's CFO, gave a "straightforward answer" of "no."

96. But, as further described below, just five months later, on August 7, 2018, the Company announced massive impairments that totaled $1.265 billion, consisting of $1.0858 billion for goodwill and $179.2 million for indefinite-lived intangibles. With these charges at the end of the Class Period, the Company's reported net goodwill fell from $4.57 billion as of March 30, 2018 to $3.46 billion as of June 30, 2018.

97. Similarly, following the Merger, Dentsply Sirona issued highly misleading financial guidance based in large part on results that the Company achieved utilizing sales, earnings and margins augmented by the impact of the minimum purchase requirements in the Exclusive Distribution Agreements with Patterson and the Distributors' anticompetitive conduct. By presenting financial guidance that did not take into account the impact of Patterson's excess inventory and the Distributors' anticompetitive scheme, Dentsply Sirona and the Officer Defendants conveyed a misleading impression that the Company's growth was on a sustainable path when, in fact, it was not.

98. Only when the Company was forced to disclose the true impact of the schemes that had served in the past to prop up its reported revenues, earnings and margins did investors learn that Dentsply Sirona's projected growth could not be sustained. Thus, for example, in August 2017, when Dentsply Sirona incurred a $1.17 billion impairment charge, it reduced its 2017 EPS guidance to a range of $2.65-$2.70 after previously projecting a range of $2.80-$2.90. Similarly, when, in August 2018, the Company incurred a $1.265 billion impairment charge, it

reduced 2018 EPS guidance to a range of $2.00-$2.15 after previously projecting a range of $2.70-$2.80 just six months earlier.

### D. The Truth Concerning Dentsply Sirona's Financial Condition Is Gradually Revealed

99. On August 9, 2017, Dentsply Sirona announced its financial results for the second quarter ended June 30, 2017, reporting a net loss of $1,050.3 million (a $4.58 EPS loss) for the quarter, which included a goodwill and intangible asset impairment charge of nearly $1,172.7 million. The Company reduced its 2017 EPS guidance to $2.65-$2.70 after only three months earlier reaffirming guidance of $2.80-$2.90. In its second quarter Form 10-Q filed on the same day, Dentsply Sirona disclosed that the goodwill impairment charge resulted primarily from lower sales, steeper sales declines, an increase in competition, and changes in its distribution relationships and end-user business model. Defendant Slovin commented in the Company's earnings release that "[o]ur results were impacted by a number of factors, the largest of which are headwinds associated with Patterson reducing its inventory in North America and the transition of North American distribution."

100. Dentsply Sirona also disclosed in its Form 10-Q for the second quarter 2017 that it had received a request from the SEC for documents and information on its "accounting and disclosures relating to transactions with a significant distributor of the Company." Indeed, despite receiving detailed information from Patterson about its inventory and retail sales from 2013 through the time of the Merger and thereafter (Cease and Desist Order, ¶ 5), Sirona (and later Dentsply Sirona) knew but failed to account for or report, among other things, that Patterson's inventory of Dentsply Sirona technology products increased from by 163% from $74 million to $195 million from 2013 to the 1Q 2016, Patterson was holding approximately $85-$100 million in excess inventory from the time of the Merger through the 3Q 2016, and the excess inventory

in the channel represented up to 10% of Dentsply Sirona's reported net sales in the second and third quarters of 2016. Cease and Desist Order, ¶¶ 6-10.

101. Despite the impairment charge, reduced guidance, and disclosure of the SEC request, Defendants misleadingly portrayed the setbacks as temporary and that Dentsply Sirona was poised for continued growth. As Defendant Slovin stated on the Company's earnings call, "In the back half of the year, we expect earnings growth as high-tech equipment returns to growth" and "I want to really highlight is the guidance that we lowered today also reflects 5-7% growth in the back half of the year. … [W]hat you should focus on really is the guidance we gave today and the fact that 7% in the back half. And … a critical driver for this is our Technologies, which means CAD /CAM and imaging playing an important role."

102. On this news, the price of Dentsply Sirona common stock dropped more than 8% from its close of $61.41 per share on August 8, 2017, to $56.23 per share on August 9, 2017, on unusually high volume of over 6 million shares trading.

103. On October 2, 2017, less than two months after the Company disclosed it was cooperating with the SEC investigation, Dentsply Sirona announced the sudden departure of three of its top executives, Defendants Slovin, Clark, and Wise. However, according to a William Blair report of October 2, 2017, despite these departures, "Management reiterated its 2017 guidance of $2.65 to $2.75," which was originally provided on the second quarter earnings call. The report continued: "We view this statement as an important reassurance that at least some rebound in U.S. Technology growth took place in the now completed third quarter, with more likely in the fourth quarter." By the close of the trading day, the price of Dentsply Sirona common stock dropped nearly 6%, from a close of $59.81 per share on September 29, 2017 to $56.33 per share on October 2, 2017, on unusually high volume of nearly 6.5 million shares trading.

104. The Company, however, continued to tout the false narrative that the end of the Exclusive Distribution Agreements with Patterson would be a long-term net positive for Dentsply Sirona, while failing to disclose the full extent of the glut of Dentsply Sirona products being held by Patterson. For instance, on November 3, 2017, the Company announced its third quarter 2017 results, which included a 5.8% increase in reported revenue compared to the third quarter 2016. The increase was at least partially attributable to sales to Schein, which, following the lapse of the Exclusive Distribution Agreements with Patterson, had been added as a distributor of the Company's equipment products, including CEREC systems. During the Company's conference call with analysts and investors, CFO Michel stated: "We are beginning to see the benefit of our expanded distribution agreement in equipment." Notably, with the Company's disclosures and statements on November 3, 2017, its stock price ***increased*** that day from $61.16 to $64.60 per share, a 5.95% increase, and it would continue to climb to $67 per share in late November 2017 and to its Class Period high of $68.30 per share on January 8, 2018.

105. Similarly, even when taking an additional charge in the fourth quarter 2017 to reflect a lower projected growth rate in 2018, on March 2, 2018, the Company's new CFO Nicholas Alexos stated: "2017 was clearly a transition year … we have now aligned to better track our inventory." And when asked whether the Company expected to recognize more goodwill impairment charges during 2018, he said: "***the straightforward answer is no***. We obviously have done a very thorough analysis of our business and the valuation of these assets, and this is the determined impairment charge that we've calculated based on our long-range projections of the business."

106. The falsity of these statements and the full impact of the undisclosed massive buildup of inventory at Patterson was not revealed until August 7, 2018, when Dentsply Sirona announced its financial results for the second quarter ended June 30, 2018 and revised its 2018

financial guidance. The Company reported a goodwill and intangible impairment charge of ***$1.265 billion*** and a sharp reduction in 2018 EPS guidance to a range of $2.00-$2.15 (down from the range of $2.55-$2.65 announced just three months earlier). As Dentsply Sirona reported in its second quarter 2018 Form 10-Q filed that day:

> ***The equipment reporting units were negatively affected in connection with the continued transition of the Company's distribution relationships primarily in the U.S. from exclusive to non-exclusive***. The Company's expectations for revenue growth from its non-exclusive distribution relationships, ***which replaced its former long-term exclusive distribution relationship***, were not met. As a result, the Company's forecasts of current and future third-party demand have been reduced as the Company's U.S. distributors continue to offer and promote competitive alternatives to the Company's full CAD/CAM systems and lower-priced alternatives to the Imaging reporting units' products.

The Form 10-Q also disclosed that efforts to reduce inventory were continuing to adversely impact the Company's financial condition, stating: "The increased reduction of inventory being held by the Company's U.S. distributors in the second quarter, which was larger than anticipated for the period, and planned further reductions of inventory, will impact the Company's near-term results."

107. The Company's earnings call on August 7, 2018 further disclosed that the Company's distributors were seeking to significantly reduce their inventory by an additional $60 to $70 million in 2018 – to $100 to $110 million – versus the $40 million figure that the Company's management said on May 7, 2018 was "a number that we can largely manage." As the Company's CEO, Donald Casey, admitted: "We are seeing destocking in both our major partners … we have a wholesale issue." Casey also stated that the Company was "working through a comprehensive review of the organization that will lead to a significant restructuring program."

108. On this news, the price of Dentsply Sirona common stock fell to its lowest price in five years, plummeting from a close of $48.44 per share on August 6, 2018 to $39.41

per share on August 7, 2018 – an 18.6% decline – on extraordinarily high volume of nearly 23.3 million shares traded that day.

## VI. CLASS ACTION ALLEGATIONS

109. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of (i) all persons who purchased the common stock of Dentsply Intl. and Dentsply Sirona during the Class Period and were damaged thereby; (ii) all persons who acquired the common stock of Dentsply Intl. in exchange for their shares of common stock of Sirona in connection with the Merger and were damaged thereby; or (iii) all Dentsply Intl. shareholders who held shares as of the record date of December 2, 2015 and were entitled to vote with respect to the Merger at the January 11, 2016 special meeting of Dentsply Intl. shareholders and were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Dentsply Sirona and their families and affiliates.

110. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of October 31, 2018, Dentsply Sirona had approximately 222 million shares of stock outstanding, owned by many thousands of investors. Further, approximately 101.8 million shares of Dentsply Sirona common stock were issued to former shareholders of Sirona common stock in the Merger, representing about 42% of the approximately 242.2 million total shares of Dentsply Sirona common stock outstanding on the Merger date.

111. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Securities Act and/or the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e) Whether the price of Dentsply Sirona common stock was artificially inflated;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damage sustained by Class members and the appropriate measure of damages.

112. Lead Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

113. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

114. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII. ALLEGATIONS PERTAINING TO LEAD PLAINTIFF'S CLAIMS UNDER SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT

### A. False and Misleading Statements Pertaining to the Favorable Results that Dentsply Sirona and Its Predecessor Dentsply Intl. Achieved as a Result of the Distributors' Anticompetitive Scheme

115. Dentsply Sirona and its predecessor Dentsply Intl. knowingly profited from the illegal anticompetitive conduct of the Distributors. The Company made statements to investors

about the purported state of competition in the industry, the drivers of internal growth and pricing that were false and misleading because they failed to disclose this fact. The Company also reported revenues, earnings, margins and other metrics that were inflated on account of the Distributors' anticompetitive scheme that artificially bulked up the Company's sales and the prices at which the Company's products were sold.

### 1. False and Misleading Statements Regarding Competition

116. On February 20, 2014, Dentsply Intl. filed its Form 10-K for the fiscal year ended December 31, 2013, which was signed by Defendants Wise and Clark. The filing contained materially false and misleading statements concerning the "highly competitive" U.S. dental market. Specifically, the Company stated:

> The Company conducts its operations, both domestic and foreign, under ***highly competitive*** market conditions. ***Competition in the dental and medical products industries is based primarily upon product performance, quality, safety and ease of use, as well as price, customer service, innovation and acceptance by professionals, technicians and patients***. DENTSPLY believes that its principal strengths include its well-established brand names, its reputation for high quality and innovative products, its leadership in product development and manufacturing, the breadth of its product line, its commitment to customer satisfaction and support of the Company's products by dental and medical professionals.

117. On February 20, 2015, Dentsply Intl. filed its Form 10-K for the fiscal year ended December 31, 2014, which was signed by Defendants Wise and Clark. And on February 12, 2016, Dentsply Intl. filed its Form 10-K for the fiscal year ended December 31, 2015, which was signed by Defendants Wise and Clark. Both filings contained identical materially false and misleading statements concerning the "highly competitive" U.S. dental market. Specifically, in both Form 10-Ks, Dentsply Intl. stated that:

> The Company conducts its operations, both domestic and foreign, under ***highly competitive*** market conditions. ***Competition in the dental and medical products industries is based primarily upon product performance, quality, safety and ease of use, as well as price, customer service, innovation and acceptance***

> ***by clinicians, technicians and patients.*** DENTSPLY believes that its principal strengths include its well-established brand names, its reputation for high quality and innovative products, its leadership in product development and manufacturing, its global sales force, the breadth of its product line and distribution network, its commitment to customer satisfaction and support of the Company's products by dental and medical professionals.

118. Following the Merger, Dentsply Sirona filed its 2016 Form 10-K on March 1, 2017, which was signed by Defendants Slovin and Michel. On March 15, 2018, Dentsply Sirona filed its 2017 Form 10-K which was signed by Defendants Casey and Alexos. In the filings, Dentsply Sirona made identical materially false and misleading statements concerning the "highly competitive" U.S. dental market. Specifically, the Company stated in both Form 10-Ks that:

> The Company conducts its operations, both domestic and foreign, under ***highly competitive*** market conditions. ***Competition in the dental and healthcare consumable products and dental technology product industries is based primarily upon product performance, quality, safety and ease of use, as well as price, customer service, innovation and acceptance by clinicians, technicians and patients.*** Dentsply Sirona believes that its principal strengths include its well-established brand names, its reputation for high quality and innovative products, its leadership in product development and manufacturing, its global sales force, the breadth of its product line and distribution network, its commitment to customer satisfaction and support of the Company's products by dental and medical professionals.

119. The above statements in paragraphs 116-118, and similar statements issued by the Company on a quarterly basis, were false and misleading when made because the dental products market was not "highly competitive." Rather, competition was impeded by the Distributors' conspiracy, including the assistance provided by Dentsply Sirona and its predecessors, which foreclosed lower-priced dental distributors from entering the market and stalled the rise of dental buying groups.

### 2. False and Misleading Statements Regarding the Company's Reported Financial Results and Primary Drivers of Internal Growth

120. From 2013 through the first quarter of 2017, Dentsply Intl. and, after the Merger, Dentsply Sirona, reported net sales, gross profit, net income, and adjusted operating margin, as follows:

**Dentsply Int'l / Dentsply Sirona Reported Results by Quarter (Q1 2013 – Q1 2017)**

| Quarter | Net Sales (in $ millions) | Gross Profit (in $ millions) | Net Income (in $ millions) | Adjusted Operating Margin |
|---|---|---|---|---|
| Q1 2013 | 732.1 | 388.2 | 72.6 | 16.2% |
| Q2 | 761.0 | 414.9 | 88.7 | 29.2% |
| Q3 | 704.0 | 376.4 | 80.9 | 17.9% |
| Q4 | 753.7 | 397.8 | 76.0 | 17.2% |
| 2013 Total | 2.950.8 | 1.577 | 318.2 | 17.6% |
| Q1 2014 | 730.1 | 394.2 | 73.0 | 17.7% |
| Q2 | 765.2 | 424.5 | 90.0 | 19.3% |
| Q3 | 708.2 | 388.1 | 75.3 | 18.7% |
| Q4 | 719.0 | 393.1 | 84.7 | 17.7% |
| 2014 Total | 2,922.6 | 1,599.8 | 322.9 | 18.4% |
| Q1 2015 | 656.3 | 373.4 | 64.0 | 18.7% |
| Q2 | 698.0 | 399.7 | 44.1 | 21.1% |
| Q3 | 648.9 | 369.5 | 84.4 | 20.9% |
| Q4 | 671.1 | 374.7 | 58.7 | 19.9% |
| 2015 Total | 2,674.3 | 1,517.2 | 251.1 | 20.2% |
| Q1 2016[3] | 772.6 | 418.9 | 125.3 | 22.7% |
| Q2[4] | 1,022.0 | 526.9 | 105.9 | 23.1% |
| Q3 | 954.2 | 513.6 | 92.3 | 20.8% |
| Q4 | 996.5 | 541.5 | 107.0 | 21.0% |
| 2016 Total | 3,745.3 | 2,000.9 | 431.4 | 21.8% |
| Q1 2017 | 900.5 | 492.0 | 59.7 | 16.6% |

121. In each of the following SEC filings, Dentsply Intl. and, after the Merger, Dentsply Sirona, made virtually identical statements regarding the "primary drivers" of the Company's internal growth: (a) 2013 Dentsply Intl. Form 10-K filed on February 20, 2014; (b) Dentsply Intl. Form 10-Qs for the first, second and third quarters of 2014 filed on May 6, 2014,

[3] Q1 2016 includes one month of Sirona results.
[4] Q2 2016 is the first full quarter with Sirona results.

July 31, 2014, and October 29, 2014; (c) 2014 Dentsply Intl. Form 10-K filed on February 20, 2015; (d) Dentsply Intl. Form 10-Qs for the first, second and third quarters of 2015 filed on May 6, 2015, July 30, 2015, and October 30, 2015; (e) 2015 Dentsply Intl. Form 10-K filed February 12, 2016; (f) Dentsply Sirona Form 10-Qs for the first, second and third quarters of 2016 filed on May 6, 2016, August 5, 2016 and November 4, 2016; (g) 2016 Dentsply Sirona Form 10-K filed on March 1, 2017; (h) Dentsply Sirona Form 10-Qs for the first, second and third quarters of 2017 filed on May 10, 2017, August 9, 2017, and November 11, 2017; (i) 2017 Dentsply Sirona Form 10-K filed on March 15, 2018; and (j) Dentsply Sirona Form 10-Q for the first quarter of 2018 filed on May 7, 2018.

122. In each of these SEC filings, the Company represented, with slight modifications, that the "primary drivers of internal growth" included global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education.

123. Dentsply Intl.'s and Dentsply Sirona's reported financial results and its statements concerning the primary drivers of internal growth, as set forth above in paragraphs 120-122, were false and materially misleading when made. The Company misrepresented the primary drivers of its internal growth by concealing from investors the impact of the Distributors' conspiracy on its reported financial results. Dentsply Intl.'s and Dentsply Sirona's revenues, margins and net income were artificially inflated by the conspiracy. The Company was able to drive growth through sales to the Distributors at inflated prices and profit margins because the aim of the conspiracy – to eliminate lower-priced distributors and the formation of new dental buying groups that would have demanded discounted prices – allowed the Distributors to, in turn, resell the Company's products at inflated prices and margins. As long as the Distributors were able to resell the Company's products at prices where they could maintain large profit margins, the

Distributors would not seek significant discounts from or object to the Company's pricing and price increases. Without the benefits from the conspiracy, the Company's sales, margins and growth would inevitably stall from new competition in the distribution channel and changes in the end-user business model such as the rise of buying groups.

124. After the first few months of 2017, the effects of the Distributors' conspiracy began to dissipate. Among other things, the resulting fall-off in the Company's projected sales, earnings and margins could no longer support the valuations of goodwill and intangible assets on its balance sheet. This was a contributing cause of the massive charges the Company took on August 9, 2017.

125. And, as shown in the following chart, beginning with the first curative disclosure on August 9, 2017, which included the Company's financial results in the second quarter 2017, through the final curative disclosure on August 7, 2018, which included the Company's financial results in the second quarter of 2018, without the Distributors' conspiracy as well as the minimum purchase requirements in the Exclusive Distribution Agreement to prop up the Company's reported results, Dentsply Sirona's net income and profit margins fell drastically lower, and its adjusted operating margin fell drastically lower starting in the first quarter of 2018.

**Dentsply Int'l / Dentsply Sirona Reported Results by Quarter**
**(Q2 2017 – Q4 2018)**

| Quarter | Net Sales (in $ millions) | Gross Profit (in $ millions) | Net Income (in $ millions) | Adjusted Operating Margin |
|---|---|---|---|---|
| Q2 | 992.7 | 544.2 | (1,050.3) | 19.8% |
| Q3 | 1,009.2 | 559.0 | 90.5 | 21.1% |
| Q4 | 1091 | 593.3 | (650.4) | 21.9% |
| 2017 Total | 3,993.4 | 2,188.5 | (1,550.3) | 20.0% |
| Q1 2018 | 956.1 | 514.1 | 81.1 | 14.5% |
| Q2 | 1,042.1 | 552.8 | (1,121.0) | 17.4% |
| Q3 | 928.4 | 476.1 | 27.5 | 13.0% |
| Q4 | 1059.7 | 524.8 | 107.5 | 16.8% |
| 2018 Total | 3,986.3 | 2,067.8 | (1,010.9) | 15.5% |

### 3. False and Misleading Statements Regarding Product Pricing

126. On numerous conference calls with investors and analysts during the Class Period, Defendants made statements with respect to the pricing of the Company's products that were false and materially misleading because they failed to disclose that price increases were enabled by the Distributors' anticompetitive conduct.

127. For example, in response to a question on pricing, a Dentsply Intl. spokesperson made the following statement on the February 18, 2014 conference call: "[O]ur price increases were generally taken back in October. We are pleased in terms of basically at this point what it looks like in terms of what has stuck. And again, I would guide in the range of probably 1.5%, pretty consistent with where we have been in the past." During the same conference call, Dentsply Sirona executives were asked: "The 1.9% organic constant dollar growth that I think you had in the fourth quarter, can you give us a sense about the price component of that was?" In response, another Dentsply Intl. spokesperson stated that the margin line "did improve about 90 basis points in the quarter. Price was a component of that. We did take our – or typically take our price increase on many of our business October 1. Our price increase overall was in the 1.5% range, and we think that most of that appears to have stuck, at least in the quarter. So again that's not on all of our businesses globally but that's on again, our U.S. consumables businesses and several of our international business. So again, there's no doubt that price is a component of the 1.9% organic growth, but I wouldn't say that it's every bit of it."

128. On the May 6, 2015 earning call in response to a question regarding the acceleration of U.S. growth, Defendant Clark stated: "From a price standpoint, we think price is in line with what the traditional price would be. It's typically in the 1.5 point range. We believe, in the U.S. improvements year-on-year, and that's associated with the price increases we took last October."

129. And on the October 28, 2015 conference call, Defendant Clark stated: "…I think our price increase was pretty similar to the rate it's been in prior years, generally in that 1 point to 1.5 point range."

130. The above statements in paragraphs 126-129 were false and materially misleading when made. The Company's statements concealed from investors an important factor for the success of these price increases; namely, the Company was able to successfully implement these price increases because of the Distributors' conspiracy. As long as the Distributors were able to resell the Company's products at prices where they could maintain large profit margins, the Distributors would not seek significant discounts from or object to the Company's pricing and price increases. Without the benefit of the conspiracy, there would have been increased competition that would have an unfavorable impact on the Company's reported financial results and good will.

### B. False and Misleading Statements Pertaining to the Exclusive Distribution Agreements and Patterson's Decision Not to Renew the Agreements

131. As described further in this Complaint, the Registration Statement for the Merger, which closed on February 29, 2016, contained many false and misleading statements, and omitted to state other material facts, relating to the Exclusive Distribution Agreements with Patterson. Among other things, the Company and the other Defendants who signed the Registration Statement and/or controlled the statements made in the Registration Statement failed to disclose that by the time of the Merger, Patterson, as a result of the Agreements' minimum purchase requirements, had amassed far more inventory on hand than it could reasonably sell. These facts have been confirmed by the Cease and Desist Order, in which the SEC found that by the end of 2015 (when the Registration Statement was filed) Dentsply Sirona had received reports from Patterson stating that Patterson held $169 million in inventory (a 128% increase

over 2013) and that in the first quarter of 2016 (when the Merger closed) Patterson's inventory grew by another $26 million (a 163% increase over 2013) to $195 million – an all-time high. Cease and Desist Order, ¶ 6. In this regard, Lead Plaintiff incorporates by reference paragraphs 34-72, above, and paragraphs 272-322, below, as if repeated in full here.

132. Defendants' false and materially misleading statements concerning the Exclusive Distribution Agreements continued after the completion of the Merger. For instance, on the first quarter 2016 earnings call on May 6, 2016, Defendant Slovin stated that the Company had "been ***working closely with our distributors to develop plans that create growth opportunities for ourselves and our partners.***" Moreover, during the Q&A portion of the call, a Goldman Sachs analyst asked:

> Was wondering if you could comment on the sales of CAD/CAM specifically? ***As your channel partner in North America had talked about carrying a higher level of inventory coming into this year, I'm just trying to get a balance between what may be they're holding versus what the end-market's really doing.***

In response, Defendant Slovin misled investors into believing that CEREC sales were poised for strong future growth, stating:

> Well, certainly, Technology led the way at 6.5% for the quarter and certainly was leading the way in the U.S. as well, and that was led by CAD/CAM. And so the proposition has not changed with regard to us believing that along with Patterson that CEREC will become a standard-of-care, and we're on the appropriate trajectory for that. Keep in mind also that we launched the new Zirconia Blocks, but more critical to that was our SpeedFire. So there was a lot of interests ahead of that, and I think that it's a situation where we've got a lot of opportunities for CEREC in North America and we'll continue to. Uli, do you want to comment…

Immediately following that response, Defendant Michel similarly stated:

> No, thank you. You mentioned it with the launch of the SpeedFire, I think people geared up to be ready to deliver, right? And we had a really good growth in CAD/CAM. I think there was nothing to be ashamed of, right? Very solid growth.

133. On that same date, May 6, 2016, in the Form 10-Q that was published for the first quarter of 2016, Defendants made false and misleading statements concerning the reasons for internal sales growth in the United States. Specifically, the Form 10-Q reported:

> United States
>
> Reported net sales, excluding precious metal content, increased by 16.7% in the first quarter of 2016 as compared to the first quarter of 2015. This increase reflects sales of $33.4 million as a result of the consolidation of the Sirona businesses for one month. This excludes approximately $8.8 million of revenue that was eliminated in fair value purchase accounting adjustments to deferred income.
>
> For the full three month period ended March 31, 2016, sales of our combined businesses grew 8.8% on a constant currency basis. This includes a benefit of 3.6% from net acquisitions and was unfavorably impacted by discontinued products by approximately 50 basis points, which results in internal growth of 5.7%. ***Both segments generated positive internal sales growth in the March 2016 quarter, led by the Technologies segment.***

Later, the Form 10-Q stated:

> Technologies
>
> Reported net sales, excluding precious metal content, increased by 61.1% in the first quarter of 2016 as compared to the first quarter of 2015. This increase reflects sales of $109.1 million as a result of the consolidation of the Sirona businesses for one month. This excludes approximately $8.8 million of revenue that was eliminated in fair value purchase accounting adjustments to deferred income.
>
> For the full three month period ended March 31, 2016, sales of our combined businesses grew 9.6% on a constant currency basis. This includes a benefit of 2.8% from net acquisitions which results in internal growth of 6.8%. Net sales, excluding precious metal content, were negatively impacted by approximately 2.3% due to the strengthening of the U.S. dollar over the prior year period. ***Sales growth in this segment reflects increased demand across all regions with the U.S. and Rest of World regions leading the growth.***

134. The SEC has confirmed in the Cease and Desist Order that the above statements from Dentsply Sirona concerning its "positive internal sales growth" in the Technologies segment driven by "increased demand" in the U.S. were false and misleading because these

statements did not also explain that internal sales growth was driven by Patterson's desire to maintain exclusivity rather than end-user market demand. Cease and Desist Order, ¶ 15. The SEC has also confirmed that Dentsply Sirona's reported sales growth for the first quarter of 2016 ***would have been materially lower*** absent the excess inventory purchased by Patterson pursuant to the Exclusive Distribution Agreements. Cease and Desist Order, ¶ 6.

135. Defendants continued to misrepresent the reasons for Technologies' sales growth in the second quarter of 2016. On August 5, 2016, the Form 10-Q that was published for the second quarter of 2016 reported:

> United States
>
> Reported net sales, excluding precious metal content, for the six months ended June 30, 2016, increased by 31.9% as compared to the six months ended June 30, 2015. This increase reflects sales of $154.5 million as a result of the consolidation of the Sirona businesses since the merger date. This excludes approximately $9.9 million of revenue that was eliminated in fair value purchase accounting adjustments to deferred income.
>
> For the six month period ended June 30, 2016, sales of our combined businesses grew 6.2% on a constant currency basis. This includes a benefit of 3.4% from net acquisitions and was unfavorably impacted by discontinued products by approximately 50 basis points, which results in internal growth of 3.3%. ***Both segments generated comparable positive internal sales growth for the six months ended June 30, 2016.***

Later, the Form 10-Q stated:

> Technologies
>
> ***Reported net sales, excluding precious metal content, increased $398.8 million as compared to the six months ended June 30, 2015.*** This increase reflects sales of $409.3 million as a result of the consolidation of the Sirona businesses since the merger date. This excludes approximately $10.4 million of revenue that was eliminated in fair value purchase accounting adjustments to deferred income.
>
> For the six month period ended June 30, 2016, sales of our combined businesses grew 6.2% on a constant currency basis. This includes a benefit of 2.6% from net acquisitions which results in internal growth of 3.6%. Net sales, excluding precious metal content, were negatively impacted by approximately 1.3% due to

> the strengthening of the U.S. dollar over the prior year period. Sales growth in all regions was led by the Rest of World region.
>
> The operating income increase for the six months ended June 30, 2016 as compared to 2015 reflects the impact of the merger.

136. Again, the SEC found that the above statements from Dentsply Sirona concerning its "positive internal sales growth" in the Technologies segment in the U.S. were false and misleading because these statements did not explain that internal sales growth would be negatively impacted by flat retail sales, high inventory at Patterson, and contract negotiations with Patterson concerning the Exclusive Distribution Agreements. Cease and Desist Order, ¶ 16. The SEC also found that 8-10% of Dentsply Sirona's reported net sales for the second quarter of 2016 were from the excess inventory that Patterson had accumulated as a result of the Exclusive Distribution Agreements, rather than end-user demand. Cease and Desist Order, ¶ 6. As a result, of the $1,022 million in net sales reported for that quarter, $81-$102 million resulted from the excess inventory at Patterson.

137. Defendants continued to misrepresent the reasons for Technologies' sales growth in the third quarter of 2016. On November 4, 2016, the Form 10-Q that was published for the third quarter of 2016 reported:

> <u>United States</u>
>
> Reported net sales, excluding precious metal content, for the nine months ended September 30, 2016, increased by 32.6% as compared to the nine months ended September 30, 2015. This increase reflects sales of $244.0 million as a result of the consolidation of the Sirona businesses since the merger date. This excludes approximately $11.0 million of revenue that was eliminated in fair value purchase accounting adjustments to deferred income.
>
> For the nine month period ended September 30, 2016, sales of our combined businesses grew 3.1% on a constant currency basis. This includes a benefit of 2.4% from net acquisitions and was unfavorably impacted by discontinued products by approximately 40 basis points, which results in internal sales growth of 1.1%. ***Both segments generated comparable positive internal sales growth for***

> ***the nine months ended September 30, 2016 as a result of higher demand in this region.***

Later, the Form 10-Q stated:

> Technologies
>
> Reported net sales, excluding precious metal content, increased $676.1 million as compared to the nine months ended September 30, 2015. This increase reflects sales_of $680.2 million as a result of the consolidation of the Sirona businesses since the merger date. This excludes approximately $12.0 million of revenue that was eliminated in fair value purchase accounting adjustments to deferred income.
>
> For the nine month period ended September 30, 2016, sales of our combined businesses grew 4.5% on a constant currency basis. This includes a benefit of 2.0% from net acquisitions which results in internal sales growth of 2.5%. Net sales, excluding precious metal content, were negatively impacted by approximately 60 basis points due to the strengthening of the U.S. dollar over the prior year period. ***Internal sales growth was positive in all regions, led by the Rest of World region, and was the result of higher demand.***
>
> The operating income increase for the nine months ended September 30, 2016 as compared to 2015 reflects the impact of the merger.

138. Again, the SEC found that the above statements from Dentsply Sirona concerning its "positive internal sales growth" as a result of "higher demand" in the Technologies segment in the U.S. were false and misleading because these statements did not explain that internal sales growth was driven by Patterson's desire to maintain exclusivity rather than end-user market demand, and the resulting inventory build at Patterson would likely impact future revenue growth especially given the likelihood that Patterson would not seek to extend the Exclusive Distribution Agreements. Cease and Desist Order, ¶ 17. The SEC further found that 9-10% of Dentsply Sirona's reported net sales for the third quarter of 2016 was attributable to the excess inventory that Patterson had accumulated as a result of the Exclusive Distribution Agreements, rather than end-user demand. Cease and Desist Order, ¶ 10. As a result, of the $954.2 million in net sales reported for that quarter, $86-$95 million resulted from the excess inventory at Patterson.

139. As noted above, on November 4, 2016, the Company disclosed the following for the first time in its Form 10-Q for the quarter ended September 30, 2016: "***Required minimum purchase commitments under agreements with key distributors may increase inventory levels at those distributors to the extent that future purchase commitments may not be met and could impact the Company's consolidated net sales and net income in a given period or over multiple periods***." The filing was made just weeks before Patterson would announce publicly that it would not be renewing the Exclusive Distribution Agreements, and further indicates the Company's and its senior officers' knowledge that Patterson had, in fact, amassed significant excess inventory due to the minimum purchase requirements in the Exclusive Distribution Agreements.

140. The statements in paragraphs 132-139, above, concerning the Company's relationship with its distributors, including Patterson, were false and misleading when made because they failed to disclose, among other things, that Patterson had amassed a huge backlog of excess inventory and that, as a result, sales would be drastically impacted going forward and it was a virtual certainty that Patterson would not renew the Exclusive Distribution Agreements when they were set to expire in September 2017. In making these statements, Defendants further failed to disclose the significant financial impact on the Company if Patterson were to decide to terminate its exclusive distribution agreements with Dentsply Sirona. As noted above, the SEC's Cease & Desist Order confirms that Dentsply Sirona, and its executives and board members, were aware of the amount of excess inventory that Patterson was carrying since at least the first quarter of 2016, that Patterson was unlikely to continue its Exclusive Distribution Agreements with Dentsply Sirona, and that these facts were likely to negatively impact Dentsply Sirona's future sales, but Dentsply Sirona failed to properly report this information to investors. In the first quarter of 2016, Dentsply Sirona's executives were aware that Patterson's

inventory levels were at an "all-time high[]", which was likely to negatively impact Dentsply Sirona's sales. Cease and Desist Order, ¶ 6. The Officer Defendants also knew that the Exclusive Distribution Agreements, not end-user demand, was driving sales, that Patterson held $85-100 million of excess inventory, and that Dentsply Sirona sales in the U.S. would have been materially lower absent Patterson's purchase of excess inventory. *Id.* These same executives knew that the excess inventory represented 8-10% of Dentsply Sirona's net sales for the second quarter of 2016, that Patterson held seven to nine months of Dentsply Sirona inventory by that time, that Patterson would likely miss its minimum purchase requirement for 2016, that Patterson would not seek to retain exclusivity past the end of the termination date of the Exclusive Distribution Agreements (9/30/17), and that the contractual requirements of the Exclusive Distribution Agreements were disconnected from end-user demand due to the requirement that Patterson "purchase 10% above 2011 base, compounded annually." Cease and Desist Order, ¶¶ 7-9. This information was also specifically presented to the Dentsply Sirona board in June 2016. Cease and Desist Order, ¶ 8. By the end of the third quarter of 2016, Dentsply Sirona's executives knew Patterson was carrying five to eleven months of excess inventory (depending on the product line), that Patterson wanted to reduce this inventory by $60-$80 million, and at the end of September 2016, Dentsply and Patterson executed a stand-still agreement to give Patterson time to decide whether it would satisfy the contractual requirements of the Exclusive Distribution Agreements. Cease and Desist Order, ¶ 10.

141. Defendants' false and misleading statements continued even after Patterson announced on November 22, 2016, that it would not renew its exclusive distribution agreements with Dentsply Sirona and would allow the agreements to terminate as scheduled as of September 30, 2017. On the conference call of February 17, 2017, the Company's management addressed

the fact that Patterson had announced the impending termination of its exclusive distribution agreements with Dentsply Sirona. In this regard, Defendant Slovin stated:

> As a result of this decision, and the transition to a non-exclusive relationship later this year, we sold less product to Patterson in Q4, in large part as they began to reduce inventories in North America. We expect this trend to continue in the first half of 2017 as the relationship transitions.

142. However, in an effort to soften the significant financial impact this development would have on the Company, and still not disclosing the massive glut of inventory that Patterson had as a result of the minimum purchase requirements in the Exclusive Distribution Agreements, Defendant Slovin falsely claimed that Dentsply Sirona "share[d] the view with Patterson that broadening our go-to-market strategy in North America will accelerate the adoption of our technologies" and that the "change in our go-to-market strategy will begin reaping benefits [in] growth and accelerating market penetration later this year and into 2018 and beyond." He stated that excluding the impact of these actions, "growth of our U.S. business improved from the first nine months' rate."

143. He further stated:

> To ignite further adoption in the U.S. market, we are expanding our go-to-market approach in the U.S. This will drive faster growth and make CEREC the standard of care. Our North American strategy will drive strong growth in the back half of 2017 and into 2018 and beyond. Top line growth remains at the forefront of our priorities and strategy but we also remain committed to driving leverage through our P&L and driving increased profitability. We anticipate earnings growth to accelerate in the second half of the year.

144. Slovin responded to another question as follows:

> What people seem to forget is it's highly unusual to have 20-year exclusive on products, and as I highlighted, certainly with CEREC and Schick and then on everything for the SIRONA in 2012. And keep in mind, we expect to continue to grow with Patterson, and we've got a very strong and terrific relationship with Schein that is global in its nature, and I know both organizations when they think about their strategy, they think about it with DENTSPLY SIRONA. So, we've got a lot to do, but I want to highlight the fact that right now we have an exclusive

> on our SIRONA products in the U.S. with Patterson, and the biggest focus that we need to do is we need to make sure that our organizations do our very best to sell during this period of time, and focus is critical, having the right resources to be able to address the needs of the dental practitioner is what we're most concerned about, and we will take care of how we go about redefining our strategy later in the year. And we'll obviously explain that in detail. But that's what we've taken into consideration when we gave guidance today.

Similarly, the Company's February 17, 2017 investor presentation stated that the "Company's relationship with Patterson remains strong and the Company expects to continue to distribute the products and equipment underlying the agreements through Patterson on a non-exclusive basis."

145. On May 9, 2017, Dentsply Sirona held a conference call with analysts and investors to address its 2017 first quarter financial results. In his prepared remarks, Defendant Slovin stated:

> This morning we also announced our plans to expand distribution in the U.S. market. We are excited to expand our partnership with Patterson, with a new long-term U.S. distribution agreement that will help drive adoption of our digital technologies and solutions for years to come.
>
> Together, over 20 years, we've created CEREC as the standard for single-visit dentistry in the U.S. We are also excited to expand our relationship with Henry Schein in North America, with a new three-year agreement beginning in September, under which Henry Schein will begin selling our leading equipment brand in the U.S. This should benefit all of our product lines, including Schick Sensors, Treatment Centers, extraoral imaging, and of course, CEREC as well.
>
> Both Patterson and Henry Schein will be critical drivers in accelerating adoption of our digital technology and our unique integrated solutions. We firmly believe our now new go-to-market strategy in the U.S. will accelerate our growth for years to come.

He further stated:

> We're also excited to expand our relationship with Henry Schein and are confident that adding our equipment lines to their sales and service infrastructure should be complementary, as they already know us and our products well. Schein can leverage the knowledge and success they've had selling our technology in Europe. With both distributors carrying our full distributed product line, we will expand our reach into the U. S. market.

146. On the call, Defendant Slovin touted Dentsply Sirona's "unique and important relationship with Patterson," telling investors that "we have confidence in our long-standing relationship with Patterson" and that "[w]e are excited to expand our partnership with Patterson." He further stated that Schein will have "everything with regard to CAD/CAM as well as our imaging products, our Treatment Centers and our instruments. … [I]t's about accelerating growth for us."

147. However, when asked by one of the analysts about the "margin profile of your business through Schein or Patterson," Slovin refused to "get into the contracts that's been agreed to by both parties" but stated that "we are confident that the way we've set up our structure benefits both Henry Schein and Patterson."

148. The statements referred to in paragraphs 141-147 concerning the Company's relationship with its distributors, including Patterson, were false and misleading when made because they failed to disclose, among other things, that Patterson had amassed a huge backlog of excess inventory that it could not resell to end-users and that, as a result, the Company's sales would be drastically impacted going forward. In making these statements, Defendants further failed to disclose the significant financial impact on the Company that the glut of inventory held by Patterson would have, and that Schein's sales of Dentsply Sirona products would similarly be adversely impacted by the glut of inventory of Dentsply Sirona products that Patterson continued to hold. In fact, as the SEC's Cease and Desist Order confirms, since at least the first quarter of 2016, Dentsply Sirona was aware that Patterson was holding up to $100 million in excess inventory of Dentsply Sirona products, but failed to disclose the negative impact that such earlier excess purchases of Sirona and Dentsply Sirona products by Patterson were likely to have on Dentsply Sirona's future sales. Additionally, when Defendant Slovin, on behalf of Dentsply Sirona, made the statements, "To ignite further adoption in the U.S. market,

we are expanding our go-to-market approach in the U.S. This will drive faster growth and make CEREC the standard of care. Our North American strategy will drive strong growth in the back half of 2017 and into 2018 and beyond," he and the Company knew that the new "go-to-market" approach could not drive faster growth because neither Patterson nor any new distributor could work through the existing inventory fast enough to produce "faster growth."

149. Even after the Defendants' partially curative disclosure on August 9, 2017, as further described below, and the termination of the Exclusive Distribution Agreements as of September 30, 2017, the Company and its senior executives continued to conceal the extent of the excess inventory that Patterson held, and the drastic impact that would have on the Company's sales, earnings, margins and goodwill. For instance, on a conference call on November 3, 2017, after the Company issued its third quarter 2017 results, which was attended by then-Interim CEO Mark Thierer, Defendant Michel stated: "We are beginning to see the benefit of our expanded distribution agreement in equipment," noting that "year over year changes in dealer equipment inventory related to the transition in distribution strategy impacted Q3 sales growth favorably by approximately [one] million." He further stated: "We expect performance to rebound here beginning in the fourth quarter." Drawing on these statements, a Morgan Stanley report of November 5, 2017, entitled "3Q De-Risks the Story: Clear Commitment to Unlocking Value," wrote that "Management remains bullish on the ability to return to above-market growth …."

150. Similarly, on March 2, 2018, when addressing a reported $848 million charge to reflect the valuation related to the Company's technology and equipment assets, the Company's new CFO, Nicholas Alexis, stated: "We expect to reduce a large portion of the dealer equipment inventory levels in the first part of the year," and gave a "***straightforward answer [of] no***," when asked if the Company expected to recognize any further goodwill impairment during 2018. And

on May 7, 2018, when the Company reported disappointing results for the first quarter of 2017 from its U.S. Technologies and Equipment businesses and noted that the second quarter would continue to be impacted by "targeted dealer inventory reductions in the first half" of the year, Defendant Casey outlined "the investments and actions we are taking to return us to growth" and Defendant Alexos stated with respect to the $40 million in forecasted inventory reductions: "The answer is yes, we feel very confident. That's a number we can largely manage. It's an important number not only for us, but for our dealer partners."

151. The statements in paragraphs 149-150 concerning the Company's relationship with its distributors and the anticipated inventory reductions of its distributors, including Patterson, were materially false and misleading when made because they continued to fail to disclose, among other things, the magnitude of the backlog of excess inventory that Patterson had amassed; the impact that such excess inventory would have on the Company's sales, earning and margins going forward; and the impact that the excess inventory and the projected lack of sell-through sales would have on the Company's valuations of its goodwill and intangible assets. Indeed, after conducting its own investigation, which included a review of internal Dentsply Sirona documents, the SEC found that since at least the first quarter of 2016, Dentsply Sirona was aware that Patterson was holding up to $100 million in excess inventory of Dentsply Sirona products, and that it would take Patterson up to eleven months to sell-off its excess inventory, but failed to disclose the negative impact that such excess holdings would have on Dentsply Sirona's future sales. Cease & Desist Order, ¶¶ 6-10.

### C. False and Misleading Statements and Omissions of Fact Regarding Goodwill and the Value of Indefinite-Lived Intangible Assets

152. In addition to the false and misleading statements above, Dentsply Sirona also overstated its goodwill and the value of its intangible assets in contravention of Generally

Accepted Accounting Principles ("GAAP"). GAAP refers to the framework of guidelines for financial accounting and reporting used by those who prepare financial statements. The SEC has the statutory authority to codify GAAP, and has delegated that authority to the Financial Standards Accounting Board ("FASB"). SEC Regulation S-X states that financial statements filed with the SEC will be presumed to be misleading or inaccurate, despite footnote or other disclosures, if they are not prepared in compliance with GAAP. SEC Regulation S-X requires that interim financial statements also comply with GAAP, although interim financial statements need not include disclosures that would be duplicative of disclosures accompanying the most recent annual financial statements. SEC registrants are additionally required to maintain sufficient systems of internal controls to ensure fair reporting in conformity with GAAP under SEC Financial Disclosure Rules.

153. GAAP provides guidance on accounting for goodwill. Goodwill represents the excess of the purchase price of all acquisitions over the estimated fair value of the net assets acquired. GAAP in the form of ASC 350-20-35-1, provides that goodwill is tested for impairment at the reporting unit level. GAAP in the form of ASC 350-20-35-2 provides that impairment is the condition that exists when the carrying amount of goodwill exceeds its implied fair value. GAAP in the form of ASC 350-20-35-28 provides that goodwill of a reporting unit shall be tested for impairment on an annual basis. GAAP in the form of ASC 350-20-35-66 provides that where an event occurs or circumstances change that indicate that the fair value of the entity (or the reporting unit) may be below its carrying amount, goodwill is required to be tested for impairment in between required annual impairment tests. And GAAP in the form of ASC 350-20-35-3C provides that triggering events that may result in an interim goodwill impairment test include:

Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;

Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (considered in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development;

Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;

Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;

Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit; and

If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

154. In connection with the Merger, the Registration Statement stated that Dentsply Intl. and Sirona had $1.9 billion and $585 million in net goodwill, respectively, as of September 30, 2015. The Registration Statement further stated that the Merger would create $3.5 billion in new goodwill, leading Dentsply Sirona to report a net goodwill of approximately $6 billion for the combined company. The Registration Statement included statements regarding the valuation of the intangible assets of Dentsply Intl., Sirona, and the combined company.

155. In these regards, the Registration Statement stated the following:

(a) *Intangible Assets, Net*: (1) Dentsply Intl.: $600.4 million; (2) Sirona: $216.8 million; and (3) pro forma combined company, after an acquisition adjustment of approximately $2.26 billion: $3.08 billion.

(b) *Goodwill, Net*: (1) Dentsply Intl.: $1.98 billion; (2) Sirona: $585.9 million; and (3) pro forma combined company, after an acquisition adjustment of approximately $3.52 billion: $6.09 billion

156. The Registration Statement represented that Dentsply Intl. "prepares its financial statements in accordance with GAAP" – that is, U.S. Generally Accepted Accounting Principles – and accounted for the Merger "using the acquisition method of accounting with DENTSPLY being considered the acquirer of Sirona for accounting purposes." As the Registration Statement further stated:

> This means that DENTSPLY will allocate the purchase price to the fair value of Sirona's tangible and intangible assets and liabilities at the acquisition date, with the excess purchase price being recorded as goodwill. Under the acquisition method of accounting, goodwill is not amortized but is tested for impairment at least annually.

157. The Registration Statement also incorporated by reference numerous SEC filings and directed readers to them for further information regarding Dentsply Intl. and Sirona. Concerning how Dentsply Intl. measured the value of goodwill carried by Sirona, the Registration Statement referred investors to Dentsply Intl.'s October 28, 2015 Form 8- K, which stated:

> **Business Acquisitions**
>
> The Company acquires businesses as well as partial interests in businesses. Acquired businesses are accounted for using the acquisition method of accounting which requires the Company to record assets acquired and liabilities assumed at their respective fair values with the excess of the purchase price over estimated fair values recorded as goodwill. The assumptions made in determining the fair

value of acquired assets and assumed liabilities as well as asset lives can materially impact the results of operations.

The Company obtains information during due diligence and through other sources to get respective fair values. Examples of factors and information that the Company uses to determine the fair values include: tangible and intangible asset evaluations and appraisals; evaluations of existing contingencies and liabilities and product line integration information. If the initial valuation for an acquisition is incomplete by the end of the quarter in which the acquisition occurred, the Company will record a provisional estimate in the financial statements. The provisional estimate will be finalized as soon as information becomes available but will only occur up to one year from the acquisition date.

158. By incorporating the October 28, 2015 Form 8-K, the Registration Statement also assured investors that "[t]he Company follows the accounting standards for goodwill and indefinite-lived intangibles," and that "[a]ssessment of the potential impairment of goodwill and other long-lived assets is an integral part of the [Dentsply Intl.'s] normal ongoing review of operations," stating:

**Goodwill and Other Long-Lived Assets**

Goodwill and Indefinite-Lived Assets

***The Company follows the accounting standards for goodwill and indefinite-lived intangibles***, which require an annual test for impairment to goodwill using a fair value approach. In addition to minimum annual impairment tests, the Company also requires that impairment assessments be made more frequently if events or changes in circumstances indicate that the goodwill or indefinite-lived assets might be impaired. If impairment related to goodwill is identified, the resulting charge is determined by recalculating goodwill through a hypothetical purchase price allocation of the fair value and reducing the current carrying value to the extent it exceeds the recalculated goodwill. If the carrying amount of an indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized.

* * *

Impairment Assessment

***Assessment of the potential impairment of goodwill and other long-lived assets is an integral part of the Company's normal ongoing review of operations***. Testing for potential impairment of these assets is significantly dependent on numerous assumptions and reflects management's best estimates at a particular point in time. *The dynamic economic environments in which the Company's businesses operate and key economic and business assumptions with respect to projected selling prices, increased competition and introductions of new technologies can significantly affect the outcome of impairment tests*. Estimates

> based on these assumptions may differ significantly from actual results. Changes in factors and assumptions used in assessing potential impairments can have a significant impact on the existence and magnitude of impairments, as well as the time at which such impairments are recognized. If there are unfavorable changes in these assumptions, particularly changes in the Company's discount rates, earnings multiples and future cash flows, the Company may be required to recognize impairment charges. Information with respect to the Company's significant accounting policies on goodwill and other long-lived assets are included in Note 1, Significant Accounting Policies, to the consolidated financial statements in this Form 10-K. [Italics added.]

159. Concerning how Dentsply Intl. measured the fair value of the goodwill carried on its own balance sheet, the Registration Statement again referred investors to the October 28, 2015 Form 8-K, which stated, in pertinent part, as follows:

> Goodwill is the excess of the purchase price over the fair value of identifiable net assets acquired and liabilities assumed in a business combination. Goodwill is not amortized. Goodwill is tested for impairment annually, during the Company's second quarter, or when indications of potential impairment exist. The Company monitors for the existence of potential impairment throughout the year. This impairment assessment includes an evaluation of various reporting units, which is an operating segment or one reporting level below the operating segment. The Company performs impairment tests using a fair value approach. The Company compares the fair value of each reporting unit to its carrying amount to determine if there is potential goodwill impairment. If impairment is identified on goodwill, the resulting charge is determined by recalculating goodwill through a hypothetical purchase price allocation of the fair value and reducing the current carrying value to the extent it exceeds the recalculated goodwill.
>
> The Company's fair value approach involves using a discounted cash flow model with market-based support as its valuation technique to measure the fair value for its reporting units. The discounted cash flow model uses five-year forecasted cash flows plus a terminal value based on a multiple of earnings. In addition, the Company applies gross profit and operating expense assumptions consistent with its historical trends. The total cash flows were discounted based on market participant data, which included the Company's weighted-average cost of capital. The Company considered the current market conditions when determining its assumptions. Lastly, the Company reconciled the aggregate fair values of its reporting units to its market capitalization, which included a reasonable control premium based on market conditions.

160. As alleged below, the representation that Dentsply Intl. appropriately valued its intangible assets and goodwill and those of businesses it acquired, and that it "considered the

current market conditions when determining its assumptions" in calculating fair value for goodwill purposes, were inaccurate. This is because, among other reasons, Dentsply Intl. did not consider the financial impacts of (a) the excess inventory that Patterson was then holding as a result of the minimum purchase requirements in the Exclusive Distribution Agreements and (b) the Distributors' anticompetitive scheme on the value of its own goodwill and intangible assets or Sirona's.

161. Following the Merger, Dentsply Sirona continued to state its goodwill valuations – which represented more than one-half of the Company's reported assets – in its periodic Forms 10-K and Forms 10-Q filed with the SEC between May 6, 2016 and May 7, 2018, as follows:

| **Reporting Period** | **Reported Net Goodwill** |
|---|---|
| First Quarter of Fiscal Year 2016 | $5.84 billion |
| Second Quarter of Fiscal Year 2016 | $5.79 billion |
| Third Quarter of Fiscal Year 2016 | $6.06 billion |
| Fourth Quarter and Fiscal Year 2016 | $5.95 billion |
| First Quarter of Fiscal Year 2017 | $5.96 billion |
| Second Quarter of Fiscal Year 2017 | $5.02 billion |
| Third Quarter of Fiscal Year 2017 | $5.07 billion |
| Fourth Quarter and Fiscal Year 2017 | $4.54 billion |
| First Quarter of Fiscal Year 2018 | $4.57 billion |

162. The Company similarly continued to provide valuations of its net intangible assets, including its indefinite-lived intangibles, as follows:

| **Reporting Period** | **Reported indefinite-lived intangible assets, Net Carrying Amount** |
|---|---|
| First Quarter of Fiscal Year 2016 | $1.13 billion |
| Second Quarter of Fiscal Year 2016 | $1.10 billion |
| Third Quarter of Fiscal Year 2016 | $1.15 billion |
| Fourth Quarter and Fiscal Year 2016 | $1.09 billion |
| First Quarter of Fiscal Year 2017 | $1.10 billion |
| Second Quarter of Fiscal Year 2017 | $1.10 billion |
| Third Quarter of Fiscal Year 2017 | $1.14 billion |
| Fourth Quarter and Fiscal Year 2017 | $.846 billion |

| **Reporting Period** | **Reported indefinite-lived intangible assets, Net Carrying Amount** |
|---|---|
| First Quarter of Fiscal Year 2018 | $.860 billion |

163. Significantly, Dentsply Sirona's goodwill and indefinite-lived asset valuations depended in large part on the Company's distribution arrangements with the Distributors, including the Exclusive Distribution Agreements with Patterson for U.S. sales of its technology and equipment products, as well as other results that were predicated, in part, on the Distributors' anticompetitive scheme.

164. The goodwill and intangible asset valuations in the Company's quarterly and annual reported financial results after the Merger, as well as in the Registration Statement, were materially false and misleading because Defendants knew or recklessly disregarded that prior to the Merger, Dentsply Intl.'s and Sirona's goodwill and intangible assets had been inflated artificially by the anticompetitive scheme described above; that Sirona had supplied Patterson with a continuing level of excess inventory that made it highly likely that Patterson would terminate its exclusive distribution relationship; and that end-user demand for the products that had been subject to the Exclusive Distribution Agreements with Patterson would inevitably be adversely affected by the existing and growing inventory backlog. Thus, during the remainder of the Class Period, notwithstanding the interim impairment charges that the Company took in the second and fourth quarters of 2017, Dentsply Sirona's goodwill and indefinite-lived intangible assets were overstated by, at the least, $1.265 billion.

165. After the Merger, the Company similarly issued highly misleading financial guidance. Based in large part on results that the Company achieved utilizing sales, earnings and margins augmented by the impact of the minimum purchase requirements in the Patterson Exclusive Distribution Agreements and the Distributors' anticompetitive conduct, as well as

materially misleading statements about what the Company could expect to achieve in the future, the Company issued overstated financial guidance that similarly served to prop up its stock price.

166. The falsity of Defendants' goodwill and intangible asset valuations, as well as their financial guidance, are further confirmed by the findings the SEC made in the Cease and Desist Order. For instance, it confirms that since at least the first quarter of 2016, Dentsply Sirona was aware that Patterson was holding a glut of Dentsply Sirona products; without the sales of excess inventory to Patterson, the Company's average growth rates for years 2014 through 2016 would have been materially lower; and at the same time as the Merger closed – on February 29, 2016 – Sirona and then Dentsply Sirona's executives were aware that Patterson's inventory levels were at an "all-time high[]", which was likely to negatively impact Dentsply Sirona's sales. Cease and Desist Order, ¶¶ 6, 11. Indeed, a reevaluation of growth rates contributed to the $1.2 billion goodwill impairment that Dentsply Sirona took over a year later, on August 9, 2017. Cease and Desist Order, ¶ 11. The Officer Defendants also knew from at least the first quarter of 2016 forward that the Exclusive Distribution Agreements, not end-user demand, was driving sales, that Patterson held $85-100 million of excess inventory, and that Dentsply Sirona sales in the U.S. would have been materially lower if Patterson had not been required to purchase excess inventory. *Id.*, ¶ 6. These executives also knew at the time of the Merger about the onerous minimum purchase requirements of the Exclusive Distribution Agreements, which required an annual 10% increase over 2011 levels for every product line – requirements that were redacted from the published versions of the Exclusive Distribution Agreements. Cease and Desist Order, ¶¶ 4, 8.

167. As reflected in the following chart, it was only when the Company was forced to disclose, from August 2017 to August 2018, the true impact of the schemes that had served in the

past to prop up the Company's reported revenues, earnings and margins – and stock price – that Dentsply Sirona dropped its guidance to sustainable levels.

| Date | Projection Period | Revenue Projections | EPS Projections |
|---|---|---|---|
| 10/28/2015 | FY 2015 | | $2.58 - $2.64 |
| 05/06/2016 | FY 2016 | $3.73B - $3.81B | $2.70 - $2.80 |
| 08/05/2016 | FY 2016 | $3.73B - $3.81B | $2.70 - $2.80 |
| 11/04/2016 | FY 2016 | $3.73B - $3.81B | $2.75 - $2.80 |
| 02/17/2017 | FY 2017 | $3.95B - $4.03B | $2.80 - $2.90 |
| 05/09/2017 | FY 2017 | $3.95B - $4.03B | $2.80 - $2.90 |
| 08/09/2017 | FY 2017 | $3.95B - $3.99B | $2.65 - $2.75 |
| 10/02/2017 | FY 2017 | | $2.65 - $2.75 |
| 11/03/2017 | FY 2017 | $3.95B | $2.65 - $2.70 |
| 03/01/2018 | FY 2018 | $4.2B - $4.25B | $2.70 - $2.80 |
| 05/06-07/2018 | FY 2018 | $4.2B | $2.55 - $2.65 |
| 08/07/2018 | FY 2018 | $3.95B | $2.00 - $2.15 |

168. By presenting revenues and earnings guidance to the market that did not take into account the impact that Patterson's excess inventory and the Distributors' anticompetitive scheme had previously had on the Company's reported revenues, earnings and margins, and that would not be sustainable in the future, the Company and the Officer Defendants further misled the market to the detriment of purchasers of Dentsply Sirona stock.

## VIII. PARTIAL DISCLOSURES, FURTHER MISLEADING STATEMENTS, AND THE GRADUAL EMERGENCE OF THE FULL SCOPE OF THE FRAUD

169. The truth about Dentsply Sirona's financial and operating condition was revealed in a series of corrective disclosures.

170. *First*, on August 9, 2017, the Company reported its financial results for the second quarter of 2017. In its Form 10-Q for the second quarter ended June 30, 2017, which was signed by Defendants Slovin as CEO and Michel as CFO, the Company reported $992.7 million in net sales, $544.2 million in gross profit, and – in large part due to a goodwill and indefinite-lived intangible assets impairment charge of $1,172.7 million – a net loss of $1,050.3 million.

171. Dentsply Sirona's financial results fell short of analyst expectations, and the Company cut its full-year guidance by over 5%, attributing the decline to a slowdown in the Company's equipment sales, primarily in the United States, and significant de-stocking of inventory from its distributors. As Defendants described it, both the Company's profits and sales were below expectations due to a change in the North America distribution strategy and lower equipment and technology sales, which was driven largely by the termination of the Company's exclusive distribution arrangement with Patterson. As Defendant Slovin stated on the conference call with analysts and investors on August 9, 2017: "Second quarter internal sales declined 3.6% driven by a decline in Technologies. … Growth was unfavorably impacted by approximately $19 million or 400 basis points. This came as a result of a quarter-over-quarter changes in net equipment inventory levels at certain distributors."

172. In addition to disclosing the Company's second quarter 2017 results and the nearly $1.2 billion impairment charge, Dentsply Sirona further revealed that the SEC had opened an investigation into the "Company's accounting and disclosures, including its accounting and disclosures relating to transactions with a significant distributor of the Company." That investigation has resulted in the December 16, 2020 Cease and Desist Order discussed above.

173. In explaining the goodwill and other impairment charge more fully during the Company's conference call, Defendant Michel stated:

> As a result of updating the estimates and assumptions following the recent changes in circumstances and in connection with the annual impairment test of goodwill…the company determined that the goodwill associated with the CAD/CAM, imagining and treatment center reporting units were impaired. As a result, the company recorded a goodwill impairment charge of $1.0929 billion. These reporting units were all within the Technologies segment.
>
> The equipment reporting units' goodwill impairment charge was primarily driven by unfavorable changes in estimates and assumptions used to forecast discounted cash flows, including lower forecasted revenues and operating margin rates,

> which resulted in a lower fair value for these reporting units. The forecasted revenues and operating margin rates were negatively impacted by recent unfavorable developments in the marketplace.
>
> These developments included significantly lower retail sales for the fiscal quarter ended April 2017 reported by the company's exclusive North American equipment distributor in May 2017, significant acceleration of sales declines in the quarter ended June 30, 2017 and the execution of new distribution agreements with Patterson Companies, Inc. and Henry Schein, Inc. …
>
> The company also observed an increase in competition, unfavorable changes in the end-user business model, as well as changes in the channels of distribution for the company and its competitors. …
>
> The company also assessed the annual impairment of indefinite-lived intangible assets as of April 30, 2017 which largely consists of acquired tradenames.… [t]he company recorded an impairment charge of $79.8 million for the three months ended June 30, 2017.
>
> The impaired indefinite-lived assets are tradenames and trademarks related to the CAD/CAM and imagining equipment reporting units. The impairment charge was driven by a decline in forecasted sales.

174. Notably, by referring to the "***increase in competition, unfavorable changes in the end-user business model, as well as changes in the channels of distribution for the company and its competitors***," Defendants implicitly admitted that the old regime – under which the three major Distributors, among other things, refused to deal with buying groups and set their prices at artificially inflated levels (which allowed Dentsply Sirona and other manufacturers to do likewise) – no longer existed, and directly impacted the "lowered forecasted revenues and operating margin rates, which resulted in a lower fair value" for certain of the Company's reporting units. And, of course, the references to the "***new distributions agreements" with Patterson and Schein and the lower retail sales "by the company's exclusive North American equipment distributor," which was Patterson***, were belated, albeit only partial, admissions of the significant impact that the Company was facing on account of the glut of inventory that Patterson

had accumulated based on the minimum purchase requirements in its Exclusive Distribution Agreements.

175. However, the Company continued to mislead investors concerning the sources and drivers of its performance. In fact, on the August 9, 2017 conference call, Defendant Michel stated that the Company's "view for the full year has not changed much," and Defendant Slovin stated that "Patterson is absolutely committed to Dentsply Sirona and the proposition that we bring to the dental office," and that the Company's "balance sheet remains strong." Defendant Slovin further stated: "in the back half of the year, we expect earnings growth as high-tech equipment returns to growth." He added that what "I want to really highlight is the guidance that we lowered today also reflects 5% to 7% growth in the back half of the year. … [W]hat you should focus on really is the guidance we gave today and the fact that 7% in the back half. And this is - a critical driver for this is our Technologies, which means CAD/CAM and imaging playing an important role."

176. Dentsply Sirona continued to mislead investors in other respects. Among other things, the Company's statements were false and misleading because they misattributed the sources and causes of Dentsply Sirona's financial performance and they failed to fully disclose the glut of inventory then being held by Patterson and its impact on ongoing sales and margins. Moreover, although the second quarter 2017 results were improved somewhat by some sales of equipment to Schein, Dentsply Sirona and Officer Defendants Slovin, Michel, Wise and Clark knew that the boost that the Company would get from its sales to Schein would only be temporary due to the full extent of the excess inventory being held by Patterson, which Dentsply Sirona and its executives were aware of stemming from the required reports in the Exclusive Distribution Agreements but which was concealed from the investing public.

177. In response to the August 9, 2017 disclosures, the price of Dentsply Sirona stock share price fell by $5.18, or 8.4%, declining from $61.41 per share on August 8, 2017 to close at $56.23 per share on August 9, 2017.

178. *Second*, less than two months after the Company announced its second quarter results and disclosed the SEC investigation, on October 2, 2017, Dentsply Sirona unexpectedly announced the departure of Defendants Slovin, Clark, and Wise, the CEO, COO and Executive Chairman, respectively. As noted in a William Blair report of October 2, 2017, however, the Company's management re-iterated its 2017 guidance that had been provided on the second quarter earnings call. On this news, Dentsply Sirona shares fell another $3.48, or 5.8%, declining from $59.81 per share on September 29, 2017 to close at $56.33 per share on October 2, 2017.

179. Even after these partial disclosures, Dentsply Sirona continued to mislead investors concerning the Company's financial condition. On November 3, 2017, Dentsply Sirona reported its third quarter 2017 results and held a conference call with analysts and investors to address its 2017 third quarter financial results. For the quarter, the Company announced $1.009 billion in net sales, $559 million in gross profit, and $90.5 million in net income.

> For the three months ended September 30, 2017, the Company reported a sales increase of 5.8%, on a constant currency basis sales increased 4.3% and internal growth was 2.4%. Based on the Company's estimate, both constant currency and internal sales growth were favorably impacted by approximately $8 million as a result of current quarter over prior year quarter net changes in equipment inventory levels at certain distributors in North America and Europe. Based on the Company's estimate, inventory held by these distributors increased by approximately $28 million during the current three month period compared to an increase of approximately $20 million in the same three month period in 2016.

And, in describing its distributor agreements, the Company stated:

> The Company had two exclusive distribution agreements with Patterson Companies, Inc. ("Patterson") for the marketing and sales of certain legacy Sirona products and equipment in the United States and Canada. In order to maintain

> exclusivity, certain purchase targets had to be achieved. In the fourth quarter of 2016, Patterson's decision not to extend the exclusivity beyond September 2017 was announced. Following that announcement, in May 2017, the Company entered into a new three-year agreement with Patterson whereby Patterson would continue to distribute the Company's equipment lines in the United States on a non-exclusive basis. In the second quarter of 2017, the Company also entered into two separate multi-year agreements with Henry Schein, Inc. ("Henry Schein") for the distribution of the Company's equipment lines in the United States and Canada. While the agreement with Henry Schein with respect to the United States was effective September 1, 2017, the agreement relating to Canada was effective June 2017. The Company began shipping initial stocking orders for the equipment products to Henry Schein under the agreements in the second quarter of 2017 and expects orders will continue through the balance of 2017. During the second quarter of 2017, the Company also modified its distribution agreement with Henry Schein with respect to the distribution of certain products in France. Based on the Company's estimate, year-over-year changes in distributor inventories associated with these agreements negatively impacted the Company's reported sales in the first nine months of 2017 by approximately $37 million. Based on the Company's estimate, distributor inventories increased during the first nine months of 2016 by approximately $36 million primarily associated with certain distributors making minimum purchase targets required in order to maintain exclusivity. Inventory held by distributors decreased during the first nine months of 2017 by approximately $1 million, based on the Company's estimate. At this time, the Company estimates that net changes in distributor inventories will decrease the Company's sales by approximately $25 million to $30 million for the balance of 2017, which is similar to the impact in the last three months of 2016.

180. During a conference call the same day, Defendant Michel reported that quarterly operating margins were 21.1%, internal growth had increased 2.4%, and stated "***[o]ur growth was driven by strength in the US***, which grew 7.1%." Defendant Michel commented on increases in the Company's reported revenue and gross profit in the third quarter 2017 compared to the third quarter 2016, stating: "***We are beginning to see the benefit of our expanded distribution agreement in equipment***" and "We expect performance to rebound here beginning in the fourth quarter." He further explained that the Company's narrowed guidance implied "***over 20% adjusted EPS growth in the fourth quarter***."

181. The release of these results and the representations made by the Company's management led to a ***5.95% increase*** in the price of Dentsply Sirona stock from a close of $61.16 on November 2, 2017 to a close of $64.80 on November 3, 2017. Indeed, with this information in the market, the Company's stock would thereafter reach a Class Period high of ***$68.30 per share on January 8, 2018***. But that price was not sustainable given the material information that Defendants had continued to conceal from the market, including but not limited to the fact that any improvement in financial results arising from the sale of equipment to Schein would be temporary, due to the massive – yet still concealed – inventory glut amassed by Patterson, which, as the SEC found, was known by Dentsply Sirona, its officers and directors, in the first half of 2016. Indeed, by "estimating" that the net changes in distributor inventories would decrease by "approximately $25 to $30 million for the balance of 2017," which the Company stated was "similar to the impact in the last three months of 2016," the Company was effectively telling the market that it was "business as usual," failing entirely to provide information about the glut of inventory that Patterson was holding that would plague Dentsply Sirona's results going forward.

182. *Third*, on Sunday, May 6, 2018, Dentsply Sirona issued a press release disclosing additional information that further revealed, at least in part, the impact of the termination of the Patterson exclusive distributions agreements on the Company's financial results, reporting that organic revenue growth for the first quarter of 2018 was down 1.4%, driven largely by a 7.6% decline in the U.S. market. The Company further reported that on a segment basis, consumables declined 1.3% year-over-year, while equipment declined 1.6% year-over-year. As a result, the Company announced that it was reducing its EPS guidance for 2018 by $0.15 per share, from $2.70-$2.80 per share to $2.55-$2.65 per share. This was the second time in nine months that the Company had reduced its guidance. The Company also lowered its projected revenue growth in 2018 from approximately 3% to approximately 2%. However, in order to

blunt the negative impact that these and other disclosures made that day would have on the Company's stock price, Dentsply Sirona announced that it was doubling its share repurchase authorization. As a JP Morgan research report of May 7, 2018 stated: "The company also announced a $500M increase to the share repurchase authorization (bringing the total to $1B), which should also help cushion the bottom line in 2018."

183. On May 7, 2018, the Company held a conference call with analysts and investors. Summarizing the results, Defendant Casey said: "In Q1, we saw solid performance in many regions and businesses, weighed down by significant headwinds in the US Technologies and Equipment business." Casey further stated: "As you saw in the press release yesterday, we are adjusting our guidance to reflect what we saw in the first quarter, and more importantly, outline the investments and actions we are taking to return us to growth."

184. Defendant Alexos provided further commentary on the first quarter 2018 results, and explained that the Company's revenue assumptions included a "$40 million targeted reduction in dealer equipment inventory, which is costing us about a 1% internal growth rate, and we are on track to reduce most of that in the first half of 2018." Later, when asked about the $40 million inventory number, Alexos stated "***on the $40 million, the answer is yes, we feel very confident. That's a number we can largely manage. It's an important number not only for us, but for our dealer partners***. And as I stated, we expect most of that to be realized through the end of Q2."

185. On May 7, 2018, the Company's stock fell by 6.14%, from $49.99 at the close on May 4, 2018, to $46.92 per share at the close on May 7, 2018. The next day, various analysts issued reports. On May 8, 2018, a Barrington research report noted that the Company had "confidently reiterated its belief that it would work through its elevated inventory (now around $30 million) at its key distributors by the end of the year, with much of issue being addressed by

the end of the second quarter." Barrington stated that this would represent "good progress and would clear the decks of a fundamental negative that has acted as an overhang on this story for the past few quarters." Nevertheless, Barrington "significantly" reduced its target price for Dentsply Sirona stock from $70 to $54 per share. Analysts at H.C. Wainwright and at Stifel Nicolaus similarly issued reports that cut their target prices for Dentsply Sirona stock. By the close of the trading day on May 8, 2018, the price of the Company's stock fell further, by 5.22%, to $44.47 per share. Thus, over the two trading days, Dentsply Sirona's stock price fell $5.52, or 11%, declining from $49.99 per share on Friday, May 4, 2018 to close at $44.47 per share on Tuesday, May 8, 2018.[5]

186. *Lastly*, on August 7, 2018, as part of its announcement of second quarter 2018 results, Dentsply Sirona disclosed that it was taking a massive goodwill impairment charge of $1.265 billion, largely in the technologies and equipment segments, and announced that it was introducing a "restructuring program" to address diminished product demand and dwindling margins. Dentsply Sirona also cut full year earnings guidance by approximately 20% due to continued significant destocking of product by Patterson and Schein, representing the third cut to its EPS guidance in the span of one year, and further reduced its revenue guidance for 2018 – ***saying that it now expected a 2.0% revenue decline in 2018 versus the prior forecast of 2.0%***

[5] On June 5, 2018, Northcoast Research issued a research report that opined on the root causes of the Company's poorer than expected first quarter 2018 results and its reduced guidance. Among other things, Northcoast wrote that whereas Dentsply Sirona was pointing to "channel inventory headwinds as the issue, … the root of the inventory issue is an end-user demand problem." The report further stated that although the Company had added Schein as a distributor of Sirona products in the United States, "it's not reasonable to think adding HSIC will be enough to offset double digit CEREC declines at PDCO. PDCO has traditionally sold well more than 1,000 CEREC systems in a year, while we only expect HSIC to sell several hundred units." The report further noted that Dentsply Sirona had benefitted from initial channel fill of Sirona products into Schein's warehouses and branch locations, but that continuing into the second half of 2018, the Company would still need to deal with Patterson's declining purchases of CEREC systems.

***revenue growth***. As CFO Alexos stated on a conference call that day: "The revenue guidance for 2018 is now $3.95 billion or a 2% constant currency decline over 2017, which is a $250 million reduction … from the previous guidance."

187. Analysts expressly tied these problems to the increased competition and pricing pressure within the Company's high-tech equipment categories as the demand for its equipment continued to struggle. As a JP Morgan analyst wrote on August 7, 2018: "The company also recorded a goodwill and intangible impairment charge of $1.3B driven mostly by the Tech & Equipment business, blaming the impact of continued transition of dealer relationships in the U.S., lower anticipated revenue/margins in the Imaging and CAD/CAM businesses, an elevated level of inventory destocking, and an increase in both the risk factor and discount rate."

188. Indeed, in sharp contrast to the Company's statement on May 7, 2018, that "we feel very confident" about the $40 million inventory destocking number, CFO Alexos stated on August 7, 2018 that the Company's dealers "are seeking to significantly reduce their inventory by an additional $60 to $70 million in 2018 versus the $40 million that we had planned, resulting in a total inventory reduction in 2018 of $100 million to $110 million." He reiterated that "Our updated EPS estimate is now $2 to $2.15, down from the previous guidance of $2.55 to $2.65." And CEO Casey acknowledged "We are seeing destocking in both our major partners" and finally admitted: "we have a wholesale issue." But, while Dentsply Sirona's CEO finally admitted that the problem was a "wholesale issue" (i.e., that there was insufficient end-user demand compared to the Dentsply Sirona product in the inventory channel), even these admissions failed to reveal the knowledge and information that has come to light only through the SEC's Cease & Desist Order issued December 16, 2020, including that Patterson's inventory of Dentsply Sirona technology products increased from 2013 to the first quarter of 2016 by 163%

from $74 million to $195 million, that Patterson was holding $85-$100 million in excess inventory during the first three quarters of 2016, and that this glut of inventory would negatively impact that Dentsply Sirona's future sales.

189. In addition, Casey stated that the Company was "working through a comprehensive review of the organization that will lead to a significant restructuring program." Casey also explained changes to the Company's go-to-market approach: "Our organization needs to do a better job of becoming responsible for our own demand creation. This pillar includes the addition of 50 new reps in our technology business in the U.S. It also involves implementing our one-customer approach, focusing on building one-to-one relationships with the dentist. We will also finish a significant sales force effectiveness program in the back half of this year that, so far, is very promising."

190. On the call, Casey was asked the following about the restructuring program: "I wonder if you've thought about what you're doing at Dentsply Sirona in as much as it might be particularly similar, different to other markets or other companies where you've worked? And if you might be able to think of analogies that could help investors to think about what the path might look like." Casey responded: "And let's start with demand creation because I think that's really important. Right now, as you saw in kind of the med supply in the med tech space, as you begin to see hospital consolidations, it was no longer in everybody's best interest to try and run 20 different sales forces at a time – at individual hospitals when all of a sudden there was a GPO. So there was a tremendous amount of how do you begin to shift your selling organizations to recognize economic buyers, as well as like clinically-oriented buyers. So I think there's ample examples in the med tech space about how you need to evolve your selling organizations to be reflective of changes in the marketplace, point one."

191. With the disclosures that Dentsply Sirona issued, its shares declined by $9.03 per share, or 18.6%, to close at $39.41 on August 7, 2018, its lowest price in over five years.

192. All told, following the full disclosure of the fraud, Dentsply Sirona's stock price declined by over 40% from its Class Period high, which had been reached just eight months earlier.

## IX. SUMMARY OF SCIENTER ALLEGATIONS

193. Defendants Dentsply Sirona and the Officer Defendants acted with scienter in that each knew or recklessly disregarded that Dentsply Sirona's publicly reported financial results and other statements issued during the Class Period were materially false and misleading. In addition to the allegations set forth previously in this Complaint, the Section 10(b) Defendants' scienter is demonstrated through the following summary:

194. *First*, from at least the time of the Merger forward – as has now been confirmed by the SEC in the Cease and Desist Order – the Company and the Officer Defendants knew that the distribution channels of Sirona, and thereafter Dentsply Sirona, were overloaded with product as a result of the minimum purchase requirements in the Exclusive Distribution Agreements with Patterson. The minimum purchase amounts were known to the Company and the Officer Defendants, but not to the investing public, because such amounts were redacted from the versions of the Agreements filed with the SEC. Specifically, Officer Defendants Slovin and Michel knew of Patterson's excess inventory of CEREC and other Sirona products in their capacities as CEO and CFO of Sirona and, thereafter, Dentsply Sirona. Officer Defendants Wise and Clark would have learned of Patterson's excess inventory through the due diligence done in advance of the Merger, and thereafter in the senior positions they held with Dentsply Sirona.

And Officer Defendants Thierer, Alexos and Casey would have learned Patterson's excess inventory at least by the times they took on their CEO or CFO positions at Dentsply Sirona.

195. As noted above and in the Cease and Desist Order, the Exclusive Distribution Agreements imposed detailed reporting requirements on Patterson, pursuant to which Sirona, and thereafter Dentsply Sirona, regularly received extensive information concerning Patterson's sales and operations as they related to the distribution and sale of the products subject to those Agreements. Defendant Slovin was the signatory on both the 2012 CAD-CAM Distributorship Agreement and the 2012 Schick Distributorship Agreement, and he was a point of contact for the notices required by the 2012 CAD-CAM Distributorship Agreement. The Agreements also mandated quarterly meetings between Patterson and the Company, as well as other regular reports, to apprise Sirona (and later Dentsply Sirona) of the extent to which Patterson was positioned to meet its contractual minimum purchase obligations, as well as its broader sales targets. The Cease and Desist Order confirms that Patterson did in fact supply Sirona, and later Dentsply Sirona, with detailed information about its inventory and retail sales of Technologies products, and that this information was specifically provided to Sirona and later Dentsply Sirona's executives and business leaders. Cease and Desist Order, ¶ 5. In this regard, Lead Plaintiffs incorporates paragraphs 34-72, above, as if set forth here in their entirety.

196. As is clear from these meeting and reporting requirements, Sirona was always well aware of Patterson's actual and forecasted sales and progress towards satisfying the minimum purchase requirements. Indeed, as a result of these meetings and reporting requirements, Patterson regularly informed Sirona of its actual and forecasted sales and progress toward satisfying the agreements' minimum purchase requirements and growth targets.

197. Dentsply Intl. became aware of the true state of Patterson's purchases pursuant to the Agreements' minimum purchase requirements and the excess inventory it was holding by the

time of the Merger. As stated in the Registration Statement, Dentsply Intl. conducted extensive due diligence on Sirona's business before agreeing to merge with Sirona. As detailed in the Registration Statement, this due diligence included:

(a) Meetings between senior executives and the financial and legal advisors of Dentsply Intl. and Sirona from March through September 2015, at which non-public information concerning their business and operations was discussed, including "their respective companies' internal management structure, business strategy, product portfolio, product pipeline, financial information and financial guidance";

(b) The establishment of electronic data-rooms, in which Dentsply Intl. and Sirona each placed non-public information concerning their business and operations, presumably including sales forecasts and information regarding sales, inventory, margins, and their relationships with the Distributors; and

(c) The performance of financial analyses by Moelis on the business of Dentsply Intl. and Sirona and the evaluation of the prospects of the combined company, Dentsply Sirona.

198. Senior executives at Sirona and, following the Merger, Dentsply Sirona had direct knowledge that the minimum purchase requirements of the Exclusive Distribution Agreements were causing Patterson to take on excess inventory, the amount of the excess inventory, and the number of months it would take Patterson to sell-off the excess inventory. These executives included Officer Defendants Slovin, Clark, Wise, and Michel. This has been confirmed by the Cease and Desist Order, in which the SEC found that in the first quarter of 2016, Dentsply Sirona's executives were aware that Patterson was carrying "all-time high[]" amounts of inventory, which was likely to negatively impact Dentsply Sirona's sales. Cease and Desist Order, ¶ 6. The Officer Defendants also knew that the Exclusive Distribution Agreements, not

end-user demand, were driving sales, that Patterson held $85-100 million of excess inventory at that time, and that Dentsply Sirona sales in the U.S. would have been materially lower absent Patterson's purchase of excess inventory. *Id.* These same executives knew that the excess inventory represented 8-10% of Dentsply Sirona's net sales for the second quarter of 2016, that Patterson held seven to nine months of Dentsply Sirona inventory, that Patterson would likely miss its minimum purchase requirement for 2016, that Patterson would not seek to retain exclusivity past the end of the termination date of the Exclusive Distribution Agreements (9/30/17), and that the contractual requirements of the Exclusive Distribution Agreements were disconnected from end user demand due to the requirement that Patterson "purchase 10% above 2011 base, compounded annually." Cease and Desist Order, ¶¶ 7-9. This information was also specifically presented to the Dentsply Sirona board in June 2016. Cease and Desist Order, ¶ 8. By the end of the third quarter, Dentsply Sirona's executives knew Patterson was carrying five to eleven months of excess inventory (depending on the product line), that Patterson wanted to reduce this inventory by $60-$80 million, and at the end of September 2016, Dentsply and Patterson executed a stand-still agreement to give Patterson time to decide whether it would satisfy the contractual requirements of the Exclusive Distribution Agreements. Cease and Desist Order, ¶ 10. The Officer Defendants who were executives and board members at this time include Defendant Slovin (CEO and a Board member at the time), Defendant Wise (the Executive Chairman), Defendant Clark (Executive Vice President, Manufacturing and Supply Chain), and Defendant Michel (Executive Vice President and CFO).

199. *Second*, Dentsply Sirona and its senior executives knew of the Distributors' anticompetitive scheme and its impact on the Company's financial results, and actively supported it. In this regard, Lead Plaintiff incorporates as if fully set forth here paragraphs 85-87, above, which identify many instances where Dentsply Intl., Sirona and Dentsply Sirona executives were

aware of and actively supported the Distributors' anticompetitive scheme. Dentsply Intl. and Sirona managers were involved in communications discussing the Distributors' efforts to boycott GPOs and dental associations that endorsed GPOs, such as the TDA and AZDA.

200. Dentsply Intl.'s knowledge and involvement in the boycotts of the TDA and AZDA annual meetings on account of the associations' endorsement of GPOs is shown directly in the emails and other correspondence cited in paragraph 85 above. Among these is a July, 30, 2014 email from a Benco Regional Manager to a Dentsply Intl. Senior Territory Manager, which states: "I have communicated with our competition at Schein and Patterson and we are all of the same mind that we will not be supporting a competitor's [AZDA's] meeting next year." *In the Matter of Benco Dental Supply Co., Henry Schein, Inc. Patterson Companies, Inc.*, Before the Federal Trade Commission Office of Administrative Law Judges, Complaint Counsel's Pre-Trial Brief, CX1331-001 (Docket No. 9379) (filed Oct. 10, 2018). As further noted above, the Distributors' decision to boycott the TDA conference arose after they learned of TDA Perks, a buying group that would offer its participants lower prices for dental supplies than the Distributors offered. In response to TDA Perks, the Distributors took concerted action to direct their representatives to boycott the TDA conference in 2014 – an anticompetitive decision that would financially and operationally harm the TDA (as the Distributors knew and intended), since the TDA drew significant financial support from payments by the attendees of its conferences. Dentsply Intl. advised a Schein vice president and general manager that the Company would inform the TDA that "they feel the TDA has put all manufacturers in a very difficult place and that going forward that they won't participate if their dealers don't." *SourceOne Dental v. Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company*, Declaration of Abby L. Bilkiss in Support of SourceOne's Opposition to Patterson Companies Inc.'s and

Benco Dental Supply Company's Motions for Summary Judgment, No.15-cv-05440-BMC, Document 218-2, page 181 of 205 (filed Dec. 1, 2017).

201. Sirona was similarly aware of and acquiesced in the Distributors' anticompetitive conduct. For example, in an August 28, 2014 email, the Director of Special Markets & Strategic Projects at Sirona wrote to the President Special Markets at Patterson: "Historically, at Patterson's direction we have not included buying groups as part of special markets." *In the Matter of Benco Dental Supply Co., Henry Schein, Inc. Patterson Companies, Inc.*, Before the Federal Trade Commission Office of Administrative Law Judges, Complaint Counsel's Memorandum of Law In Opposition to Respondent Patterson's Motion to Dismiss the Case Against Patterson in its Entirety, at RX0333-00001 (Docket No. 9379) (filed Feb. 12, 2019). In the same email chain, Sadusky suggests a meeting between Sirona and Patterson to "get aligned." Similarly, in a September 2014 email chain, a Patterson employee wrote that he talked to "Steven at Sirona" regarding whether or not a particular doctor's office was part of a "buying group," to which another Patterson employee replied: "As a rule we do not deal with buying groups." *In the Matter of Benco Dental Supply Co., Henry Schein, Inc. Patterson Companies, Inc.*, Before the Federal Trade Commission Office of Administrative Law Judges, Complaint Counsel's Memorandum of Law In Opposition to Respondent Patterson's Motion to Dismiss the Case Against Patterson in its Entirety, at RX0342-000002 (Docket No. 9379) (filed Feb. 12, 2019).

202. *Third*, Defendants Slovin, Michel and Alexos regularly spoke to analysts and investors about, among other subjects, Dentsply Sirona's financial results and guidance, its relationship with Patterson, the Exclusive Distribution Agreements, and sales of CEREC systems. By publicly commenting on these subjects, these Officer Defendants (as well as Defendant Thierer while he was Interim CEO) held themselves out as knowledgeable about them. Among other things, Defendant Slovin portrayed the Company's CAD/CAM sales

(including CEREC systems) as poised for significant growth despite his knowledge that Patterson was sitting on excess inventory, a fact since confirmed by the Cease and Desist Order. For example, during Dentsply Sirona's May 5, 2016 first quarter earnings call, Defendant Slovin was asked directly to comment on CAD/CAM sales as follows:

> Was wondering if you could comment on the sales of CAD/CAM specifically? ***As your channel partner in North America had talked about carrying a higher level of inventory coming into this year, I'm just trying to get a balance between what may be they're holding versus what the end-market's really doing.***

Although Defendant Slovin and other senior Dentsply Sirona officers clearly knew (a) what Patterson was holding, (b) what Patterson was obligated to buy under the Exclusive Distribution Agreements, and (c) the sales that were actually being made to end-users of the Company's products, all of which has now been confirmed by the Cease and Desist Order, Slovin instead misleadingly proclaimed that CAD/CAM sales were poised for further growth:

> Well, certainly, Technology led the way at 6.5% for the quarter and certainly was leading the way in the U.S. as well, and that was led by CAD/CAM. And so the proposition has not changed with regard to us believing that along with Patterson that CEREC will become a standard-of-care, and we're on the appropriate trajectory for that. Keep in mind also that we launched the new Zirconia Blocks, but more critical to that was our SpeedFire. So there was a lot of interests ahead of that, and I think that it's a situation where we've got a lot of opportunities for CEREC in North America and we'll continue to.

203. *Fourth*, the sudden resignations of four of the Company's top executives – Defendants Slovin, Clark, Wise and Michel – in close proximity to the announcement of an SEC investigation and a more than $1 billion impairment charge is strong evidence of scienter. On August 9, 2017, Dentsply Sirona disclosed that it had recorded a non-cash goodwill impairment charge of approximately $1.1 billion associated with its CAD/CAM, imaging and treatment center reporting units. The Company also disclosed that it had "observed an increase in competition, unfavorable changes in the end-user business model as well as changes in channels of distribution for the company and its competitors." These factors tie specifically into the

Company's knowledge of and involvement with the Distributors' anticompetitive scheme as well as the massive inventory build-up at Patterson as of the time of and since the Merger.

204. The Company further disclosed that the SEC had opened an investigation into the "Company's accounting and disclosures, including its accounting and disclosures relating to transactions with a significant distributor of the Company." This SEC investigation concluded with the issuance of the Cease and Desist Order. Less than two months later, on October 2, 2017, Dentsply Sirona announced the resignations of Defendants Slovin, Clark and Wise, the Company's CEO, President and COO – Technology, and Chairman, respectively. And just one month after that, Michel's resignation from his CFO position at Dentsply Sirona was announced on November 2, 2017.

205. At the time of the departures, Defendant Slovin was 52 years old and held 766,813 shares of Dentsply Sirona stock; Defendant Wise was 57 years old, held 143,481 shares of Dentsply Sirona stock (plus 37,418 Restricted Stock Units), and affiliated entities and persons owned another 35,385 shares; Defendant Clark was 56 years old, held 22,392 shares of Dentsply Sirona stock (plus 16,516 Restricted Stock Units), and his spouse held 57,687 shares; and Defendant Michel is believed to have been about 50 years old and held 78,147 shares of Dentsply Sirona stock.

206. *Fifth*, Defendants Slovin, Wise, Clark, and Michel also had a personal, monetary interest in maintaining the fraudulent conduct. All four received new positions at Dentsply Sirona as a result of the Merger. Slovin became its CEO and a member of the Board entitling him to a base salary of $950,000, a bonus target at $1,235,000, and annual long term incentive awards with a value of $4,815,000. Wise became Executive Chairman of the Board entitling him to a base salary of $900,000, a bonus target at $1,080,000, and annual long term incentive awards with a value of $3,920,000. Clark became President and COO – Technology with a base salary

of $675,300, a bonus target at $607,770, and additional annual long term incentive awards. And Michel became CFO with a base salary of $607,300, a bonus target at $455,475, and additional annual long term incentive awards. From the time of the Merger until the times of their departures from the Company, Defendant Slovin had received grants of 814,661 shares of Dentsply Sirona stock (including 790,537 shares on February 29, 2016, the date of the Merger); Defendant Wise had received grants of 52,392 shares (including 48,140 at the time of the Merger) and he also received and exercised options for 203,904 shares, on which he received net proceeds of $2,793,449; Defendant Clark had received grants of 42,769 shares (including 26,522 at the time of the Merger) and he also received and exercised options for 260,800 shares, on which he received net proceeds of $7,522,614; and Michel had received a grant of 77,789 shares at the time of the Merger, and received and exercised options for 24,000 shares, on which he received net proceeds of $607,287. Moreover, when each resigned in September and October 2017, each walked away with millions of dollars: Slovin's termination benefits amounted to $10,085,035; Michel's were $6,170,861; Wise's were $13,198,839; and Clark's were $6,797,325.

207. Thus, each of these Officer Defendants also had a personal, monetary interest in pursuing the Merger and continuing in their positions, in order to obtain lucrative grants (including grants at the time of the Merger) and stock options, notwithstanding the issues that had propped up Sirona's, Dentsply Intl.'s and Dentsply Sirona's reported results, and that would cause great harm to the Company and its shareholders after they left the Company in late 2017.

208. *Sixth*, the fact that the fraud concerned a core product and key business area of the Company is strong evidence of scienter. In 2016, Patterson – which had been Sirona's exclusive dealer, and continued to be the Company's exclusive dealer for many key products in the United States – accounted for twelve percent of Dentsply Sirona's worldwide sales. Patterson had been

Sirona's largest customer, accounting for between 28% and 38% of its total revenues on a quarterly basis leading up to the Merger. In Sirona's fiscal year ended September 30, 2015, Patterson accounted for 33% of Sirona's revenue. Moreover, through September 30, 2017, Patterson served as the exclusive distributor in the United States for most of the products sold through the Company's Technology segment. Until the expiration of the Exclusive Distribution Agreements, Patterson was the sole distributor of Dentsply Sirona's CEREC systems, which were touted as a key driver of the Company's growth. The respective impairment charges of $1.17 billion announced on August 9, 2017 and $1.265 billion announced on August 7, 2018 were related, in part, to the Company's CAD/CAM business, further demonstrating the significance of this business to Dentsply Sirona and the knowledge that Dentsply Sirona and the Officer Defendants had concerning end user demand for CAD/CAM products. Indeed, just the excess inventory that Patterson purchased pursuant to the minimum purchase requirements in the Exclusive Distribution Agreements, which were subject to 10% annual increases, accounted for 8-10% of Dentsply Sirona's net sales in the second and third quarters of 2016.

209. *Seventh*, the magnitude of the impairment charges and the severe changes in the Company's guidance to the market constitute further indicators of the Officer Defendants' scienter. As shown above, the impairment charges taken in the second and fourth quarters 2017, and again in the second quarter of 2017 (after Defendant Alexos had stated unequivocally on March 2, 2018 that no further impairment charges would be taken in 2018) caused the Company's reported goodwill to be reduced from $5.96 billion as of March 31, 2017, to $5.02 billion as of June 30, 2017, to $4.54 billion as of December 31, 2017, and ultimately to $3.46 billion as of June 30, 2018 – an aggregate reduction in the value of goodwill that was reported by the Company and the Officer Defendants of $2.5 billion, a 42% reduction. The Cease and Desist Order has confirmed that the August 9, 2017 impairment charge was a direct result of Dentsply

Sirona's late recognition that it had overstated its estimated growth as a result of its failure to recognize the impact of its sales of excess inventory to Patterson, something Dentsply Sirona had been aware of since the first quarter of 2016, at the latest. Cease and Desist Order, ¶ 11.

210. Similarly, the massive changes in the Company's financial guidance beginning with the first partial curative disclosure on August 9, 2017 and continuing to the end of the Class Period on August 7, 2018 – all of which stemmed from information known to the Officer Defendants but not disclosed accurately, timely or fully to the market – provides another indicator of the Officer Defendants' scienter. While the Company and Officer Defendants Slovin, Michel and others provided fiscal year 2017 EPS guidance of $2.80 to $2.90 on May 9, 2017, they were forced to lower that guidance to $2.65 to $2.75 with the first partial corrective disclosure on August 8, 2017. And, even after Defendants Slovin, Clark, Wise and Michel left their positions with the Company, the Company and its then current CEOs (Thierer and Casey) and CFO Alexos provided fiscal year 2018 EPS guidance of $2.70 to $2.80, but they too were forced to finally disclose a reduction of that guidance to $2.00 to $2.15 at the end of the Class Period on August 7, 2018.

## X. LOSS CAUSATION

211. During the Class Period, Defendants engaged in a scheme to deceive the market and in a course of conduct that operated as a fraud on Class Period purchasers of Dentsply Intl. and Dentsply Sirona securities. As detailed in this Complaint, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This fraudulent course of conduct artificially inflated the price of the Company's common stock during the Class Period. When the truth later entered the market through piecemeal disclosures,

the price of Dentsply Sirona common stock declined in statistically significant amounts as the artificial inflation dissipated over time.

212. As a result of their purchases of Dentsply Sirona common stock during the Class Period at artificially inflated prices, Lead Plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws, when subsequent disclosures removed the inflation from the price of the stock. Had the full truth been disclosed to the market at or before the time of its ultimate disclosure, Lead Plaintiff would not have purchased the Company's stock at the prices then being offered in the market.

213. Defendants' wrongful conduct, as alleged in this Complaint, directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses. As set forth above in Section VIII, with the Company's releases from August 9, 2017 through the final disclosures on August 7, 2018, Dentsply Sirona's stock price dropped from a close of $61.41 on August 8, 2017 to $39.41, a decline of over 35%, on August 7, 2018. It dropped even more (43%) from the Class Period high that was reached on January 8, 2018, at $68.30 per share, after the false and misleading statements that made on November 3, 2017, in connection with the Company's report of its third quarter 2017 results.

214. August 9, 2017 disclosures. On August 9, 2017, Dentsply Sirona announced its financial results for the second quarter ended June 30, 2017, reporting a net loss of $1,050.3 million (a $4.58 EPS loss) for the quarter, which included a goodwill and intangible asset impairment charge of $1,172.7 million. As Dentsply Sirona disclosed: "Second quarter results reflect the impact of a non-cash goodwill impairment charge of $1,092.9 million and a non-cash indefinite-lived intangible asset impairment charge of $79.8 million." The net loss for the second quarter of 2017 ($1,050.3 million) was "a loss of $4.58 per share, compared to income of $105.4 million, or $0.44 per diluted share in the second quarter of 2016."

215. In its press release, Dentsply Sirona stated that the charges resulted in large part from the termination of the Exclusive Distribution Agreements with Patterson, the continuing excess inventory levels in the distribution channel, and the transition from an exclusive supplier relationship with Patterson to multiple non-exclusive supplier relationships. Dentsply Sirona similarly stated in the Company's Form 10-Q filed on August 9, 2017, that the goodwill impairment charge primarily resulted from lower sales, steeper sales declines, an increase in competition, and changes in its distribution relationships, as follows:

> These developments included significantly lower retail sales for the fiscal quarter ended April 2017 reported by the Company's exclusive North America equipment distributor in May 2017, significant acceleration of sales declines in the Company's quarter ended June 30, 2017, and the execution of new distribution agreements with Patterson Companies, Inc. and Henry Schein, Inc. in May and June 2017. The Company also observed an increase in competition, unfavorable changes in the end-user business model as well as changes in channels of distribution for the Company and its competitors.

216. The Company reported that net sales for the second quarter of 2017 declined by 2.9% as compared to the 2016 second quarter, as Dentsply Sirona was adversely affected by: (1) "changes in net equipment inventory levels at certain distributors in North America and Europe that the Company believes is related to the transition in distribution strategy in North America"; and (2) "lower equipment sales to end-users, primarily in the United States, which in the company's assessment was mainly a result of transition challenges at our exclusive distributor."

217. Similarly, "reported net sales in the United States were $331.6 million in the second quarter of 2017, a 9.7% decrease" as compared to the 2016 second quarter, "as a result of changes in net equipment inventory levels at two distributors in the United States that the Company believes is related to the transition in distribution strategy" and "lower equipment sales to end-users . . . as a result of transition challenges at the Company's exclusive distributor."

218. Additionally, "[r]eported net sales for Technologies" – the segment responsible for the CAD/CAM equipment – "declined by 8.3% to $438.6 million during the second quarter of 2017 as compared to the same period in 2016," also "as a result of quarter-over-quarter changes in net equipment inventory levels at certain distributors in North America and Europe, that the Company believes is related to the transition in distribution strategy in North America."

219. The Company further cut its full-year guidance by over 5%, which, according to the Company, was driven largely by the termination of the Company's exclusive distribution agreement with Patterson.

220. The Company further explained the shortfalls in the results and guidance in the press release of August 9, 2017. In the release, Defendant Slovin, Dentsply Sirona's CEO, attributed the results in significant part to the loss of exclusivity with Patterson and Patterson's ensuing efforts to decrease inventory, stating: "Our results were impacted by a number of factors, the largest of which are headwinds associated with Patterson reducing its inventory in North America and the transition of North American distribution." And, on the conference call the same day, Defendant Slovin said that internal growth in Technologies declined by approximately 10% "as a result of a quarter-over-quarter changes in net equipment inventory levels at certain distributors," and that the U.S. business declined by 11.1% on an internal basis. Defendant Michel, the Company's CFO, said that the second quarter 2017 GAAP EPS loss of $4.58 compared to $0.44 diluted GAAP EPS earnings in the prior year was mainly driven by the non-cash impairment charges.

221. All of the factors to which the Company attributed its negative second quarter 2017 results, as well as the 5% cut in the Company's guidance, were related directly to, and partially (but only partially) curative of, the false and misleading statements and omissions

alleged in this Complaint – including the massive glut of inventory being held by Patterson and the earlier bolstering effect on the Company's revenues, earnings, margins and goodwill of the Distributors' anticompetitive scheme. In addition, the Company announced that it was the subject of an SEC investigation concerning its accounting and disclosures relating to Patterson. In this regard, the Form 10-Q stated, in pertinent part:

> The SEC's Division of Enforcement has asked the Company to provide documents and information concerning the Company's accounting and disclosures, including its accounting and disclosures relating to transactions with a significant distributor of the Company. The Company is cooperating with the SEC's investigation. The Company is unable to predict the ultimate outcome of this matter, or whether it will have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.

This investigation has since been resolved with the issuance of the Cease and Desist Order and Dentsply Sirona's agreement to pay the SEC's assessed fine.

222. But even though the Company was reducing its guidance for the year, Defendant Slovin sought to soften the reaction that the market would have to all of these disclosures by stating during the conference call, "In the back half of the year, ***we expect earnings growth*** as high-tech equipment returns to growth" and what "I want to really highlight is the guidance that we lowered today also ***reflects 5-7% growth in the back half of the year***. … ***[W]hat you should focus on really is the guidance we gave today and the fact that 7% in the back half***. And … a critical driver for this is our Technologies, which means CAD /CAM and imaging playing an important role."

223. Notwithstanding Defendant Slovin's attempt to mute the market's reaction to the second quarter results and the Company's explanations for those results, the price of Dentsply Sirona common stock dropped more than 8% from its close of $61.41 per share on August 8,

2017, to $56.23 per share on August 9, 2017, on unusually high volume of over 6 million shares trading.

224. October 2, 2017 disclosures. On October 2, 2017, Dentsply Sirona announced the departure of three of its top executives, Defendants Slovin, Clark, and Wise. An article appearing in *The Wall Street Journal* that day, entitled "Dentsply Sirona Shakes Up Leadership as CEO, Operating Chief Exit," reported that "[t]he leadership changes come less than two months after the company disclosed it was cooperating with a[n SEC] investigation regarding its accounting and disclosures relating to transactions with a distributor," while also noting that the three executives had "assumed their most recent positions when the [Merger] closed in February 2016." On this news, the price of Dentsply common stock dropped nearly 6%, from a close of $59.81 per share on September 29, 2017 to $56.33 per share on October 2, 2017, on unusually high volume of nearly 6.5 million shares trading.

225. However, after these departures were announced, the Company continued to tout the false narrative that the end of the Exclusive Distribution Agreements with Patterson would be a long-term net positive for Dentsply Sirona, while failing to disclose the full extent of the glut of Dentsply Sirona products being held by Patterson. For instance, on November 3, 2017, after announcing the Company's third quarter 2017 results, which included a 5.8% increase in reported revenue compared to the third quarter 2016 that was at least partially attributable to sales to Schein as it acquired Dentsply Sirona products for resale to end-users, the Company held a conference call with analysts and investors. During the conference call, which was attended by Defendants Mark Thierer and Ulrich Michel, the Company's Interim CEO and its CFO, respectively, CFO Michel stated: "We are beginning to see the benefit of our expanded distribution agreement in equipment" and "Even at the low end of the [Company's narrowed guidance] range, our guidance implies over 20% adjusted EPS growth in the fourth quarter."

Notably, with the Company's disclosures and statements on November 3, 2017, its stock price ***increased*** from $61.16 to $64.60 per share, a 5.95% increase, and it would continue to climb to $67 per share in late November 2017 and to its Class Period high of $68.30 per share on January 8, 2018.

226. Similarly, even when taking an additional $848 million charge in the fourth quarter 2017 to reflect a lower projected growth rate in 2018, on March 2, 2018, the Company's new CFO Nicholas Alexos stated: "2017 was clearly a transition year … we have now aligned to better track our inventory." And when asked whether the Company expected to recognize more goodwill impairment charges during 2018, he said: "***the straightforward answer is no***. We obviously have done a very thorough analysis of our business and the valuation of these assets, and this is the determined impairment charge that we've calculated based on our long-range projections of the business."

227. May 6-8, 2018 disclosures. The falsity and misleading nature of the Company's prior statements and representations further came to light on May 6-8, 2018, when the Company reported its first quarter 2018 results. The Company reported that organic revenue growth for the first quarter 2018 was down 1.4%, driven largely by a 7.6% decline in the U.S. market. As a result, the Company announced that it was reducing its 2018 guidance by $0.15 per share, to a range of $2.55 to $2.65 per share versus the prior forecast of $2.70 to $2.80 per share.

228. On the May 7, 2018 conference call, the Company reported "solid performance in many regions and businesses, weighed down by significant headwinds in the U.S. Technologies and Equipment businesses." Defendant Alexos, the Company's CFO, reported that for the first quarter constant currency total, "sales decreased 1.1% driven by Technologies & Equipment, which declined by 1.7%. The Technologies and Equipment segment was impacted by approximately $8 million of dealer inventory reductions in the quarter and we continue to target

$40 million of such reductions in 2018." He noted that adjusted non-GAAP operating margin "declined to 14.5% versus 16.6% a year ago."

229. However, in order to blunt the impact that the first quarter results otherwise would have had on the price of Dentsply Sirona stock, Dentsply Sirona also announced a $500 million increase to its share repurchase authorization (bringing the total to $1 billion). Further, on the conference call, Alexos said that going forward, the Company had adjusted its revenue assumptions to "assume the $40 million targeted reduction in dealer equipment inventory, which is costing us about a 1% internal growth rate." But he said that the Company was "on track to reduce most of that in the first half of 2018." And following up on these comments by Alexos, Defendant Casey – who was by then the Company's CEO – stated the business was "stable" and that the then-projected $40 million inventory reduction number was "a number that we can largely manage."

230. Further, on May 8, 2018, analysts at H.C. Wainwright and Stifel Nicolaus cut their price targets for the Company's stock. As H.C. Wainwright wrote:

> Management expects total revenue in 2018 to be approximately $4.2B, and lowered its non-GAAP EPS guidance range to $2.55-2.65 from $2.70-2.80 per diluted share. In our view, the company may continue to experience headwinds in the current quarter, with a potential pick-up in growth coming in 2H 2018. Our current 2018 revenue and EPS projections are $4.2B and $2.55 (was $2.71), respectively. Our list of comparable companies currently generates a forward P/E multiple of 20.4x, down from 22.7x. Therefore, the projected $2.55 EPS leads to a share price of approximately $52. Accordingly, we reiterate our Neutral rating and have lowered the 12-month price target to $52 from $63 per share on our lower EPS projection and lower sector multiple.

231. In response to these disclosures, Dentsply Sirona's stock price fell $5.52, or 11%, declining from $49.99 per share on Friday, May 4, 2018 to close at $44.47 per share on Tuesday, May 8, 2018.

232. August 7, 2018 disclosures. The falsity of Defendants' false and misleading statements and the impact of the undisclosed massive buildup of inventory at Patterson was not fully revealed until August 7, 2018, when Dentsply Sirona announced its financial results for the second quarter ended June 30, 2018, which included a goodwill and intangible impairment charge of nearly ***$1.3 billion***. As Dentsply Sirona's press release of that day stated:

> During the quarter ended June 30, 2018, the Company recorded a goodwill and intangible impairment charge of $1,265 million. ***Of this charge, $1,196 million was in the Technologies and Equipment segment. The Technology and Equipment Segment was negatively affected by the continued transition of the Company's distribution relationships in the U.S., lower anticipated revenue and margin in our Imaging and CAD CAM businesses, and an elevated level of expected dealer inventory destocking in the U.S. in 2018***. In addition, an increase in both the risk factor and discount rate was a significant factor in driving the Technology and Equipment goodwill and intangible impairment. The Consumable Segment had a $69 million impairment, reflecting lower than expected growth for our legacy orthodontic business.

233. In its August 7, 2018 Form 10-Q, Dentsply Sirona also more clearly explained how its transition from an exclusive to a non-exclusive supplier – in connection with Patterson's decision not to extend exclusivity – had a material adverse impact on revenue:

> ***The equipment reporting units were negatively affected in connection with the continued transition of the Company's distribution relationships primarily in the U.S. from exclusive to non-exclusive***. The Company's expectations for revenue growth from its non-exclusive distribution relationships, ***which replaced its former long-term exclusive distribution relationship***, were not met. As a result, the Company's forecasts of current and future third-party demand have been reduced as the Company's U.S. distributors continue to offer and promote competitive alternatives to the Company's full CAD/CAM systems and lower-priced alternatives to the Imaging reporting units' products.

234. The Form 10-Q also disclosed that efforts to reduce inventory were continuing to adversely impact the Company's financial condition, stating: "The increased reduction of inventory being held by the Company's U.S. distributors in the second quarter, which was larger

than anticipated for the period, and planned further reductions of inventory, will impact the Company's near-term results."

> Management expects adjusted EPS for 2018 in the range of $2.00 to 2.15 per diluted share, down from our previous estimate of $2.55 to $2.65. ***2018 guidance now assumes an approximately 2% constant currency revenue decline for the full year***, down from our previous expectation of 2% constant currency revenue growth. The reduction in our 2018 revenue guidance reflects our lowered second half revenue forecast, ***partially driven by elevated levels of anticipated inventory destocking at our dealer partners***. The reduction in our 2018 EPS guidance reflects the lower revenue expectation and increased margin pressure for the remainder of the year.

235. The Company's earnings call on August 7, 2018 disclosed that the Company's distributors were seeking to significantly reduce their inventory by an additional $60 to $70 million in 2018 – to $100 to $110 million – versus the $40 million figure that the Company's management said on May 7, 2018 was "a number that we can largely manage." As the Company's CEO, Donald Casey, admitted: "We are seeing destocking in both our major partners … we have a wholesale issue."

236. In addition, Casey stated that the Company was "working through a comprehensive review of the organization that will lead to a significant restructuring program." Casey also explained changes to the Company's go-to-market approach: "Our organization needs to do a better job of becoming responsible for our own demand creation. This pillar includes the addition of 50 new reps in our technology business in the U.S. It also involves implementing our one customer approach, focusing on building one-to-one relationships with the dentist. We will also finish a significant sales force effectiveness program in the back half of this year that, so far, is very promising."

237. On this news, the price of Dentsply Sirona common stock fell to its lowest price in five years, plummeting from a close of $48.44 per share on August 6, 2018 to $39.41

per share on August 7, 2018 – an 18.6% decline – on extraordinarily high volume of nearly 23.3 million shares traded that day.

238. The stock price declines, detailed above, were directly related to the disclosures that corrected over time Defendants' previously issued materially false and misleading statement and omissions. Accordingly, the conduct of the Defendants as alleged in this Complaint directly and proximately caused damages to Lead Plaintiff and members of the Class.

## XI. INAPPLICABILITY OF STATUTORY SAFE HARBOR

239. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements – particularly the knowledge that the Company and Officer Defendants knew but did not disclose about the minimum purchase requirements and excess inventory build-up at Patterson, something that has since been confirmed by the Cease and Desist Order, as well as the Distributors' anticompetitive scheme from which the Company benefitted. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Dentsply Sirona who knew that those statements were false or misleading when made.

## XII. PRESUMPTION OF RELIANCE

240. At all times relevant to this Complaint, the market for Dentsply Intl. and Dentsply Sirona's common stock was an efficient market for the following reasons, among others:

(a) Dentsply Intl. and Dentsply Sirona stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As regulated issuers, Dentsply Intl. and Dentsply Sirona filed periodic public reports with the SEC and the NASDAQ;

(c) Dentsply Intl. and Dentsply Sirona regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, conference calls with analysts and investors, and other similar reporting services; and

(d) Dentsply Intl. and Dentsply Sirona were followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Among the securities firms that provided research coverage for Dentsply Sirona are Bank of America Merrill Lynch, Baird, Barrington Research, Edward Jones, Goldman Sachs, H.C. Wainwright, Jefferies & Co., JP Morgan Securities, Morgan Stanley, Stephens Inc., Stifel Nicolaus, and William Blair. Reports issued by the analyst firms, either in full or summarized versions, were publicly available and entered the public marketplace.

241. As a result of the foregoing, the markets for Dentsply Intl. and Dentsply Sirona securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of their stock. Under these

circumstances, purchasers of Dentsply Intl. and Dentsply Sirona common stock during the Class Period suffered similar injury through their purchases of Dentsply Intl. and Dentsply Sirona common stock at artificially inflated prices and the presumption of reliance applies.

242. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Dentsply Sirona's business operations – including but not limited to the existence and impact of the Distributors' anticompetitive scheme, and the minimum purchase requirements and glut of inventory that was being held by Patterson, which information Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Dentsply Sirona's financial performance, as set forth above, that requirement is satisfied here.

## XIII. CLAIMS BROUGHT PURSUANT TO SECTIONS 10(b) AND 20(a) OF THE EXCHANCE ACT

243. The claims set forth below, pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, sound in fraud and are based on knowing or reckless misconduct by Dentsply Sirona and the Officer Defendants (collectively, the "Section 10(b) Defendants"). These claims are independent of any other claims asserted in this Complaint and the allegations of fraud pertaining to the claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief asserted herein.

244. As part of the claims for violations of Sections 10(b) and 20(a) of the Exchange Act, Lead Plaintiff asserts that the Section 10(b) Defendants violated Items 303(a) and 503(c) of SEC Regulation S-K. Item 303(a) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

245. In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract. …
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

246. Furthermore, the 1989 Interpretive Release set forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

247. Similarly, Item 503(c) of SEC Regulation S-K, 17 C.F.R. §229.503(c), which governs disclosure of risk factors, requires an issuer to "provide under the caption 'Risk Factors'

a discussion of the most significant factors that make the [securities] speculative or risky." Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk."

248. The Distributors' anticompetitive scheme described above constituted a known risk or uncertainty under Item 303, and otherwise required disclosure under Item 503, because the public exposure and cessation of the scheme materially threatened the operations of both Dentsply Intl. and Sirona, thus also threatening the combined company after the Merger. Dentsply Intl. and Dentsply Sirona faced the prospect of having negatively impacted sales going forward and a reduction in the value of their intangible assets and goodwill – upon the resolution of the scheme. Accordingly, even if the management of Dentsply Intl. or Dentsply Sirona could not reasonably estimate or quantify the manner in which the revelation of the scheme might impact those entities, disclosure was required.

249. Patterson's stockpile of excess inventory also posed known trends and uncertainties because it rendered unpredictable Sirona's sales and revenues – problems that would continue to afflict Dentsply Sirona after the Merger and later result in significant write-downs to the value of intangible assets and goodwill. As the Cease and Desist Order confirms, Item 303 required disclosure of these trends and uncertainties, particularly because they threatened Dentsply Sirona's exclusive and lucrative supplier relationship with Patterson, and Item 503 required disclosure of the true risks associated with these then-occurring problems.

## FIRST CLAIM FOR RELIEF

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against the Section 10(b) Defendants

250. Lead Plaintiff repeats, incorporates and re-alleges each and every allegation set forth above as if fully set forth herein.

251. During the Class Period, the Section 10(b) Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Dentsply Sirona common stock at artificially inflated prices.

252. The Section 10(b) Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Dentsply Sirona common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

253. The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

254. During the Class Period, the Section 10(b) Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they

contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

255. The Section 10(b) Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. The Section 10(b) Defendants engaged in this misconduct to conceal Dentsply Sirona's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

256. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Dentsply Sirona common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Dentsply Sirona common stock had been artificially inflated by the Section 10(b) Defendants' fraudulent course of conduct.

257. As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

258. By virtue of the foregoing, the Section 10(b) Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## SECOND CLAIM FOR RELIEF

### For Violations of Section 20(a) of the Exchange Act Against the Officer Defendants

259. Lead Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

260. As alleged above, the Officer Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this complaint.

261. The Officer Defendants acted as controlling persons of Dentsply Sirona within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Dentsply Sirona, the Officer Defendants had the power and ability to control the actions of Dentsply Sirona and its employees.

262. By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIV. ALLEGATIONS RELATING TO CLAIMS BROUGHT PURSUANT TO SECTION 14(a) OF THE EXCHANGE ACT AND SECTIONS 11, 12(a)(2) AND 15 OF THE SECURITIES ACT

263. In this part of the Complaint, Lead Plaintiff asserts strict liability and negligence claims under Sections 11, 12(a)(2) and 15 of the Securities Act and negligence claims under Section 14(a) of the Exchange Act on behalf of Class members who (i) acquired shares of the common stock of Dentsply Sirona in exchange for their shares of common stock of Sirona in connection with the Merger; or (ii) are former Dentsply Intl. shareholders who held shares as of December 2, 2015 and were entitled to vote with respect to the Merger. These claims are not based on any knowing or reckless misconduct on behalf of the Defendants – *i.e.*, they do not allege, and do not sound in, fraud – and expressly disclaim any allegations of fraud or intentional misconduct in connection with the claims that are pleaded separately in this

Complaint under Sections 10(b) and 20(a) of the Exchange Act, except that any challenged statements of opinion or belief made in connection with the Proxy Statement and Registration Statement are alleged to have been knowingly misstated statements of opinion or belief when made and at the time of the Merger.

264. To avoid any argument that Defendants may put forward that the claims below somehow "sound in fraud," the facts pertinent to these claims are primarily stated in paragraphs 265 to 322 below. However, in order to provide a fuller factual basis for the Securities Act claims, the factual allegations in paragraphs 16-61 and 73-84, above, are also incorporated by reference in this section of the Complaint.

**A. The Merger and the Offering Documents**

265. On September 15, 2015, Dentsply Intl. and Sirona announced that the companies had approved a definitive merger agreement under which the companies would combine in an all-stock merger of equals, which valued Sirona at $5.5 billion. Under the terms of the Merger, Sirona shareholders would receive 1.8142 shares of Dentsply Sirona common stock in exchange for each share of Sirona common stock they held.

266. On October 29, 2015, Defendants filed with the SEC a registration statement on Form S-4 for the Merger, which, after an amendment on December 4, 2015, was declared effective by the SEC on December 7, 2015. The Dentsply Director Defendants each signed and/or authorized their signature on the Registration Statement, and the Registration Statement disclosed that certain of the Individual Defendants would serve as directors of the combined company.

267. The Registration Statement included the Proxy, which described the Merger and stated that both Dentsply Intl.'s and Sirona's boards of directors had (a) approved the Merger, and (b) recommended to the shareholders of their respective companies that they approve the Merger at special shareholder meetings scheduled for January 11, 2016.

268. On December 8, 2015, Dentsply Intl. filed the Prospectus for the Merger with the SEC on Form 424B3, which, together with the Proxy, formed part of the Registration Statement. The Registration Statement also expressly incorporated by reference the following documents and categories of materials and information for each of Dentsply Intl. and Sirona:

(a) For Dentsply Intl.: (1) Annual Report on Form 10-K for the fiscal year ended December 31, 2014, as revised; (2) Annual Report on Form 11-K for the fiscal year ended December 31, 2014; (3) Proxy Statement on Schedule 14A filed April 10, 2015, supplemented on May 11, 2015; (4) Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2015, June 30, 2015 and September 30, 2015; (5) Current Reports on Form 8-K filed on February 18, 2015, May 6, 2015, May 21, 2015, May 26, 2015, July 30, 2015, September 15, 2015, September 16, 2016, October 28, 2015, October 29, 2015, November 13, 2015 and November 23, 2015 (other than the portions of those documents not deemed to be filed); and (6) updated risk factors in subsequently filed Quarterly Reports on Form 10-Q or Current Reports on Form 8-K.

(b) For Sirona: (1) Annual Report on Form 10-K for the fiscal year ended September 30, 2015; (2) Annual Report on Form 10-K for the fiscal year ended September 30, 2014, and any amendments thereto; (3) Proxy Statements on Schedule 14A filed January 28, 2015; (4) Quarterly Reports on Form 10-Q for the quarterly periods ended December 31, 2014, March 31, 2015 and June 30, 2015; (5) Current Reports on Form 8-K filed September 15, 2015, September 16, 2015 and November 23, 2015; (6) any future filings with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act prior to the date of the Sirona special meeting; and (7) updated risk factors in subsequently filed Quarterly Reports on Form 10-Q or Current Reports on Form 8-K.

269. The Registration Statement further cautioned shareholders not to rely on any information outside of the Registration Statement and documents incorporated by reference, stating:

> You should rely only on the information contained in or incorporated by reference into this joint proxy statement/prospectus. No one has been authorized to provide you with information that is different from that contained in, or incorporated by reference into, this joint proxy statement/prospectus.

270. The Registration Statement incorporated documents by reference on nearly 20 pages and advised: "*Additional important information is also contained in the Annexes to, and the documents incorporated by reference into, this joint proxy statement/prospectus*." And, with regard to the financial information of Dentsply Intl. and Sirona that was contained in the Registration Statement, the document further advised readers to review such information in conjunction with the incorporated financial statements "and their accompanying notes and management's discussion and analysis of financial condition and results of operations … contained in such reports."

271. As detailed below, the Registration Statement contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and otherwise failed to disclose information required under the rules and regulations governing its preparation. Specifically, the Registration Statement contained (and/or incorporated by reference) misrepresentations and omissions concerning demand and inventory, the backlog of Company product that was being held at Patterson that it could not timely sell to end-users making termination of the exclusive relationship likely, reported net sales, gross profit and net income, the impact of the Distributors' conspiracy on the Company's reported financial results, and industry competition.

**B. The Registration Statement Contained Untrue Statements and Material Omissions About Product Demand and Inventory, and Sirona's Exclusive Distribution Agreements with Patterson**

272. The Registration Statement and the documents incorporated therein included materially untrue and misleading statements and omissions regarding product demand and inventory, and specifically, the Company's exclusive distribution relationships with its distributors. In Sirona's 2015 Form 10-K, which was filed with the SEC only 17 days before the effective date of the Registration Statement, Sirona discussed the Exclusive Distribution Agreements as follows:

> On April 27, 1998, Sirona and Patterson Companies entered into an exclusive distribution agreement (the ''CAD/CAM Distribution Agreement'') pursuant to which Patterson was appointed as the exclusive distributor of Sirona's CEREC CAD/CAM products within the United States and Canada. Under the terms of the CAD/CAM Distribution Agreement, Patterson's exclusivity was to terminate on September 30, 2007. On June 30, 2005, Sirona and Patterson entered into an amendment of the CAD/CAM Distribution Agreement which extended Patterson's exclusivity from October 1, 2007 through September 30, 2017. As consideration for the extension of its exclusivity, Patterson agreed to make a one-time payment to Sirona in the amount of $100 million (the ''Exclusivity Fee''). In July 2005, Patterson paid the Exclusivity Fee, in its entirety, to Sirona. The full amount of the Exclusivity Fee was recorded as deferred income and has been recognized on a straight-line basis since October 1, 2007. The extension did not modify or alter the underlying provisions of the companies' agreement through 2007, including the performance criteria necessary to maintain the exclusivity. The performance criteria are benchmark thresholds which afford Sirona the opportunity to abandon the exclusivity or to terminate the agreement with Patterson, but do not create minimum purchase obligations under a take-or-pay arrangement. The CAD/CAM Distribution Agreement was amended in May 2011 to revise the parameters for inLab sales in the United States and Canada.
>
> In April 2000, Schick and Patterson entered into an exclusive distribution agreement (the "Schick Distribution Agreement") covering the United States and Canada; and as of May 1, 2000, Schick began marketing and selling its CDR dental products in the United States and Canada through Patterson. This contract was amended in July 2005, March 2007, and May 2010 and expired on December 31, 2012.
>
> In May 2012, the Company and Patterson amended and restated the terms of their business relationship set forth in CAD/CAM Distribution Agreement and the Schick Distribution Agreement with respect to distribution of certain products

> throughout the United States and in October 2013 entered into new distribution agreements covering Canada. The amendment and restatement of both the CAD/CAM Distribution Agreement and Schick Distribution Agreement addressed issues related to pricing, termination and annual minimum purchase quotas, and provided growth targets which, if achieved, extend the companies' exclusivity period.

273. With respect to Sirona's distributor relationships with Patterson and Schein, the 2015 10-K further stated:

> ***We are dependent upon a limited number of distributors for a significant portion of our revenue, and loss of these key distributors could result in a loss of a significant amount of our revenue.***
>
> Historically, a substantial portion of our revenue has come from a limited number of distributors. For example, Patterson Dental Company, Inc. accounted for 33% of revenue for the fiscal year ended September 30, 2015. In addition, 14% of our revenue for the fiscal year ended September 30, 2015, was attributable to sales to Henry Schein, Inc. It is anticipated that Patterson and Henry Schein will continue to be the largest contributors to our revenue for the foreseeable future. There can be no assurance that Patterson and Henry Schein will purchase any specified minimum quantity of products from us or that they will continue to purchase any products at all. If Patterson or Henry Schein ceases to purchase a significant volume of products from us, it could have a material adverse effect on our results of operations and financial condition.

274. The 2015 10-K also stated:

(a) "For the fiscal year ended September 30, 2015 . . . [w]e continued to see growing demand for products across all segments."

(b) "We believe that the high-tech end of the dental market is growing at a faster pace than the overall dental market and that this trend will continue over time.

(c) "The Company's business has grown substantially in the past several years, driven by numerous high-tech product introductions, a continued expansion of its global sales and service infrastructure, strong relationships with key distribution partners, namely Patterson and Henry Schein, and an international dealer network."

275. With respect to CAD/CAM sales, Sirona's 2015 Form 10-K stated that "[a]ll regions experienced growth, with especially strong demand in international markets," providing, in part:

> **CAD/CAM Systems** (*increased 2.1% - up 12.1% Local Currency*): Segment revenues were $434.9 million (*prior year period: $425.8 million*), an increase of $9.1 million reported compared to an increase of $51.4 million in Local Currency ($40.1 million organic growth and $11.3 million via business acquisitions). All regions experienced growth, with especially strong demand in international markets.
>
> * * *
>
> Revenues benefited primarily from strong demand for our CAD/CAM Systems and Imaging products. Sales in the latter part of the fiscal year showed signs of a promising future growth in the U.S. for our Treatment Center segment.

276. And, while Sirona's 2015 Form 10-K disclosed eleven factors that could affect fluctuations in its revenue and operating results, including "changes in relationships with distributors"; "the timing of operational decisions by distributors and end users"; and "our ability to supply products to meet customer demand," it failed to disclose that the minimum purchase requirements in the Exclusive Distribution Agreements had resulted in Patterson holding a massive glut of inventory that would put at risk Patterson's continuing ability to purchase the same amounts of Sirona products, and an increased risk that Patterson would terminate its exclusive arrangements with Sirona, causing a severe disruption to Sirona's business and operations. The Cease and Desist Order confirms that Sirona received reports from Patterson from 2013 through the end of 2015 indicating that Patterson's inventory had increased from $74 million to $179 million (a $128% increase) by the end of 2015, and that Patterson's excess inventory level was nearing its all-time high. Despite this, Sirona's 2015 Form 10-K, which was filed on November 20, 2015, failed to disclose this glut of inventory. Those underlying facts also made Sirona's warnings in the Form 10-K that there could be "no assurance that Patterson and Henry Schein will purchase any specified minimum quantity of products from us or that they will

continue to purchase any products at all," and that if they "cease[d] to purchase a significant volume of products from us, it could have a material adverse effect on our results of operations and financial condition," materially misleading, since Patterson had already accumulated a glut of excess inventory that made it highly unlikely that it could or would continue to purchase Sirona products as it had pursuant to the minimum purchase requirements in the Exclusive Distribution Agreements. To the contrary, the excess inventory being held by Patterson made it highly likely that it would, at some point after the Merger, commence a large destocking program.

277. The Registration Statement also represented that the boards of directors of Dentsply Intl. and Sirona recommended that the shareholders of the respective companies approve the Merger. With respect to Sirona, the Registration Statement stated: "After careful consideration, the Sirona board of directors unanimously approved the merger agreement and determined that the merger agreement and the transactions contemplated thereby, including the merger, are advisable, fair to and in the best interests of Sirona and its stockholders." The Registration Statement also stated, in bold text: "**The Sirona board of directors unanimously recommends that Sirona stockholders vote 'FOR' the proposal to adopt the merger agreement…**" Similar representations were made by the board of Dentsply Intl. to its shareholders.

278. Among the factors that the Registration Statement said had been taken into account by the Sirona and Dentsply Intl. boards of directors in recommending the Merger to their respective shareholders were "key industry trends" and the "growing demand" for high-tech dental products manufactured by Sirona. The Registration Statement represented that Dentsply Intl.'s board of directors had considered, among other favorable factors, the following:

(a) "that the combined company will be better positioned to capitalize on key industry trends, including the accelerating adoption of digital technologies, the consolidation of dental practices, increased focus on dentist productivity and efficiency to serve a wider and larger set of patients, and the growing demand for dentistry in developed and developing markets"; and

(b) "the current and prospective climate in the industry in which DENTSPLY and Sirona operate, including a changing demographic driving demand for specialties, prosthetics, restorative and aesthetic dentistry and the potential for further consolidation[.]"

279. The Registration Statement also provided the following factors, among others, that Sirona's board of directors found favorable and supportive of the Merger:

(a) the merger will result in the world's largest manufacturer of professional dental products and technologies, with an implied pro forma equity value of approximately $13.3 billion at announcement of the merger, creating a robust platform to develop end-to-end solutions to drive increasing demand for our products, better meet customer needs and improve patient care; and

(b) the combined company will be better positioned to capitalize on key industry trends, including the accelerating adoption of digital dentistry and the adoption of single visit dentistry, through a robust clinical education platform and enhanced capabilities to foster the development of new, safer, better and more efficient dental solutions and procedures which will drive additional sales of the combined company's product

280. The Registration Statement also pointed to the purported "predictability" of Sirona's revenues as a key reason for recommending the Merger, explaining that "the combined company will have greater revenue diversification and predictability with equipment expected to represent approximately 30% and consumables expected to represent approximately 70% of revenues on a pro

forma basis[.]"

281. These representations were materially false and misleading for at least the following reasons:

(a) Sirona's U.S.-based revenues were largely driven by growth targets and minimum purchase requirements in the Exclusive Distribution Agreements, and were not attributable simply to growing demand for Sirona's products;

(b) the minimum purchase requirements in the Exclusive Distribution Agreements resulted in a backlog of Sirona inventory in the market that could not be sold at comparable rates to end-users, thereby undercutting the "predictability" claim;

(c) Patterson was forced to purchase far more inventory than it could reasonably and timely sell in order to comply with the minimum purchase requirements;

(d) there was a substantial risk that Patterson would breach or terminate the Exclusive Distribution Agreements or otherwise allow exclusivity to lapse when the Exclusive Distribution Agreements were scheduled to expire on September 30, 2017;

(e) penalties for failing to meet the minimum purchase requirements contained in the Exclusive Distribution Agreements were the functional equivalent of a "take-or-pay" provision and forced Patterson to purchase inventory it could not sell; and

(f) when the Exclusive Distribution Agreements ended and Sirona or the combined company lost its ability to force Patterson to purchase excessive inventory to meet growth targets, Sirona's and the combined Company's goodwill and other intangible assets would be impaired and require appropriate and material charges.

282. Nor did the Registration Statement disclose that Patterson's contractual obligation to make minimum purchases under the terms of the Exclusive Distribution Agreements

threatened its and Sirona's business relationship as of the effective date of the Registration Statement. By representing that "Sirona is uniquely positioned to benefit from several trends in the global dental industry, such as technological innovation, the shift to digital imaging, favorable demographic trends, and growing patient focus on dental health and cosmetic appearance," the Registration Statement portrayed only a partial picture of Sirona's business, which was materially misleading in the absence of the adverse trends then affecting it and placing in jeopardy its financial results and condition.

283. The Registration Statement also included financial forecasts that Dentsply Intl.'s management prepared regarding Sirona using projections furnished by Sirona management, called the "Sirona Adjusted Projections." As stated, "DENTSPLY management adjusted the Sirona projections to take into account Sirona's historical performance and expected business trends," which assumptions Dentsply Intl. management purportedly "believed to be reasonable at the time." The Sirona Adjusted Projections, which covered the fiscal years ending September 30, 2015 through 2020, are as follows:

**Sirona Adjusted Projections**

| | Fiscal Year Ending September 30, | | | | | |
|---|---|---|---|---|---|---|
| *(in millions of US dollars)* | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E |
| Sales | $ 1,140 | $ 1,238 | $ 1,345 | $ 1,461 | $ 1,588 | $ 1,726 |
| Non-GAAP Net Income | $ 222 | $ 243 | $ 259 | $ 285 | $ 316 | $ 347 |
| Adjusted EBITDA | $ 325 | $ 360 | $ 381 | $ 414 | $ 454 | $ 494 |

284. The Registration Statement also included financial forecasts that Sirona management prepared for Sirona for the fiscal years ending September 30, 2015 through 2020, as follows:

| | For Calendar Year Ending on December 31, | | | | |
|---|---|---|---|---|---|
| **($ in millions)** | 2015E | 2016E | 2017E | 2018E | 2019E |
| Total Revenue | $ 1,200 | $ 1,337 | $ 1,470 | $ 1,617 | $ 1,771 |
| Adjusted EBITDA(1) | $ 354 | $ 390 | $ 426 | $ 477 | $ 531 |
| Adjusted Net Income | $ 230 | $ 250 | $ 276 | $ 315 | $ 355 |

(1) Adjusted EBITDA excludes stock-based compensation expense.

285. And Sirona's management prepared financial projections for the combined company, also set forth in the Registration Statement, combining aspects of the above projections and covering fiscal years ending December 31, 2016 through 2018, as follows:

| ($ in millions) | For Fiscal Year Ending on December 31, 2016E | 2017E | 2018E |
|---|---|---|---|
| Total Revenue (incl. potential additional sales synergies)(1) | $ 4,073 | $ 4,369 | $ 4,674 |
| Adjusted EBITDA (excl. total pre-tax income synergies) | $ 1,041 | $ 1,125 | $ 1,232 |
| Adjusted EBITDA (incl. total pre-tax income synergies) | $ 1,074 | $ 1,212 | $ 1,357 |
| Adjusted Net Income (incl. total pre-tax income synergies) | $ 667 | $ 768 | $ 877 |

(1) DENTSPLY revenue excludes precious metals.

286. These financial projections were materially misleading because, at least in part, they were artificially inflated by revenue and earnings that had historically resulted from the minimum purchase requirements of Sirona's Exclusive Distribution Agreements with Patterson. The financial projections were further materially misleading because the companies failed to disclose the glut of inventory that Patterson had amassed by the time of the Merger, and the likelihood that Patterson would terminate its exclusive arrangement with Dentsply Sirona after the Merger on account of the minimum purchase requirements in the Agreements. Likewise, the Registration Statement's description of various financial analyses for Dentsply Intl. and Sirona was materially misleading, because it also reflected financial information that was artificially inflated as a result of the excess inventory with Patterson.

287. Indeed, despite receiving detailed information from Patterson about its inventory and retail sales from 2013 through the time of the Merger and thereafter (Cease and Desist Order, ¶ 5), Sirona (and later Dentsply Sirona) failed to account for or report that Patterson's inventory of Dentsply Sirona technology products increased from by 163% from $74 million to $195 million. Cease and Desist Order, ¶ 6.

### C. Material Misrepresentations and Omissions About Industry Competition, Sources of Revenue, Financial Results, and Forecasts

#### 1. Failure to Disclose the Distributors' Anticompetitive Scheme and Its Impact and Potential Impacts on Sirona, Dentsply Intl. and Dentsply Sirona

288. Prior to the Merger, the Distributors were engaged in an illicit scheme designed to quash industry competition for dental products, while maintaining artificially inflated prices for those same products. Dentsply Intl. as well as Sirona were aware of, and beneficiaries of, the scheme. However, the Registration Statement made misrepresentations regarding this conduct and failed to disclose: (i) the existence of the scheme, (ii) the extent to which Sirona's and Dentsply Intl.'s financial performance and results had materially benefited from the Distributors' anticompetitive conduct; and (iii) how the scheme's existence subjected Sirona's, Dentsply Intl.'s, and Dentsply Sirona's businesses and operations to material risks, including the material risk of reduced profits or profit growth at such time as the scheme was unraveled.

289. As noted above, the Registration Statement indicated that the boards of directors of Dentsply Intl. and Sirona recommended that the shareholders of the respective companies approve the Merger. The Registration Statement included a lengthy yet non-exhaustive list of factors that the Sirona board considered in reaching its conclusions and recommendation, including the following:

(a) "the combined company will be better positioned to capitalize on key industry trends, including the accelerating adoption of digital dentistry and the adoption of single visit dentistry";

(b) "the combined company will have greater revenue diversification and predictability with equipment expected to represent approximately 30% and consumables expected to represent approximately 70% of revenues on a pro forma basis";

(c) "its knowledge of Sirona's business, financial condition, results of operations and prospects, as well as DENTSPLY's business, financial condition, results of operations and prospects, taking into account the results of Sirona's due diligence review of DENTSPLY";

(d) "the financial projections prepared by Sirona management for Sirona as a standalone company through 2019, the financial projections prepared by DENTSPLY management for DENTSPLY as a standalone company through 2019, and the pro forma financial projections for the combined company"; and

(e) "the financial presentation and written opinion, dated September 15, 2015, of Jefferies[.]"

290. In this respect, Sirona shareholders were led to believe that Sirona's board had thoroughly evaluated the advantages and disadvantages of a merger between Sirona and Dentsply Intl., which necessarily included the consideration of non-public information regarding Sirona's and Dentsply Intl.'s businesses and prospects. Similar representations were made by the board of Dentsply Intl. to its shareholders. Yet the Registration Statement did not disclose the anticompetitive conduct that served as a source of success for both Dentsply Intl. and Sirona, and that would continue to bolster – at least in the short-term – their sales numbers and margins, as well as the sales numbers and margins of the combined Company. Nor did the Registration Statement disclose whether the boards of Sirona and Dentsply Intl. considered such illicit conduct as a factor in deciding whether to recommend the Merger to their shareholders.

291. The Registration Statement also incorporated by reference financial information and results, as well as SEC filings containing representations about industry competition, which failed to reflect or disclose the anticompetitive scheme or its financial or other impact on Dentsply Intl. or Sirona. As a result, the financial information presented by, and incorporated into, the Registration

Statement was materially misleading, because those financials included sales, income and revenue generated by the Distributors' anticompetitive scheme (as well as, with respect to Sirona, Patterson's excess inventory and its continuing purchases pursuant to the minimum purchase requirements) that portrayed the operating condition of Dentsply Intl. and Sirona in a more favorable light than was accurate.

292. For instance, in documents incorporated by reference in the Registration Statement, Dentsply Intl. presented and otherwise discussed sales and net income information that reinforced its representations concerning the strong trajectory of sales and profitability, engendering the misleading impression that the combined company would harness those purported strengths to deliver positive results going forward, as the following examples illustrate:

(a) In its 2014 Form 10-K, filed with the SEC on February 20, 2015, Dentsply Intl. represented: "[f]or over 115 years, DENTSPLY's commitment to innovation and professional collaboration ha[d] enhanced its portfolio of branded consumables and small equipment," facilitating its reporting of net income of $192.5 million and $238.2 million, respectively, on net sales of $2.003 billion and $2.204 billion, respectively, for the nine months ended September 30, 2015 and 2014; and net income of $322.9 million, $318.2 million and $318.5 million, respectively, on net sales of $2.923 billion, $2.951 billion and $2.928 billion, respectively, for the fiscal years ended December 31, 2014, 2013 and 2012.

(b) In its Form 10-Q for the period ended September 30, 2015, filed with the SEC on October 30, 2015, Dentsply Intl. stated that its "[g]ross profit rate for the three months ended September 30, 2015 [had] increased 180 basis points to 58.7% from 56.9% for the three months ended September 30, 2014"; that its "[o]perating margin for the three months ended September 30, 2015 was 15.7% compared to 16.1% in the prior year quarter, reflecting operating

improvements"; and that its "[a]djusted operating margin (a non-US GAAP measure) for the three months ended September 30, 2015 was 20.9%, a 220 basis point improvement from the prior year period."

293. Moreover, Dentsply Intl.'s 2014 Form 10-K emphasized that its growth had been due to its operating and sales prowess, rather than to the anticompetitive scheme perpetrated by the Distributors to boycott GPOs and state trade associations that would have supported GPOs and raise the market prices of dental supplies, stating, in pertinent part as follows:

> The primary drivers of internal growth include global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education. Management believes that over time, the Company's ability to execute its strategies allows it to grow at a modest premium to the growth rate of the underlying dental market. Management further believes that the global dental market has generally in the past and should over time in the future grow at a premium to underlying economic growth rates. Considering all of these factors, the Company assumes that the long-term growth rate for the dental market will range from 3% to 6% on average and that the Company targets a slight premium to market growth.
>
> * * *
>
> Product innovation is a key component of the Company's overall growth strategy. New advances in technology are anticipated to have a significant influence on future products in dentistry and consumable medical device markets in which the Company operates. As a result, the Company continues to pursue research and development initiatives to support technological development, including collaborations with various research institutions and dental schools.

294. Likewise, Dentsply Intl.'s 2014 Form 10-K stated that it "conducts its operations, both domestic and foreign, under highly competitive market conditions," stating, in pertinent part:

> **Competition**
>
> The Company conducts its operations, both domestic and foreign, under highly competitive market conditions. Competition in the dental and medical products industries is based primarily upon product performance, quality, safety and ease of use, as well as price, customer service, innovation and acceptance by clinicians, technicians and patients. DENTSPLY believes that its principal strengths include its well-established brand names, its reputation for high quality and innovative products, its leadership in product development and manufacturing, its global sales

> force, the breadth of its product line and distribution network, its commitment to customer satisfaction and support of the Company's products by dental and medical professionals.

295. Reinforcing these representations regarding competition, Dentsply Intl.'s 2014 Form 10-K also provided, in pertinent part:

> **The dental and medical device supplies markets are highly competitive and there is no guarantee that the Company can compete successfully.**
>
> The worldwide markets for dental and medical products are highly competitive. There can be no assurance that the Company will successfully identify new product opportunities and develop and market new products successfully, or that new products and technologies introduced by competitors will not render the Company's products obsolete or noncompetitive. Additionally, the size and number of the Company's competitors vary by product line and from region to region. There are many companies that produce some, but not all, of the same types of products as those produced by the Company. Certain of DENTSPLY's competitors may have greater resources than the Company. In addition, the Company is exposed to the risk that its competitors or its customers may introduce private label, generic, or low cost products that compete with the Company's products at lower price points. If these competitors' products capture significant market share or result in a decrease in market prices overall, this could have a negative impact on the Company's results of operations and financial condition.

296. Similar representations regarding product innovation and competition were included in Sirona's 2015 Form 10-K, filed with the SEC on November 20, 2015 and also incorporated in the Registration Statement. While reporting net income of $186.2 million, $175.7 million and $146.7 million, respectively, on revenue of $1.161 billion, $1.171 billion and $1.102 billion, respectively, for the fiscal years ended September 30, 2015, 2014 and 2013, Sirona's Form 10-K for the fiscal year ended September 30, 2015, represented that "Sirona has a long tradition of innovation in the dental industry … Sirona continues to make significant investments in R&D, and its track record of innovative and profitable new products continues today."

297. With respect to competition, the Form 10-K also stated:

> Competition in the global dental market is fragmented by both geography and

> products. We compete with a variety of companies, including large international companies as well as smaller companies that compete regionally or on a narrower product line. Sirona competes on the basis of its comprehensive and innovative product line and its global distribution network.

298. These statements regarding product innovation and competition were materially misleading because they affirmatively misrepresented the state of competition in the industry for Dentsply Intl., Sirona, and the combined company, and failed to disclose the existence or effects of the Distributors' ongoing anticompetitive scheme.

299. Additionally, as stated in paragraphs 283-286, above, the Registration Statement included financial forecasts that Dentsply Intl.'s management prepared regarding Sirona using projections furnished by Sirona management, called the "Sirona Adjusted Projections," as well as financial forecasts that Sirona management prepared for Sirona and for the combined company. These financial projections were also materially misleading because they were artificially inflated by revenue resulting from the Distributors' anticompetitive conduct, which was continuing and then causing the financial information of Dentsply Intl. and Sirona not to accurately reflect the nature of their business in the absence of such conduct. Likewise, the Registration Statement's description of various financial analyses for Dentsply Intl. and Sirona was materially misleading, because it also reflected financial information that was artificially inflated as a result of the illicit anticompetitive scheme described herein.

### 2. False Statements Regarding Goodwill and Impairment

300. The Registration Statement included statements regarding the valuation of the intangible assets and goodwill of each of Dentsply Intl., Sirona and the combined company that were materially misleading as a result of the Distributors' scheme as well as the Patterson minimum purchase requirements and the excess inventory that had been sold to Patterson, which inflated the value of these items. Specifically, the Registration Statement contained line items for these values,

as follows:

(a) *Intangible Assets, Net*: (1) Dentsply Intl.: $600.4 million; (2) Sirona: $216.8 million; and (3) pro forma combined company, after an acquisition adjustment of approximately $2.26 billion: $3.08 billion.

(b) *Goodwill, Net*: (1) Dentsply Intl.: $1.98 billion; (2) Sirona: $585.9 million; and (3) pro forma combined company, after an acquisition adjustment of approximately $3.52 billion: $6.09 billion

301. The Registration Statement also represented that Dentsply Intl. "prepares its financial statements in accordance with GAAP" – that is, U.S. Generally Accepted Accounting Principles – and accounted for the Merger "using the acquisition method of accounting with DENTSPLY being considered the acquirer of Sirona for accounting purposes." As the Registration Statement further indicated:

> This means that DENTSPLY will allocate the purchase price to the fair value of Sirona's tangible and intangible assets and liabilities at the acquisition date, with the excess purchase price being recorded as goodwill. Under the acquisition method of accounting, goodwill is not amortized but is tested for impairment at least annually.

302. Because the benefits flowing from the Distributors' anticompetitive scheme as well as the Patterson excess inventory and continuing sales artificially inflated the value of the intangible assets and goodwill of Dentsply Intl. and Sirona, their value was already impaired by the effective date of the Registration Statement. Therefore, the Registration Statement presented a misleading portrayal of these values, which in fact were inaccurate and did not comply with GAAP.

303. As noted, the Registration Statement also incorporated by reference numerous SEC filings and directed readers to them for further information regarding Dentsply Intl. and Sirona.

These SEC filings contained material misstatements and omissions concerning industry competition and the sources of revenue and financial results for each of Dentsply Intl. and Sirona that rendered the Registration Statement materially misleading and incomplete.

304. For example, concerning how Dentsply Intl. measured the value of goodwill carried by Sirona, the Registration Statement referred investors to Dentsply Intl.'s October 28, 2015 Form 8- K, which stated:

> **Business Acquisitions**
>
> The Company acquires businesses as well as partial interests in businesses. Acquired businesses are accounted for using the acquisition method of accounting which requires the Company to record assets acquired and liabilities assumed at their respective fair values with the excess of the purchase price over estimated fair values recorded as goodwill. The assumptions made in determining the fair value of acquired assets and assumed liabilities as well as asset lives can materially impact the results of operations.
>
> The Company obtains information during due diligence and through other sources to get respective fair values. Examples of factors and information that the Company uses to determine the fair values include: tangible and intangible asset evaluations and appraisals; evaluations of existing contingencies and liabilities and product line integration information. If the initial valuation for an acquisition is incomplete by the end of the quarter in which the acquisition occurred, the Company will record a provisional estimate in the financial statements. The provisional estimate will be finalized as soon as information becomes available but will only occur up to one year from the acquisition date.

305. By incorporating the October 28, 2015 Form 8-K, the Registration Statement also assured investors that "[t]he Company follows the accounting standards for goodwill and indefinite-lived intangibles," and that "[a]ssessment of the potential impairment of goodwill and other long-lived assets is an integral part of the [Dentsply Intl.'s] normal ongoing review of operations," stating:

> **Goodwill and Other Long-Lived Assets**
>
> <u>Goodwill and Indefinite-Lived Assets</u>
>
> ***The Company follows the accounting standards for goodwill and indefinite-lived intangibles***, which require an annual test for impairment to goodwill using a fair

> value approach. In addition to minimum annual impairment tests, the Company also requires that impairment assessments be made more frequently if events or changes in circumstances indicate that the goodwill or indefinite-lived assets might be impaired. If impairment related to goodwill is identified, the resulting charge is determined by recalculating goodwill through a hypothetical purchase price allocation of the fair value and reducing the current carrying value to the extent it exceeds the recalculated goodwill. If the carrying amount of an indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized.

306. Concerning how Dentsply Intl. measures the fair value of the goodwill carried on its own balance sheet, the Registration Statement again referred investors to the October 28, 2015 Form 8-K, which stated, in pertinent part, as follows:

> Goodwill is the excess of the purchase price over the fair value of identifiable net assets acquired and liabilities assumed in a business combination. Goodwill is not amortized. Goodwill is tested for impairment annually, during the Company's second quarter, or when indications of potential impairment exist. The Company monitors for the existence of potential impairment throughout the year. This impairment assessment includes an evaluation of various reporting units, which is an operating segment or one reporting level below the operating segment. The Company performs impairment tests using a fair value approach. The Company compares the fair value of each reporting unit to its carrying amount to determine if there is potential goodwill impairment. If impairment is identified on goodwill, the resulting charge is determined by recalculating goodwill through a hypothetical purchase price allocation of the fair value and reducing the current carrying value to the extent it exceeds the recalculated goodwill.
>
> The Company's fair value approach involves using a discounted cash flow model with market-based support as its valuation technique to measure the fair value for its reporting units. The discounted cash flow model uses five-year forecasted cash flows plus a terminal value based on a multiple of earnings. In addition, the Company applies gross profit and operating expense assumptions consistent with its historical trends. The total cash flows were discounted based on market participant data, which included the Company's weighted-average cost of capital. The Company considered the current market conditions when determining its assumptions. Lastly, the Company reconciled the aggregate fair values of its reporting units to its market capitalization, which included a reasonable control premium based on market conditions

307. The representation that Dentsply Intl. appropriately valued its intangible assets and goodwill and those of businesses it acquired, and that it "considered the current market conditions when determining its assumptions" in calculating fair value for goodwill purposes, were inaccurate.

This is because, as noted, Dentsply Intl. did not consider the financial impact of the Distributors' scheme or Patterson's excess inventory of Sirona's product sales on the value of its own goodwill and intangible assets or Sirona's or the combined company's.

308. The Cease and Desist Order has confirmed that the August 9, 2017 impairment charge to goodwill was a direct result of Dentsply Sirona's belated recognition that it had overstated its estimated growth generated by the sale of excess inventory to Patterson. Cease and Desist Order, ¶ 11.

**D. False Statements Regarding the Fairness Opinion**

309. As stated in the Registration Statement, Jefferies "delivered a written opinion, dated September 15, 2015, to the Sirona board of directors as to the fairness, from a financial point of view and as of such date, of the exchange ratio provided for in the merger agreement to holders of Sirona common stock." Specifically, the Registration Statement recites that Jefferies concluded and expressed that "the exchange ratio provided for in merger agreement was fair, from a financial point of view, to holders of Sirona common stock." The Registration Statement not only described information regarding the financial analyses that Jefferies performed, but it also included a non-exhaustive list of information that Jefferies considered, including:

(a) "publicly available financial and other information about Sirona and DENTSPLY";

(b) "certain information furnished . . . by the respective managements of Sirona and DENTSPLY relating to the businesses, operations and prospects of Sirona and DENTSPLY, including financial forecasts and estimates relating to Sirona and DENTSPLY prepared by the respective managements of Sirona and DENTSPLY";

(c) "certain estimates of, and related information prepared by, the managements of Sirona and DENTSPLY as to the cost savings and revenue enhancements potentially resulting from the merger";

(d) "discussions with members of the senior managements of Sirona and DENTSPLY concerning the matters described [above]";

(e) "the relative contributions of Sirona and DENTSPLY to certain financial metrics of the pro forma combined company"; and

(f) "the potential pro forma financial effects of the merger relative to Sirona on a standalone basis and on DENTSPLY, in each case after taking into account potential synergies, utilizing financial forecasts and estimates relating to Sirona and DENTSPLY prepared by the respective managements of Sirona and DENTSPLY[.]"

310. The Registration Statement indicated that "Jefferies relied upon the assessments of the managements of Sirona and DENTSPLY as to … the potential impact on [their] businesses of their existing and future relationships, agreements and arrangements with … distributors." As alleged in this portion of the Complaint, however, the management of Dentsply Intl. and Sirona were aware of worsening inventory issues at Patterson and the risk of non-renewal of the Exclusive Distribution Agreement, as confirmed by the Cease and Desist Order, as well as the Distributors' anticompetitive scheme that would impact future product sales – conditions that the Registration Statement failed to disclose.

311. By representing that Jefferies concluded, based on evaluating extensive information and performing financial analysis, that the consideration offered to Sirona shareholders was fair from a financial point of view to them, the Registration Statement led Sirona shareholders to believe that Jefferies considered all information that could materially

impact the valuation of such consideration. Yet the Registration Statement did not disclose how anticompetitive conduct by the Distributors was responsible for the financial results of Dentsply Intl., how the cessation of that conduct might affect the prospects of the combined company, or whether Jefferies considered such conduct in rendering its fairness opinion.

312. The Registration Statement also stated that Jefferies relied on the assessments of the management teams of Dentsply Intl. and Sirona regarding "competitive and other trends" and governmental and regulatory matters regarding "the dental products industry" and "the potential impact on … [their] businesses" of relationships with the Distributors, as follows:

> Jefferies relied upon the assessments of the managements of Sirona and DENTSPLY as to, among other things, (i) the potential impact on Sirona and DENTSPLY of market, competitive and other trends in and prospects for, and governmental, regulatory and legislative matters relating to or affecting, the dental products industry, . . . [and] (iii) the potential impact on Sirona's and DENTSPLY's businesses of their existing and future relationships, agreements and arrangements with, and the ability of Sirona and DENTSPLY to attract and retain, key employees, customers, distributors and other commercial relationships . . . .

313. Similarly, the Registration Statement stated that Jefferies relied on the assessments of the management of Dentsply Intl. and Sirona regarding the financial forecasts, estimates and other information, which Jefferies assumed were reasonably prepared, as follows:

> Jefferies was advised, and assumed, that the financial forecasts and estimates relating to Sirona and DENTSPLY and the potential synergies that Jefferies was directed to utilize in its analyses were reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the respective managements of Sirona and DENTSPLY, as the case may be, as to the future financial performance of Sirona, DENTSPLY, such potential synergies and the other matters covered thereby.

314. However, for the reasons stated above, such representations were materially misleading.

**E. The Registration Statement Failed to Disclose the Information Required by Items 303 and 503 of Regulation S-K, and Did Not Otherwise Disclose Information Concerning Trends, Uncertainties, Events or Risks**

315. Item 303(a) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

316. In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

317. Furthermore, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

318. Similarly, Item 503(c) of SEC Regulation S-K, 17 C.F.R. §229.503(c), which governs disclosure of risk factors, requires an issuer to "provide under the caption 'Risk Factors'

a discussion of the most significant factors that make the [securities] speculative or risky." Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk."

319. The anticompetitive scheme described herein constituted a known risk or uncertainty under Item 303, and otherwise required disclosure under Item 503, because the public exposure and cessation of the scheme materially threatened the operations of both Dentsply Intl. and Sirona, thus also threatening the combined company after the Merger. Both Dentsply Intl. and Sirona faced the prospect of having negatively impacted sales going forward and a reduction in the value of their intangible assets and goodwill – upon the resolution of the scheme. Accordingly, even if the management of Dentsply Intl. or Sirona could not reasonably estimate or quantify the manner in which the revelation of the scheme might impact those entities, disclosure was required.

320. Likewise, Patterson's stockpile of inventory posed known trends and uncertainties, because the inventory problems suffered by Patterson worsened as time went on and the inventory and sales issues rendered unpredictable Sirona's sales and revenues – problems that would continue to afflict Dentsply Sirona after the Merger and later result in significant write-downs to the value of intangible assets and goodwill. Item 303 required disclosure of these trends and uncertainties, particularly because they threatened Sirona's exclusive and lucrative supplier relationship with Patterson, and Item 503 required disclosure of the true risks associated with these then-occurring problems.

321. The Registration Statement represented that "Sirona is uniquely positioned to benefit from several trends in the global dental industry, such as technological innovation, the shift to digital imaging, favorable demographic trends, and growing patient focus on dental health and

cosmetic appearance." This statement conveyed the misleading impression that Sirona was benefitting from – and the combined company stood to benefit from – Sirona's unique positioning and ongoing trends in the dental industry. This statement also gave rise to an obligation to disclose in the Registration Statement those trends that were adversely affecting Sirona and could adversely affect the combined company.

322. Yet the Registration Statement failed to disclose the trend, known to the management of Dentsply Intl. and Sirona, of increasing inventory then affecting Sirona's exclusive U.S. distributor, Patterson, nor did it describe the potential or actual consequences of the trend on Sirona or Dentsply Intl.: that the sales channels for the CEREC systems and other Sirona products were stuffed; that Patterson was stockpiling inventory to satisfy minimum purchase requirements, but could not sell from its existing inventory; that Sirona's exclusive supplier arrangement with Patterson was at risk of non-renewal or early termination; and that Sirona – and, by extension, Dentsply Sirona – faced declining sales, revenues, and income from continuing operations, all as a consequence of the foregoing.

## XV. CLAIMS BROUGHT PURSUANT TO SECTIONS 11, 12(a)(2), AND 15 OF THE SECURITIES ACT AND SECTION 14(a) OF THE EXCHANGE ACT

323. The claims set forth herein pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, are not based on any allegations of knowing or reckless misconduct by any Defendant. These claims do not allege, and do not sound in, fraud, and Lead Plaintiff specifically disclaims any reference to or reliance upon allegations of fraud in these non-fraud claims under Section 14(a) and SEC Rule 14a-9.

324. The claims set forth herein pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act are based solely on strict liability and negligence, and are not based on any

knowing or reckless conduct by or on behalf of any defendant – *i.e.*, they do not allege, and do not sound in, fraud – and Lead Plaintiff specifically disclaims any allegations of fraud, scienter or recklessness in these non-fraud claims.

**THIRD CLAIM FOR RELIEF**

**For Violations of Section 11 of the Securities Act Against Dentsply Sirona, the Dentsply Director Defendants, and Officer Defendants Wise, Clark, Slovin and Michel**

325. This Cause of Action is brought by Lead Plaintiff pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who acquired the common stock of Dentsply Sirona in exchange for their shares of the common stock of Sirona pursuant to the Registration Statement.

326. Lead Plaintiff incorporates by reference paragraphs 263-322, above, as if set forth here. The allegations do not allege fraud, scienter or the intent of the Defendants to defraud Lead Plaintiff or members of the Class. For the purposes of this Section 11 claim, Lead Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act. This Cause of Action is predicated upon Defendants' liability for making false and materially misleading statements in the Registration Statement.

327. The Registration Statement was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein. The misstatements and omissions set forth in paragraphs 272-322, above were material.

328. Dentsply Intl. – Dentsply Sirona's predecessor-in-interest – is the registrant for the shares issued and distributed to the Class members pursuant to the Merger. The Defendants

named in this Cause of Action were responsible for the contents and dissemination of the Registration Statement.

329. At a minimum, as the issuer of the shares, Dentsply Intl. (now Dentsply Sirona) is strictly liable to Lead Plaintiff and the Class for the Registration Statement's material misstatements and omissions.

330. None of the defendants named in this Cause of Action made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

331. By reason of the conduct alleged herein, each of these defendants violated Section 11 of the Securities Act.

332. Lead Plaintiff and certain members of the Class exchanged their shares of Sirona common stock for Dentsply Intl. common stock in connection with the Merger and pursuant to the Registration Statement.

333. Lead Plaintiff and these members of the Class have sustained damages. The value of Dentsply Intl. (now Dentsply Sirona) common stock has declined substantially after the Merger and subsequent to the issuance and dissemination of the materially misleading Registration Statement.

334. At the time of their acquisition of Dentsply Intl. common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged.

335. This initial complaint in this action was filed on December 19, 2018, less than one year from the curative disclosures of August 7, 2018, that disclosed the full extent of the materially false and misleading statements in the Registration Statement, and less than one year

from the filing of the FTC Complaint. Further, less than one year elapsed from the time that any person who exchanged Sirona stock for Dentsply Sirona stock in the exchange discovered, or reasonably could have discovered, the facts upon which this claim is based to the time that a plaintiff filed a Section 11 claim in the Supreme Court of the State of New York on June 7, 2018. Further, less than three years elapsed between the time that the securities upon which this count is brought were offered to the public and the time that the plaintiff in the New York State Court and the plaintiff in this Action filed their complaints.

**FOURTH CLAIM FOR RELIEF**

**For Violations of Section 12(a)(2) of the Securities Act Against Dentsply Sirona**

336. This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all persons who acquired the common stock of Dentsply Sirona in exchange for their shares of the common stock of Sirona pursuant to the Registration Statement.

337. Lead Plaintiff incorporates by reference paragraphs 263-322, above, as if set forth here. The allegations do not allege fraud, scienter or the intent of the Defendants to defraud Lead Plaintiff or members of the Class. For the purposes of this Section 12(a)(2) claim, Lead Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent. This Cause of Action is predicated upon Defendants' liability for making false and materially misleading statements in the Registration Statement and Prospectus.

338. By means of the defective Prospectus and as otherwise detailed herein, Dentsply Sirona promoted and sold, for the benefit of themselves and their associates, Dentsply Intl. common stock to Lead Plaintiff and other members of the Class.

339. The Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. Dentsply Sirona owed Lead Plaintiff and other members of the Class who acquired Dentsply Sirona common stock pursuant to the prospectus a duty to make a reasonable and diligent investigation of the statements contained in the prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Dentsply Sirona, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus as set forth above. Lead Plaintiff and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time they purchased or otherwise acquired Dentsply Intl. common stock.

340. By reason of the conduct alleged herein, Dentsply Sirona violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who exchanged Sirona common stock for Dentsply Intl. common stock in the Merger pursuant to the Prospectus sustained substantial damages in connection therewith. Accordingly, Lead Plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the Defendant sued herein. Class members who have sold their Dentsply Intl. common stock seek damages to the extent permitted by law.

341. This claim is timely filed for the same reasons set forth in paragraph 336 of the Third Claim for Relief.

## FIFTH CLAIM FOR RELIEF

### For Violations of Section 15 of the Securities Act Against the Dentsply Director Defendants and Officer Defendants Wise, Clark, Slovin and Michel

342. This Cause of Action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against Dentsply Director Defendants and the above-identified Officer Defendants. This Cause of Action does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed. Lead Plaintiff incorporates by reference paragraphs 263-322, above, as if set forth here.

343. The Dentsply Director Defendants and the above-identified Officer Defendants each were control persons of Dentsply Intl. or Sirona by virtue of their positions as directors and/or senior executive officers of Dentsply Intl. or Sirona at the time of the Merger. The Dentsply Director Defendants and the above-identified Officer Defendants each had a series of direct and/or indirect relationships with the Sirona and Dentsply Intl. companies, and were therefore control persons with respect to the materially false and misleading statements in the Registration Statement and Prospectus.

344. This claim is timely filed for the same reasons set forth in paragraph 336 of the Third Claim for Relief.

345. By reason of the conduct alleged herein, these defendants violated Section 15 of the Securities Act and Lead Plaintiff and the members of the Class have suffered harm as a result.

## SIXTH CLAIM FOR RELIEF

### For Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder Against Dentsply Sirona, the Dentsply Director Defendants, and Officer Defendants Wise, Clark, Slovin and Michel (together, the "Proxy Defendants")

346. Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder prohibits making material misstatements and omissions in soliciting any proxy. For the purposes of this Section 14(a) claim, Plaintiff does not allege that any Defendant acted with fraudulent intent, which is not an element of a claim under Section 14(a) of the Exchange Act. This Cause of Action is predicated upon the Proxy Defendants' liability for making false and materially misleading statements in connection with soliciting shareholder approval of the Merger. It is brought on behalf of former Dentsply Intl. shareholders who held shares as of December 2, 2015 and were entitled to vote with respect to the Merger. Lead Plaintiff incorporates by reference paragraphs 263-322, above, as if set forth here.

347. The misstatements and omissions set forth in paragraphs 272-322 above were material. The Proxy Defendants made or were responsible for making the misstatements and omissions. Through their negligence in issuing the Proxy containing material misstatements and omissions, the Proxy Defendants failed to disclose to Dentsply Intl. shareholders who held shares as of the record date of December 2, 2015 and were entitled to vote with respect to the Merger at the January 11, 2016 special meeting of Dentsply Intl. shareholders all material facts necessary for shareholders to cast a fully informed vote with respect to the Merger, as alleged above.

348. Lead Plaintiff and other shareholders have been injured by the material misstatements and omissions contained in the Proxy.

349. Lead Plaintiff and other members of the Class are entitled to recover damages to compensate them for all damages resulting from the acts and omissions of the Proxy Defendants in violation of Section 14(a) of the Exchange Act.

350. This action was filed on December 19, 2018, less than one year from the curative disclosures of May 6-7, 2018 and August 7, 2018, that disclosed the full extent of the materially false and misleading statements in and omissions from the Registration Statement, and less than one year from the filing of the FTC Complaint. Accordingly, less than one year has elapsed from the time any plaintiff discovered or reasonably could have discovered the facts upon which this Claim is based to the time the initial complaint was filed in this Court and less than three years have elapsed from the shareholder vote based on the Defendants' filing of the Registration Statement with the SEC for the Merger.

## SEVENTH CLAIM FOR RELIEF

### For Violations of Section 20(a) of the Exchange Act Against Officer Defendants Wise, Clark, Slovin and Michel

351. As alleged above, the Proxy Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder by their acts and omissions as alleged in the First Claim for Relief. This claim is similarly brought on behalf of former Dentsply Intl. shareholders who held shares as of December 2, 2015 and were entitled to vote with respect to the Merger.

352. The above-identified Officer Defendants acted as controlling persons of Dentsply Intl. and of Sirona within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and/or awareness of their respective company's operations, direct involvement in the day-to-day operations of the companies, and/or knowledge of each company's actual performance, and their power to control public statements about Dentsply Intl. and Sirona, the Officer Defendants had the power and ability to control the actions of Dentsply Intl. and Sirona and its employees. Specifically, at the time of the Merger, Defendant Slovin served as the President and CEO of Sirona; Defendant Wise served as the CEO

and Chairman of the Board of Dentsply Intl.; Defendant Clark served as the President and CFO of Dentsply Intl.; and Defendant Michel served as the CFO of Sirona.

353. This claim is timely filed for the same reasons set forth in paragraph 336 of the Sixth Claim for Relief.

354. By reason of such conduct, Officer Defendants Slovin, Wise, Clark and Michel are liable pursuant to Section 20(a) of the Exchange Act.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XVII. JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: January 22, 2021

Respectfully submitted:

**BARRACK RODOS & BACINE**

*/s/ Michael A. Toomey*
A. Arnold Gershon

Michael A. Toomey
11 Times Square
640 Eighth Avenue, 10th Floor
New York, NY 10036
Telephone: 212.688.0782
Facsimile: 212.688.0783

and

Jeffrey W. Golan
Robert A. Hoffman
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: 215.963.0600
Facsimile: 215.963.0838

*Attorneys for the Strathclyde Pension Fund and Lead Counsel for the Putative Class*