UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- x

IN RE DENTSPLY SIRONA, INC.
SECURITIES LITIGATION

OPINION & ORDER
18-cv-7253 (NG)(PK)

--------------------------------------------------------- x

GERSHON, United States District Judge:

This action, initially brought by plaintiff Boynton Beach General Employees' Pension Plan on December 19, 2018, is a proposed class action on behalf of shareholders of Dentsply Sirona, Inc. ("Dentsply Sirona"). On March 8, 2019, Strathclyde Pension Fund was appointed Lead Plaintiff ("Plaintiff") and subsequently filed an Amended Complaint on May 6, 2019. It makes claims pursuant to Section 10(b) (15 U.S.C. § 78j(b)) of the 1934 Securities and Exchange Act and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), as well as Section 20(a) (15 U.S.C. § 78t(a)) of the Exchange Act. It also brings claims under Sections 11 (15 U.S.C. § 77k), 12(a)(2) (15 U.S.C. § 77l(a)(2)), and 15 (15 U.S.C. § 77o) of the 1933 Securities Act. The claims are brought in connection with the merger of Dentsply International, Inc. ("Dentsply Intl.") and Sirona Dental Systems, Inc. ("Sirona") on or about February 29, 2016, and statements made in Securities and Exchange Commission ("SEC") filings by these companies and their successor in interest, Dentsply Sirona, and in public disclosures to the market between February 20, 2014 and August 7, 2018 ("the Class Period").

Following a fully briefed motion to dismiss, but before I issued an opinion, Dentsply Sirona, on December 16, 2020, settled charges with the SEC, relating to the SEC's investigation into Dentsply Sirona's "accounting and disclosures relating to transactions with a significant"

distributor.  *See* Defs.' Ex. 25, at 32.  Based on this new development, Plaintiff filed a Second Amended Complaint ("Complaint") on January 25, 2021.[1]

Dentsply Sirona is named as a defendant in the Section 10(b) and Rule 10b-5 claims, as well as the Sections 11 and 12(a)(2) claims.  Additionally, Section 10(b) and Rule 10b-5 and Section 20(a) claims are brought against Nicholas W. Alexos, Donald M. Casey, Christopher T. Clark, Ulrich Michel, Jeffrey T. Slovin, Bret W. Wise, and Mark A. Thierer (the "Officer Defendants"), and the Section 11 and 15 claims are brought against Michael C. Alfano, Eric K. Brandt, Paula H. Cholmondeley, Michael J. Coleman, Willie A. Deese, William F. Hecht, Francis J. Lunger, John L. Miclot, and John C. Miles II (the "Director Defendants") and certain of the Officer Defendants, specifically, Bret W. Wise, Christopher T. Clark, Jeffrey T. Slovin, and Ulrich Michel.  All Defendants move to dismiss the Complaint for failing to meet the pleading standards of Federal Rules of Civil Procedure 9(b) and 12(b)(6), the Securities Act, the Exchange Act, and the Private Securities Litigation Reform Act of 1995 ("PSLRA").[2]

For the reasons that follow, while I find that certain of the alleged misrepresentations or omissions are not actionable, the motion is denied.

## I.     Facts

The following facts, as alleged in the Complaint, are accepted as true for the purposes of this motion.

---

[1] There have been four complaints filed.  The first, by Boynton Beach General Employees' Pension Plan, the second by Plaintiff, the third by Plaintiff following the first motion to dismiss, and the fourth—and operative—complaint filed by Plaintiff a day later to correct an error.  I refer to the operative complaint in this opinion as the Complaint.

[2] Although, in their original motion to dismiss, Defendants moved under Federal Rule of Civil Procedure 12(b)(6), they do not mention that rule in their second motion.  Plaintiff correctly recognizes that the present motion is nonetheless based on that Rule.

Defendant Dentsply Sirona is the world's largest manufacturer of professional dental products. Prior to their merger, Dentsply Intl. designed and manufactured dental equipment and dental consumables (i.e., products that are used on patients by dental professionals while performing dental procedures), while Sirona designed and manufactured technologically advanced dental equipment, including computer-aided design/computer-aided manufacturing ("CAD/CAM") restoration systems and 3D imaging systems (equipment that allows dental offices to design and create dental prostheses). With respect to its CAD/CAM segment, Sirona pioneered the application of high-tech CAD/CAM techniques to the traditional lab-based restoration process with the Chairside Economical Restorations of Esthetic Ceramics ("CEREC") method in 1987. In brief, the CEREC system gave dentists the ability to complete a dental crown in a single visit. At the time of the merger, a CEREC system cost well over six figures, with higher-end units costing up to $200,000. As for Sirona's Imaging Systems segment, it included a broad range of systems for diagnostic imaging in the dental practice. In 2005, Sirona cemented its place as a leader in the dental imaging market when it purchased Schick Technologies, Inc. ("Schick"). Schick's name was changed to Sirona Dental, Inc. on October 1, 2012.

There are three major non-party distributors of dental consumable supplies and equipment such as those produced by Dentsply Sirona. According to the Complaint, those distributors—Schein, Patterson, and Benco—held an 80-85% market share, with Patterson and Schein holding 75% market share. Prior to the merger, Patterson accounted for between 28% and 38% of Sirona's revenue in any given quarter and was Sirona's largest customer. Following the merger, in 2016, Patterson accounted for 12% of Dentsply Sirona's worldwide sales.

The relationship between Patterson and Sirona, dating back to 1998, was governed by agreements, collectively referred to as the "Exclusive Distribution Agreements," which gave Patterson exclusive rights to distribute, in the United States and Canada, current and future Sirona CAD/CAM products and Schick and Sirona-branded imaging products.  In June 2005, Sirona and Patterson entered into a Consolidated and Restated Amendment to Distributorship Agreement concerning all current and future Sirona CAD/CAM equipment sold in the United States and Canada, for which Patterson made a one-time payment to Sirona of $100 million. This agreement was then amended on May 31, 2012, for purposes of selling Sirona CAD/CAM equipment in the United States, but left the 2005 Agreement in place for sales in Canada.  In May 2010, Schick, which was owned by Sirona, and Patterson entered into an Amendment to Distributorship Agreement concerning sales to Patterson of Schick products, including Schick x-ray systems and software.  This agreement was amended by Sirona and Patterson on May 31, 2012, for purposes of selling Schick products in the United States but left the 2010 Agreement in place for sales in Canada.  In addition to sales of Schick products, the 2012 amended agreement also concerned sales of certain Sirona products, including Sirona branded imaging products and equipment, in the United States.

The Exclusive Distribution Agreements mandated that Patterson purchase minimum quantities of Sirona's products, referred to as the "minimum purchase requirements," in order to retain exclusivity.  If Patterson failed to purchase the minimum amount required, it would be subject to a fee; and Sirona could terminate the Agreements if Patterson failed to maintain the agreed-to purchasing levels over a prolonged period of time.  The Exclusive Distribution Agreements also required Patterson to make detailed reports to Sirona, and later Dentsply Sirona, on a monthly basis, about the state of the market, and sales of Sirona's, and, thereafter, Dentsply

4

Sirona's products. The reports included information about "the market situation, economic situation and forecast, trade policies, business prospects, activities of competitors;" "order entry/turnover and backlog, sorted out as to number of units and value, relative to sale regions;" stock of products "relative to sale branches;" "the sales targets and results for each of Patterson's branch offices for that month;" and a "schedule of Patterson's sales for that month with respect to each product. Complaint ¶¶ 46–49. The Exclusive Distribution Agreements had an expiration date of September 30, 2017, unless renewed.

Sirona filed the Exclusive Distribution Agreements in 2015 as exhibits to its SEC filings, and investors were aware that the contracts expired in September 2017. Investors were also aware that the publicly filed contracts included minimum purchase requirements, but the exact figures required by the minimum purchase requirements were redacted from public filings. Patterson's reports to Sirona and, thereafter, Dentsply Sirona about the market and inventory were not made public.

At least as early as 2014, Plaintiff alleges, Schein, Patterson, and Benco were engaged in an anticompetitive conspiracy. While traditionally, independent dentists, or solo practitioners, had purchased dental products for their own practices alone, the distributors were aware that, in related dental markets, dentists had joined dental buying groups, as a means to "aggregate and leverage" their collective purchasing power in exchange for lower prices. *Id*. ¶ 76. Concerned that the formation of dental buying groups would drive down prices, the distributors entered into an illegal conspiracy to not "deal with" dental buying groups and to block lower-priced, rival distributors, who could sell to dental buying groups, from entering the market. *Id*. ¶ 79. Plaintiff alleges that the distributors pressured state dental associations — including the Texas Dental Association and Arizona Dental Association — not to form dental buying groups that would be

supplied by a lower-priced distributor, by boycotting their annual trade shows. Their anticompetitive conduct slowed the formation and growth of dental buying groups, enabling the distributors to charge supra-competitive prices for their dental products.

Citing email correspondence involving the distributors and Dentsply Intl. and Sirona, Plaintiff alleges that Dentsply Intl., Sirona, and Dentsply Sirona, thereafter, were "well aware of" the conspiracy and "acquiesced in" the boycott of the state dental associations. *Id*. ¶ 85. Dentsply Sirona also "benefitted from" the distributors' conspiracy. *Id*. ¶ 89. As long as dental buying groups and lower-priced distributors were excluded from the market, the distributors could sell products at supra-competitive prices, which, in turn, allowed Defendants to sell their products to the distributors at inflated prices and high profit margins. While the distributors' conspiracy continued, Dentsply Sirona's "revenues, earnings and profit margins" were artificially inflated. *Id*. ¶ 91.

Dentsply Intl., and Dentsply Sirona, thereafter, also took "affirmative steps" to assist the distributors in eliminating gray market competitors, who sold products online at discounted prices. *Id*. ¶ 86. In coordination with the distributors, Dentsply Sirona told dentists not to purchase from unauthorized distributors and threatened and filed allegedly vexatious trademark and tortious interference litigation against unauthorized distributors.

As early as the quarter ended August 1, 2015, Patterson held a glut of Sirona inventory that it was unable to sell. This was because end-user demand in the market for Sirona's products was inadequate. Specifically, Plaintiff alleges that Patterson's inventory of Sirona products increased by $112.9 million in the quarter ended August 1, 2015 when compared to the quarter ended April 25, 2015. Though end-user demand was insufficient, Patterson continued making purchases of Sirona's products in order to comply with the Exclusive Distribution Agreements'

minimum purchase requirements, which led to Patterson amassing additional excess inventory. Plaintiff alleges that Dentsply Sirona and the Officer Defendants were well-aware of the supply, demand, and resultant build-up of excess inventory by Patterson because of the disclosure requirements in the Exclusive Distribution Agreements.

On February 29, 2016, a "merger of equals" occurred, and Dentsply Intl. completed a $5.5 billion stock-for-stock acquisition of Sirona.  Sirona shareholders received 1.8142 shares of Dentsply Intl. for each share of Sirona, and the combined company was renamed Dentsply Sirona.  Dentsply Intl.'s registration statement, which was filed with the SEC and became effective on December 7, 2015, expressly incorporated by reference, *inter alia*, Annual Reports on Form 10-K, Proxy Statements on Schedule 14A, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K for both Dentsply Intl. and Sirona for the preceding fiscal year.

Patterson's inventory build-up continued into 2016.  By the quarter ended October 28, 2016, Plaintiff alleges that Patterson's inventory of Sirona's and, thereafter, Dentsply Sirona's products increased $191.7 million when compared to the quarter ended April 25, 2015.  In November 2016, as a result of a lack of end-user demand and the glut of inventory that it held, Patterson publicly announced that it would not renew the existing Exclusive Distribution Agreements when they expired in September 2017.  Patterson then began to purchase fewer products from Dentsply Sirona in an effort to destock inventory.

The Complaint alleges that the market was unaware of the magnitude of the build-up at Patterson and the lack of end-user demand.  For example, according to the Complaint, in the question-and-answer portion of a conference call on May 5, 2016, a Goldman Sachs analyst specifically asked Dentsply Sirona about Patterson "carrying a higher level of inventory coming into this year" and sought input on what the stockpile was as compared to "what the end-

market's really doing." *Id.* ¶ 132.  Plaintiff alleges that Defendants Slovin and Michel failed to answer that specific question.  Plaintiff also cites analyst reports from late 2016 to late 2017, indicating that analysts considered market demand to be "healthy." *Id.* ¶ 65.

In early 2017, the distributors could no longer thwart the rise of dental buying groups, and they were forced to sell products to them.  As they feared, the dental buying groups were able to force lower prices that reduced the distributors' profit margins.  After the first few months of 2017, "the effects of the Distributors' conspiracy waned" or "began to dissipate." *Id.* ¶¶ 91, 124.  Dentsply Sirona's "reported sales, profits and earnings could no longer be buoyed by the conspiracy." *Id.* ¶ 91.

In May 2017, after Patterson decided to end exclusivity, Dentsply Sirona announced that it had entered into a new non-exclusive distribution agreement with Patterson.  At the same time, Dentsply Sirona announced that it had engaged a new non-exclusive distributor, Schein.  To "soften the significant financial impact this development would have," it described the new non-exclusive distribution agreements as a new "go-to-market strategy" that would "accelerate" growth. *Id.* ¶ 142.  Plaintiff alleges that Dentsply Sirona knew at the time that the new non-exclusive agreements could not drive faster growth because of the glut of inventory Patterson held and the lack of sufficient end-user demand.

Dentsply Sirona's 2016 Form 10-K, filed on March 1, 2017, acknowledged that the disruption caused by Patterson's failure to renew the exclusivity contract negatively impacted fourth quarter sales by approximately $30 million.  In Dentsply Sirona's first quarter 2017 filings with the SEC and in a contemporaneous conference call with analysts and investors, Dentsply Sirona reported that inventory of Sirona equipment by Patterson decreased by $9 million in the first quarter and that Patterson was projected to further reduce inventory another $50-60 million

8

in the second and third quarters of 2017.  Thereafter, in its Form 10-Q for the second quarter 2017, Dentsply Sirona announced that the SEC had opened an investigation into its "accounting and disclosures relating to transactions" with Patterson.  *Id*. ¶ 100.

Plaintiff alleges that the "full scope" of the distributors' conspiracy was not revealed until February 12, 2018, when the Federal Trade Commission ("FTC") filed a complaint against Patterson, Schein, and Benco.  Quoting the FTC complaint, Plaintiff alleges that the distributors' conspiracy was a "horizontal agreement to restrain price competition" which constituted a "per se violation of Section 5 of the Federal Trade Commission Act."  *Id*. ¶ 81.  Plaintiff alleges that the FTC complaint includes "hundreds of emails, texts and telephone calls" exchanged by the distributors in furtherance of the scheme.  *Id*.

On May 6, 2018, Dentsply Sirona announced that its first quarter results had been impacted by approximately $8 million of Patterson inventory reductions, and it anticipated $40 million of total destocking in 2018.  Then, it shocked the market, on August 7, 2018, when it announced that it anticipated an additional $66 million to $76 million in destocking.  Its 2018 Form 10-K confirmed that there had been approximately $100 million in destocking for the full year 2018.  In total, Patterson's destocking of Sirona products from the end of 2016 through 2018 was, at a minimum, $189 million.

As a result of the SEC's investigation, and in anticipation of the SEC instituting cease-and-desist proceedings pursuant to Section 21C of the Exchange Act, Dentsply Sirona submitted an offer of settlement, which the SEC accepted.  On December 16, 2020, the SEC announced the issuance of a consensual Cease-and-Desist Order ("SEC Order"), resulting in Dentsply Sirona's agreeing to cease-and-desist from violations of the charged provisions and payment of a one

million dollar fine with no admission of liability.  The SEC Order made numerous findings, which were neither admitted nor denied by Defendants.

As summarized in the SEC Order, the SEC found the following:

[Dentsply Sirona] failed to make required disclosure of known trends and uncertainties in its periodic filings for the first three quarters of 2016 ("Relevant Period").  [Dentsply Sirona] sold more of its dental technologies equipment to [Patterson] than [Patterson] could sell to retail purchasers.  [Dentsply Sirona] knew during the Relevant Period that retail demand for certain of its technology products was not keeping pace with [Patterson]'s purchases and that inventory levels at [Patterson] were at an all-time high. By second quarter 2016, [Dentsply Sirona] also knew that [Patterson] wanted to negotiate key terms of its next contract to reduce its inventory levels.  In third quarter 2016, [Dentsply Sirona] was negotiating with [Patterson] to minimize the financial impact of the excess inventory on [Dentsply Sirona]'s net sales in the future, but knew the outcome of those negotiations was uncertain.  Each quarter, [Dentsply Sirona] knew the trends or uncertainties were reasonably likely to have a material unfavorable impact on net sales or revenues.  When preparing its quarterly filings, however, [Dentsply Sirona] did not disclose these known trends and uncertainties to investors in its Forms 10-Q for the first three quarters of 2016.  By failing to disclose these known trends and uncertainties, [Dentsply Sirona] violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder.

*Id.*, App'x A at ¶ 1.

Plaintiff asserts claims on behalf of two categories of plaintiffs.  First, it sues on behalf of investors who purchased or otherwise acquired the common stock of Dentsply Intl. and its successor-in-interest, Dentsply Sirona, between February 20, 2014, and August 7, 2018, pursuant to Exchange Act sections 10(b) and 20(a), and SEC Rule 10b-5.  Second, it sues on behalf of investors who acquired shares of the common stock of Dentsply Sirona in exchange for their shares of common stock of Sirona in connection with the merger of Dentsply Intl. and Sirona on or about February 29, 2016, pursuant to Securities Act sections 11, 12(a)(2), and 15.

The Complaint alleges that, in light of the above-recited facts, Defendants made materially misleading statements and omissions including in the following respects:

(1) attributed its growth to strong demand for its products;

10

(2) stated that the primary drivers of internal growth were global dental market growth, innovation, and new products launched, and continued investments in sales and marketing resources;

(3) explained that its growth was the result of price increases;

(4) claimed that the dental markets were "highly competitive;"

(5) inflated goodwill valuations; and

(6) failed to disclose the lack of end-user demand, and the distributors' conspiracy.

Additionally, Plaintiff alleges that Defendants violated Item 303 of SEC Regulation S-K by failing to disclose known trends and uncertainties relating to the lack of end-user demand and uncertainty with respect to the Patterson relationship and the distributors' conspiracy's impact on the company's financial results.[3]

According to the Complaint, a series of corrective disclosures occurred in 2017 and 2018 that revealed the truth to the market. First, the lack of end-user demand and impact of Patterson's inventory backlog, as well as the distributors' conspiracy's effect, on revenues, margins and earnings were partially revealed on August 9, 2017, when Dentsply Sirona announced second quarter net losses and an impairment charge of approximately $1.17 billion, consisting of approximately $1.09 billion for goodwill and $79.8 million for indefinite-lived intangibles, in a Form 10-Q for the second quarter of 2017. On this news, the price of Dentsply Sirona stock fell 8.4%, from $61.41 to $56.23 per share. In a conference call, Defendant Michel attributed the impairment charge, in part, to "significantly lower retail sales" "by the company's exclusive North American equipment distributor," "significant acceleration of sales decline," "new distribution agreements," an "increase in competition," and "changes in the channels of

---

[3] Plaintiff also alleges a violation of Item 503(c) of SEC Regulation S-K based on the same facts.

distribution for the company and its competitors." *Id*. ¶ 173. Plaintiff alleges that these disclosures first led it to learn about the glut of Patterson inventory and lack of end-user demand's effect and the distributors' conspiracy's impact on Dentsply Sirona's financial results. Defendants "implicitly admitted" that the distributors' conspiracy "no longer existed." *Id*. ¶ 174.

A second curative disclosure is alleged to have occurred on October 2, 2017, when the resignations of Defendants Slovin, Wise, and Clark were disclosed and Dentsply Sirona's stock fell 5.8%, from $59.81 to $56.33 per share. A third curative disclosure is alleged to have occurred between May 6-8, 2018, when Dentsply Sirona reported its first quarter 2018 financial results, which included disclosing that its results were impacted by $8 million in dealer inventory reductions and an anticipated $40 million in destocking for 2018. Based on these disclosures, Dentsply Sirona's stock price fell 11%, from $49.99 to $44.47 per share.

Fourth, and finally, on August 7, 2018, Dentsply Sirona announced additional impairments that totaled approximately $1.26 billion, consisting of approximately $1.08 billion for goodwill and $179.2 million for indefinite-lived intangibles. Dentsply Sirona further announced, as noted, on an earnings call that day that it anticipated an additional $66 to $76 million in destocking, with a total destocking for 2018 of $100 to $110 million. Following these disclosures, Dentsply Sirona's stock price declined 18.6% from $48.44 to a five-year low of $39.41 per share on August 7, 2018, the end of the Class Period.

In total, Dentsply Sirona's reported goodwill was reduced from $5.96 billion as of March 31, 2017, to $5.02 billion as of June 30, 2017, to $4.54 billion as of December 31, 2017, and ultimately to $3.46 billion as of June 30, 2018—an aggregate 42% reduction in the value of goodwill totaling $2.5 billion.

Further factual allegations will be discussed as relevant to the legal discussion below.

## II.     Pleading Standards

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The court accepts as true all well-pleaded factual allegations in the complaint, [and] draws all reasonable inferences in favor of the nonmoving" party.  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (internal quotation marks omitted).  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Facial plausibility exists when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In addition to the complaint, a court may consider "written instruments attached, statements incorporated by reference, [] public disclosure documents filed with the SEC," and "items of which it has taken judicial notice under Federal Rule of Evidence 201."  *Gamm*, 944 F.3d at 462.[4]

Claims of fraud are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud."  The PSLRA imposes similar requirements on claims of fraud brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  To

---

[4] Except for the SEC order, which is discussed below, the parties do not dispute what I may consider, namely, the Exclusive Distribution Agreements and the SEC Filings of Patterson, Dentsply Intl., Sirona, and Dentsply Sirona.

adequately plead scienter, the PSLRA further requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

### III.   Overview of the Applicable Law

Plaintiff's claims can be divided into two categories: (1) claims against Dentsply Sirona and the Officer Defendants under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 on behalf of itself and others who purchased or otherwise acquired Dentsply Intl. and Dentsply Sirona common stock during the Class Period; and (2) claims against Dentsply Sirona, the Director Defendants and certain of the Officer Defendants under Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of itself and others who acquired Dentsply Sirona common stock in exchange for their shares of Sirona common stock in connection with the merger of Dentsply Intl. and Sirona on February 29, 2016.[5]

#### A.   Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5

To state a private claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff "must plausibly allege: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 136 (2d Cir. 2021). Section 20(a) of the Exchange Act provides for joint and several liability of any person who directly or indirectly controls a person found liable for a primary violation of Section 10. 15 U.S.C. § 78t(a).

---

[5] Following Defendants' initial pre-motion conference letter, Plaintiff withdrew its claim pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9, acknowledging that it was time-barred by the three-year statute of repose.

**B.  Sections 11, 12(a)(2), and 15 of the Securities Act**

Section 11 of the Securities Act creates a private right of action for registration statements that contain materially false or misleading information, while Section 12 creates a private right of action for those who were offered or sold securities by means of a prospectus or oral communication that contained materially false or misleading information.  15 U.S.C. §§ 77k(a); 77*l*(a)(2).  To state a claim under Section 11 of the Securities Act, a plaintiff must allege that "the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010) (quoting § 77k(a)).  Similarly, Section 12(a)(2) requires a plaintiff to allege that "the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'"  *Id.* at 359 (quoting § 77*l*(a)(2)).  Unlike the Exchange Act, scienter, reliance, economic loss, and loss causation are not elements of a plaintiff's *prima facie* Securities Act claims.  *See id.* at 358–60.  The absence of loss causation, however, is an affirmative defense to the Sections 11 and 12(a)(2) claims.  *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 99 (2d Cir. 2017); *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1048 (2d Cir. 1995).  Section 15 "creates liability for individuals or entities that 'control[] any person liable' under section 11 or 12."  *Morgan Stanley*, 592 F.3d at 358 (quoting 15 U.S.C. § 77*o*).

## IV.     Discussion

### A.  References to the SEC Order Will Not Be Stricken

Defendants seek to strike any allegations in the Complaint that reference the SEC Order,

under Federal Rule of Civil Procedure 12(f), which permits a court to strike any matter deemed

"redundant, immaterial, impertinent, or scandalous" from a pleading.  Relying primarily on the

Second Circuit's decision in *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir.

1976), they argue that it is never appropriate for allegations in a pleading to be taken from an

SEC consent judgment.

Defendants, however, misapprehend *Lipsky*'s reach.  *Lipsky* stands for an evidentiary

principle that SEC consent decrees, like pleas of *nolo contendere*, may not be used for collateral

estoppel purposes because the issues in the underlying action were not fully adjudicated.  *See*

*United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981).  It does not stand for the broad

proposition that the content of SEC orders may never support allegations in a complaint.  *See,*

*e.g.*, *VNB Realty, Inc. v. Bank of Am. Corp.*, 2013 WL 5179197, at *4 (S.D.N.Y. Sept. 16, 2013)

(explaining that *Lipsky* "has limited utility if a plaintiff has adequately identified the material

omissions and misstatements in the offering documents relevant to his claim"); *In re Bear*

*Stearns Mortgage Pass–Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y.

2012) (stating that "[n]either Circuit precedent nor logic supports" reading *Lipsky* as imposing

"such an absolute rule").

Indeed, since *Lipsky*, the Second Circuit has both explicitly and implicitly sanctioned the

inclusion of allegations taken from SEC Orders, in pleadings, where a plaintiff "also allege[s]

[additional] non-conclusory facts" that "render unproblematic any implied reliance on the SEC

findings."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir.

2015); *see also Hain*, 20 F.4th at 135; *Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553, 556 (2d Cir. 2018).  Such allegations "are in the nature of allegations 'upon information and belief,'" which can support a fraud claim for "matters peculiarly within the opposing party's knowledge." *Loreley*, 797 F.3d at 180.

Here, any implied reliance on the SEC's findings is unproblematic.  For the most part, the SEC Order does not add materially new facts to the Complaint; it merely overlaps, and supports, Plaintiff's separately stated allegations.  In addition, what new, or at least more specific, information is found in the SEC Order — such as that the minimum purchase requirements "increased annually by ten percent for each product line" and details about a presentation to the Dentsply Sirona Board — are matters peculiarly within Defendants' knowledge.  Nor is Plaintiff's reliance on this information of the kind contemplated by *Lipsky*.  Plaintiff does not reference the SEC Order for the purposes of asserting collateral estoppel and proving liability for the underlying claims.  I thus deny Defendants' application to strike references to the SEC Order.

### B.  Plaintiff's Securities Act Claims Are Subject to Rule 9(b)

In assessing Section 11 or Section 12(a)(2) Securities Act claims, courts must "conduct a preliminary inquiry into whether plaintiffs' allegations are premised on fraud, or merely on negligence, to determine the appropriate pleading standard."  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (internal quotation marks omitted).  The Second Circuit explained in *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), that, while "[f]raud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)," claims brought under Section 11 or Section 12(a)(2) of the Securities Act that "sound in fraud" must meet the particularity requirement of Rule 9(b).  *Id*. at 171.  The question is whether a plaintiff's allegations "are classically associated with fraud."  *Id*. at 172.  Courts must look

beyond formalisms, such as separating the Exchange Act and Securities Act claims into different sections of the complaint and disclaiming allegations of fraud as to the latter claims. *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 402 (S.D.N.Y. 2020). Instead, the conduct alleged must be assessed, considering whether the same course of conduct that forms the basis for the Sections 11 or 12(a)(2) claims would support a Section 10(b) and Rule 10b-5 claim. *Rombach*, 355 F.3d at 171.

Here, Plaintiff separates the Exchange Act and Securities Act claims into two different sections of the Complaint and "disclaim[s] any allegations of fraud or intentional misconduct" in connection with the Securities Act claims, Complaint ¶ 263, but makes no effort to plead different theories of Defendants' wrongdoing. With respect to the allegations of excess inventory, Plaintiff alleges that the SEC Order "confirms that Sirona received reports from Patterson from 2013 through the end of 2015 indicating that Patterson's inventory had increased . . . [and] was nearing its all-time high." *Id*. ¶ 276. The inference to be drawn from this allegation is that Sirona knew that sales were being driven by the minimum purchase requirements, and not by end-user demand, but failed to disclose it. Similarly, with respect to the distributors' conspiracy, Plaintiff alleges that "Dentsply Int'l as well as Sirona were aware of, and beneficiaries of" the anticompetitive scheme, *id*. ¶ 288, but did not disclose its impact on their financial results. These allegations are "classically associated with fraud."

Plaintiff also does not distinguish different theories of wrongdoing between its Exchange Act and Securities Act claims in its opposition. It argues that the false or misleading statements that form the basis of its Securities Act claims are viable for the same reasons as its Exchange Act claims. *E.g.*, Opp. 15–16, 21. Accordingly, for purposes of this motion, Plaintiff's Securities Act claims are assessed under Rule 9(b).

### C.  Statute of Limitations

#### i.  The Legal Landscape

The statute of limitations for claims brought under § 10(b) of the Exchange Act and SEC Rule 10b-5 provides that a claim may not be brought "2 years after the discovery of the facts constituting the violation."  28 U.S.C. § 1658(b)(1).  The statute of limitations for Securities Act Sections 11 and 12(a)(2) claims, which is in Section 13 of the Securities Act, requires that the action be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.

In *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), involving a claim under § 10(b), the Supreme Court construed the word "discovery" in the Exchange Act's statute of limitations as encompassing "those facts the plaintiff actually knew [and] those facts a reasonably diligent plaintiff would have known."  *Id*. at 648.  *Merck* abrogated the "inquiry notice" standard.

In *City of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011), the Second Circuit summarized the statute of limitations standard for claims brought under § 10(b).  Following *Merck*, "the limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation."  *Id*. at 174.  The Second Circuit also explained that "the reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss."  *Id*. at 175.

A question that was not resolved in *Merck* and *MBIA* is whether the inquiry notice standard still applies to Sections 11 and 12(a)(2) Securities Act claims.  District courts in this

circuit have reached different conclusions.  *See Yi Xiang v. Inovalon Holdings, Inc.*, 268 F. Supp. 3d 515, 520–22 (S.D.N.Y. 2017).  The Second Circuit has not expressly resolved this question, but in *Federal Housing Finance Agency v. Nomura Holding America, Inc.*, 873 F.3d 85 (2d Cir. 2017), where the issue was undisputed, it assumed *arguendo* that *Merck* "applies with equal force to the statute of limitations in Section 13 of the Securities Act," and seemingly cited with approval two decisions that had found that the *Merck* standard applies to such claims.  *Id.* at 119 n.37 (citing *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 273 (3d Cir. 2013) and *Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 318–20 (S.D.N.Y. 2012)).  I, too, will apply *Merck* to the statute of limitations in Section 13 of the Securities Act.  *See Pension Tr. Fund*, 730 F.3d at 273.

Finally, the parties dispute what particular facts need to be "discovered" to commence the limitations period for the Exchange Act and Securities Act claims.  With respect to the Exchange Act claims, Plaintiff argues that the limitations period did not commence until it had sufficient facts to plead not only the misrepresentations and omissions and scienter elements of its claim, but also loss causation.  In *Merck*, the Supreme Court held that "scienter" is among the "facts constituting the violation."  *Merck*, 559 U.S. at 648–49.  *Merck* explicitly did not resolve whether "other facts necessary to support a private § 10(b) action," such as reliance, loss, and loss causation, are among those facts.  *Id.* at 649.  However, in explaining why "scienter" was among the "facts constituting the violation," *Merck* stated that "scienter 'constitut[es]' an important and necessary element of a § 10(b) 'violation.'"  *Id.* at 648.  Under the logic of *Merck*, because loss causation is an element of a § 10(b) claim, I agree with Plaintiff that it must have discovered

sufficient facts to plead the misrepresentations and omissions, scienter, and loss causation elements before the statute of limitations began to run.[6]

With respect to the Securities Act claims, Defendants note that the text of the statute of limitations in Section 13 provides that it commences upon the "discovery of the untrue statement or the omission" rather than the "facts constituting the violation."  They argue that this textual distinction means that the limitations period commences upon "discovery" of the "untrue statement or the omission" rather than any other facts.  Plaintiff contends that it must have "discovered" the facts supporting its claimed damages before the limitations period commences. I agree with Defendants.  The text of the statute plainly requires only discovery of the "untrue statement or the omission" before the limitations period commences.  Additionally, under the logic of *Merck*, unlike the "scienter" element of a § 10(b) claim, damages are not an element of Plaintiff's Securities Act claims.

### ii.  Defendants' Factual Burden

At the evidentiary stage of the case, it is Defendants' "burden to prove that a reasonable investor in the [plaintiffs'] shoes would have conducted a fulsome investigation and uncovered information sufficient to make out a plausible claim for relief."  *Nomura*, 873 F.3d at 122. Defendants must adduce "evidence of . . . how long it would take a reasonably diligent investor in the [plaintiffs'] position to investigate [its] claims such that it could adequately plead them." *Id.* (second alteration in original).

---

[6] Defendants' argument in its Reply, at page 3, that "[t]he Second Circuit has since recognized that reliance, economic loss and loss causation are not elements of a Section 10(b) violation" misreads *United States v. Vilar*, 729 F.3d 62, 75 (2d Cir. 2013), which expressly differentiated between the criminal case before the court and a private civil action.  *Vilar* noted, to the contrary, that these are elements of a private, civil claim.

At the pleading stage, it is possible for a securities fraud complaint to be dismissed as untimely, but Defendants must make a showing, from the face of the complaint and matters of which the court may take judicial notice, that would enable the court, drawing all reasonable inferences in Plaintiff's favor, to identify the "precise moment" at which Plaintiff would have had "sufficient information to plead its claims with 'sufficient detail and particularity to survive a 12(b)(6) motion to dismiss.'" *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 95 (2d Cir. 2018) (quoting *MBIA*, 637 F.3d at 175).

### iii. Application to Plaintiff's Exchange Act and Securities Act Claims

Plaintiff filed this action on December 19, 2018.  Defendants do not contest, for purposes of this motion, that Plaintiff's Securities Act claims, but not its Exchange Act claims, were tolled on June 7, 2018.[7]  Accordingly, Defendants must show that a reasonably diligent plaintiff would have "discovered" the facts necessary to plead the misrepresentations and omissions, scienter, and loss causation for the Exchange Act claims earlier than December 19, 2016, and the misrepresentations and omissions for the Securities Act claims earlier than June 7, 2017. Defendants have not made that showing.

Beginning with the misrepresentations and omissions element of Plaintiff's Exchange Act and Securities Act claims, with respect to the distributors' conspiracy, it is necessary to briefly discuss Plaintiff's claims.  The core of Plaintiff's claims relating to the distributors' conspiracy is that Dentsply Sirona was "aware of," "acquiesced in," and "benefitted from" the distributors' conspiracy to not "deal with" dental buying groups and block lower-priced, rival distributors, who could sell to dental buying groups.  Complaint ¶¶ 79, 85, 89.  Plaintiff alleges that the

_____

[7] On that date, a since-dismissed state court complaint, alleging Securities Act violations against Defendants, was filed.  *See In re Dentsply Sirona, Inc. S'holders Litig.*, 191 A.D.3d 404, 404 (1st Dept 2021).

distributors boycotted state dental associations that had planned to start dental buying groups that would buy from a rival, low-priced distributor. Plaintiff cites a series of emails, which show that Dentsply Intl. and Sirona were "aware of" the conspiracy and "acquiesced in" the boycott of the state dental associations. *Id*. ¶ 85. According to the Complaint, these emails became publicly accessible after December 2017. Dentsply Sirona also "benefitted from" the conspiracy because, while it was ongoing, it was able "to report inflated revenues, earnings and profit margins." *Id*. ¶ 91. Plaintiff alleges that it was only after Dentsply Sirona announced its August 2017 impairment charge that it learned that Dentsply Sirona "benefitted from" the distributors' conspiracy because Dentsply Sirona's "reported sales, profits and earnings could no longer be buoyed by the conspiracy." *Id*.

In an effort to show that a reasonably diligent plaintiff would have possessed sufficient information to plead Plaintiff's claims with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss earlier than June 2017, Defendants attach to their motion numerous lawsuits, and news articles reporting on those lawsuits, that were brought against the distributors relating to their anticompetitive conduct. The vast majority of these lawsuits and news articles, however, do not appear to mention Sirona, Dentsply Intl., or Dentsply Sirona. Defendants have not shown that these lawsuits and news articles would have provided a reasonably diligent plaintiff with sufficient information to plead Plaintiff's claims, namely, that Dentsply Sirona was "aware of," "acquiesced in," and "benefitted from" the distributors' conspiracy.

In its Reply, responding to Plaintiff's argument that none of the lawsuits or news articles reference Dentsply Sirona, Defendants point to counterclaims, which were filed against Dentsply Sirona by a "gray market" distributor of Dentsply Sirona's products, Dental Brands for Less LLC, and a single allegation from an antitrust class action complaint that was filed against the

distributors.[8]  Neither the cited portions of the counterclaims nor the allegation from the antitrust class action complaint allege that Dentsply Sirona "benefitted from" the distributors' conspiracy. They do not provide facts showing that the distributors' conspiracy inflated Dentsply Sirona's "revenues, earnings and profit margins."  *Id.* ¶ 91.

The counterclaims and the allegation in the antitrust class action complaint also lack other facts necessary to Plaintiff's claims.  The counterclaims allege that Dentsply Sirona "enforce[d]" the distributors' "price fixing agreement" through efforts to eliminate gray market distributors.  *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, 2016 WL 6310777, at *1 (S.D.N.Y. Oct. 27, 2016).  Specifically, the counterclaims allege that Dentsply Sirona engaged in: (1) a "disinformation campaign" directed at dentists, warning them not to purchase products from unauthorized distributors; and (2) litigation against unauthorized distributors.  *Id.* at *2. While Plaintiff also alleges that Dentsply Sirona took "affirmative steps" to assist the distributors in eliminating gray market sellers, Complaint ¶ 86, the core of Plaintiff's claim in this case is not related to Defendants actions with respect to gray market sellers, but to Defendants' knowledge of and acquiescence in the distributors' conspiracy to not deal with dental buying groups and block lower-priced rival distributors who could sell to dental buying groups.  Defendants acknowledge as much by arguing that "Plaintiff's allegations regarding 'gray market' goods are unrelated to the alleged Distributor Conspiracy."  Motion 40 n.15; *see* Reply 10 n.11.  Apart from the allegations concerning Dentsply Sirona's conduct relating to "gray market" sellers, the counterclaim allegations concerning the distributors' "price fixing agreement," *Dental Brands*, 2016 WL 6310777, at *1, are general.  They would not have allowed Plaintiff to plead that

---

[8] As a "gray market" distributor, Dental Brands for Less purchased Dentsply Sirona's products overseas at a discount and sold them in the U.S. market.

24

Defendants were "aware of" and "acquiesced in" the conspiracy to block the formation of dental buying groups and boycott state dental associations.

As for the allegation in the antitrust class action complaint, the allegation concerns an email that Benco wrote to Dentsply Sirona about the distributors' boycott of the Arizona Dental Association.  However, here, Plaintiff relies on a series of emails to allege with sufficient detail and particularity that Defendants were aware of the distributors' conspiracy and acquiesced in the boycott of the state dental associations.  Defendants have not shown that the lone email they rely on provided Plaintiff with enough information to plead its claims.

In sum, while these lawsuits and news articles may have put Plaintiff on "inquiry notice," that is no longer the standard after *Merck*.  Drawing all reasonable inferences in Plaintiff's favor, Defendants have not established that a reasonably diligent investor would have had sufficient information to plead Plaintiff's claim with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss earlier than Plaintiff alleges that it did.

Defendants also have not shown when a reasonably diligent investor would have discovered the facts underlying Plaintiff's excess inventory allegations.  Plaintiff claims that demand for Sirona's and, thereafter, Dentsply Sirona's products was lacking, but that Sirona and, thereafter, Dentsply Sirona continued to sell product to Patterson as a result of the minimum purchase requirements.  This led to Patterson holding an increasing glut of inventory.  Even if a reasonably diligent investor may have been able to determine that Patterson was carrying a higher level of inventory, Plaintiff makes numerous allegations that it was not known to the market, including market analysts, that Patterson's situation was driven by the minimum purchase requirements and not by end-market demand.  *See, e.g.*, Complaint ¶¶ 65, 132.  For example, Plaintiff alleges that analyst reports between late 2016 and late 2017 continued to

portray market demand as "healthy." *Id.* ¶ 65.  Additionally, in a mid-2016 Q&A, a Goldman Sachs analyst asked Defendants Slovin and Michel "what the end-market's really doing;" in response, Plaintiff alleges that they did not directly answer the question, but misled the market into believing that Dentsply Sirona CEREC sales were "poised for strong future growth." *Id.* ¶ 132.

*Freidus v. Barclays Bank PLC*, 734 F.3d 132 (2d Cir. 2013), relied upon by Defendants, does not support their position.  There, the Second Circuit charged the plaintiffs with knowledge of the fraud from the date that Barclays Bank PLC ("Barclays") issued a corrective disclosure that disclosed "the same alleged untruths and omissions" that plaintiffs alleged were absent from, or misstated in, its filings.  *Id.* at 138.  The Circuit also found it significant that the subject of the fraud, deteriorating credit markets linked to the mortgage-backed securities market, had already been "widely and publicly exposed," including by Barclay's peer banks.  *Id.* at 139.  Here, Defendants have not pointed to any disclosures revealing the "same alleged untruths and omissions" that Plaintiff alleges were absent from, or misstated in, its filings.  Nor is the market comparable to the "widely and publicly exposed" deteriorating credit market at issue in *Freidus*.

### iv.  The Exchange Act Claims Are Not Untimely For Additional Reasons

Defendants have also not shown, for purposes of Plaintiff's Exchange Act claims, that a reasonably diligent investor could have discovered sufficient facts to survive a motion to dismiss on the loss causation and scienter elements earlier than December 19, 2016.  Plaintiff could not have sufficiently alleged loss causation until Dentsply Sirona's August 2017 impairment charge. Plaintiff relies on a number of facts which support an inference of scienter that could not have been alleged until late 2017, including the magnitude of the August 2017 impairment charge and

the resignations of top executives in October and November 2017.  *See* scienter discussion *infra* Section E, at pp. 41–43.

For these additional reasons, Defendants have not shown that Plaintiff's Exchange Act claims were untimely.

### D.  Plaintiff Has Pleaded Actionable Misstatements or Omissions[9]

There are three bases for liability under Section 10(b) of the Exchange Act and Rule 10b-5(b), and Sections 11 and 12(a)(2) of the Securities Act: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011) (Sections 11 and 12(a)(2) of the Securities Act); *see In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) (Section 10(b) of the Exchange Act and Rule 10b-5(b)).

As noted above, in a securities fraud case, a plaintiff must "state with particularity the circumstances constituting fraud."  Plaintiff must, therefore, "explain why the statements were fraudulent" when made.  *Novak v. Kasaks*, 216 F.3d 300, 306, 312–13 (2d Cir. 2000).  However, unlike a violation of clauses (a) and (c) of Rule 10b-5, which give rise to liability for a "fraudulent scheme or practice," a plaintiff need not allege that the conduct underlying the misrepresentation or omission was "fraudulent or otherwise illegal."  *Hain*, 20 F.4th at 136–37.

---

[9] Because, as discussed below, Plaintiff has alleged at least some actionable misrepresentations or omissions, it is unnecessary to address every misrepresentation or omission alleged in the Complaint.  The "exact parameters" of Plaintiff's claims can be evaluated "following discovery, either in connection with a motion for summary judgment or in advance of trial."  *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 n.26 (S.D.N.Y. 2013).  Below I address those categories of misrepresentations or omissions that Defendants have challenged as not actionable in their motion.  In certain instances, Defendants cited to an allegation in the Complaint, but did not offer any argument or authority to explain why they viewed that alleged misrepresentation or omission as insufficient.  I do not address such misrepresentations or omissions here.

The focus, rather, of Sections 11 and 12(a)(2) and clause (b) of Rule 10b-5 is on the "statements made" and "whether something said was materially misleading."  *Id*. at 136 (explaining pleading requirements for clause (b) of Rule 10b-5); *see Morgan Stanley*, 592 F.3d at 360 (stating the two central issues for Securities Act Sections 11 and 12(a)(2) claims: "(1) the existence of either a misstatement or an unlawful omission; and (2) materiality").  Subsequent events can lend support to an inference that a statement was fraudulent when made.  *See Novak*, 216 F.3d at 312–13.

### i. Statements Relating to Patterson's Excess Inventory

### 1. Misleading Statements Regarding Strong Demand

Plaintiff alleges actionable false or misleading statements in, or incorporated by, the registration statement, which was declared effective on December 7, 2015.  Plaintiff alleges that Sirona's 2015 Form 10-K, which was incorporated in the registration statement, stated that "[r]evenues benefited primarily from strong demand for our CAD/CAM Systems and Imaging products," while omitting to state that sales were driven by the minimum purchase requirements, not end-user market demand.  A reasonable investor could have understood this statement to mean that end-user demand was strong when, in fact, sales were driven by the minimum purchase requirements.  These allegations bear similarities to those asserted in *Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*, 367 F. Supp. 3d 16 (S.D.N.Y. 2019), in which the court found that statements attributing revenue growth to "'strong' end-user demand," while failing to disclose that growth had, in fact, been inflated by sales to its distributors, were actionable.  *Id*. at 32.  The statements could mislead a reasonable investor because, whether the revenues were driven by "inflated channel inventory" or "end-user demand" "fundamentally differ in sustainability."  *Id*. at 33.  So too here.

Plaintiff has also plausibly alleged actionable post-merger statements, such as in the 2016 Forms 10-Q. "[A] violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data," *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021), but Plaintiff's allegations do more. Plaintiff identifies post-merger statements attributing "sales growth" to "increased demand" or "higher demand." Complaint ¶¶ 133, 137. As discussed above, these statements could plausibly mislead a reasonable investor to believe that sales growth was driven by end-market demand when, in fact, it was driven by the minimum purchase requirements.

Plaintiff also sufficiently alleges why these statements were false or misleading when made. Plaintiff alleges that, at the time of the registration statement, inventory at Patterson had increased substantially, including a $112.9 million increase in the quarter ended August 1, 2015. This fact supports an inference that, at that time, end-user demand was inadequate, and Patterson held a glut of inventory that it could not sell. Subsequent facts and events also lend support to this inference. *See Novak*, 216 F.3d at 312–13. By the end of the first quarter 2016, the SEC Order stated, Defendants were aware that Patterson's inventory levels were at all-time highs and end-user sales were not keeping pace. It also stated that, in the second quarter 2016, a presentation was delivered to Dentsply Sirona's Board acknowledging that the minimum purchase requirements, and not end-user demand, was driving its sales to Patterson. By the quarter ended October 28, 2016, Plaintiff further alleges that Patterson inventory had increased by $191.7 million as compared to the quarter ended April 25, 2015. By November 2016, Patterson announced that it would end exclusivity, which was the result of lack of end-user demand. Finally, in August 2017 and 2018, Dentsply Sirona announced approximate $1.2

billion and $1.3 billion impairment charges, respectively.  These facts also support Plaintiff's allegations that the post-merger statements were fraudulent when made.

### 2. Statements Regarding the Patterson and Schein Relationships Are Not Puffery

Defendants challenge certain statements that were made on a conference call and in an investor presentation on February 17, 2017, and on a May 9, 2017 conference call, regarding Dentsply Sirona's relationship with Patterson and Schein, as inactionable puffery.  *See* Motion 19; Complaint ¶ 144 (describing Schein relationship as a "very strong and terrific relationship" and the Patterson relationship as "strong"); *id*. ¶ 146 (explaining that they have a "unique and important relationship with Patterson"); *id*. ¶ 147 (stating that they "are confident that the way we've set up our structure benefits both Henry Schein and Patterson").

Statements that "are too general to cause a reasonable investor to rely upon them" constitute "puffery," which do not give rise to securities violations.  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).  Characteristic examples include "general statements about reputation, integrity, and compliance with ethical norms," particularly when used with aspirational qualifiers, such as "aims to," "wants to," and "should," *UBS AG*, 752 F.3d at 183, as well as expressions of "corporate optimism," *Rombach*, 355 F.3d at 174.  "No investor would take such statements seriously in assessing a potential investment," *ECA*, 553 F.3d at 206, and thus, they do not rise "to the level of materiality required to form the basis" for an actionable claim.  *UBS AG*, 752 F.3d at 183.  "Whether a representation constitutes mere puffery depends, in part, on the context in which it was made."  *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018).  "While certain statements, viewed in isolation, may be mere puffery, when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company

30

and investors, those statements may become material to investors." *Id*. (internal quotation marks omitted). This is especially so where the statements are made in response to direct questions on the subject. *See id*. at *12.

Applying these principles, I cannot conclude, as a matter of law, that no reasonable investor would take the challenged statements seriously in assessing an investment in Dentsply Sirona stock. Patterson had just publicly announced, in November 2016, that it would not renew exclusivity. The Complaint alleges that the statements were made "in an effort to soften the significant financial impact this development would have on the Company" and to reassure investors. Complaint ¶ 142. They were made as part of an effort to portray the non-exclusive Patterson and Schein contracts as a new "go-to-market" strategy that would drive faster growth. *Id*. ¶¶ 143, 145. Some of these statements were also made in response to direct questions by analysts about the Schein and Patterson relationships. In fact, Plaintiff alleges that Patterson's undisclosed glut of inventory would adversely impact sales to Patterson and Schein, and not allow faster growth. In this context, the challenged statements concerning Dentsply Sirona's relationship with Schein and Patterson are not mere puffery. *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000), supports this conclusion. There, allegations that the defendants' "inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true" were not puffery, but actionable statements. *Id*. at 315; *see also Signet*, 2018 WL 6167889, at *11–12 (describing credit portfolio as "strong," "very strong," and "very healthy" to reassure the investing public about the portfolio's health is "not puffery at all").[10]

---

[10] Nor does anything in *Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022), relied upon by Defendants, suggest a different result here. That decision did not address puffery. In any event, there, the Second Circuit concluded that the defendant's disclosure that it was conducting a clinical trial, which targeted patients with a "strong" expression of the "PD-L1" protein, could not plausibly mislead a reasonable investor,

### ii.  Statements Relating to Distributors' Conspiracy

#### 1.  Statements Regarding the Company's Reported Financial Results, Drivers of Internal Growth, and Product Pricing

As noted earlier, "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Plumber*, 11 F.4th at 99.  Accordingly, "accurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct that may have contributed to the financial results." *Id*. at 98–99.  Thus, to the extent that Plaintiff relies on accurately reported historical financial results, such as Dentsply Intl.'s and Dentsply Sirona's "reported net sales, gross profit, net income, and adjusted operating margin" reflected in quarterly filings from "Q1 2013" through "Q1 2017," Complaint ¶ 120, and accurately reported price increases, *id*. ¶¶ 128–29, such statements are not actionable.

As with the excess inventory allegations, however, Plaintiff alleges more.  Courts in this circuit have drawn a distinction between accurately reported financial results and statements in which the defendant "puts at issue the cause of its financial success . . . [but] fails to disclose that a material source of its success is the use of improper or illegal business practices." *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *7 (S.D.N.Y. Sept. 24, 2018); *In re Mylan N.V. Sec. Litig.,* 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018).  Thus, for example, statements attributing growth to factors that omit that a portion of growth is a result of anticompetitive conduct are actionable.  *Speakes*, 2018 WL 4572987, at *7, *Mylan*, 2018 WL 1595985, at *6.

Here, Plaintiff has adequately alleged that Defendants' statements relating to the sources of their success were false or misleading.  These include statements in various SEC filings that

---

because there was no consensus in the industry, and even in the plaintiff's own complaint, about the meaning of the word in context.  *Id*. at 353–54.  No similar lack of consensus about the meaning of Defendants' language exists here.

"the 'primary drivers of internal growth' included global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education," Complaint ¶¶ 121–22, and statements relating to product pricing, such as that "there's no doubt that price is a component of the 1.9% organic growth." *Id.* ¶ 127. These statements attribute growth to certain factors but omit that a portion of the growth was the result of anticompetitive conduct.

Plaintiff has also sufficiently alleged why these statements were false or misleading when made. It alleges that the distributors, at least from 2014 through 2017, were engaged in a conspiracy to slow the formation and growth of dental buying groups and block low-priced, rival distributors, who could sell to dental buying groups, enabling the distributors to charge supra-competitive prices and maintain high profit margins. According to the Complaint, the distributors pressured state dental associations — including the Texas Dental Association and Arizona Dental Association — not to form dental buying groups that would be supplied by a lower-priced distributor, by boycotting their annual trade shows. Dentsply Intl., Sirona, and Dentsply Sirona, thereafter, were "well aware" of the conspiracy and "acquiesced" in the boycott of the state dental associations. *Id.* ¶ 85. The Complaint also sufficiently alleges that Defendants "benefitted from" the conspiracy. *Id.* ¶ 89. As long as dental buying groups and lower-priced distributors were excluded from the market, the distributors could sell products at supra-competitive prices, which, in turn, allowed Defendants to sell their products to the distributors at inflated prices and high profit margins. They also took "affirmative steps" to assist the distributors in eliminating gray market rivals, who sold discounted products online.[11] *Id.* ¶ 86.

---

[11] Two additional arguments of the Defendants do not warrant finding that these statements are not actionable. Defendants argue that, because Plaintiff's claims are based on the nondisclosure of illegal conduct, Plaintiff must "state a plausible claim that the underlying conduct occurred,"

## 2.  Statements Regarding Competition

Defendants argue that statements concerning "highly competitive" markets are not actionable.  They point to, for instance, the statements that the "[c]ompany conducts its operations, both domestic and foreign, under highly competitive market conditions," *id*. ¶¶ 116–18, "dental and medical device supplies markets are highly competitive," *id*. ¶ 295, and "[c]ompetition in the global dental market is fragmented by both geography and products." *Id.* ¶ 297.  I disagree.  These allegations are similar to those asserted in *In re Henry Schein, Inc. Securities Litigation*, 2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019), in which the court held that Schein's statements that the "dental distribution business was 'highly competitive'" and "characterized by . . . intense competition," when, in fact, Schein was engaged in anticompetitive conduct, were plausibly false or misleading.  *Id.* at *10–11.  A reasonable investor could have

---

which it has failed to do.  Reply 10.  It is true that recent Second Circuit decisions have explained that, under Rule 9(b) and the PSLRA, "when the nondisclosure of an illegal act is the basis of a 10(b) complaint, the illegal act must be alleged with particularity." *Gamm*, 944 F.3d at 463–64; *see Mucha v. Winterkorn*, 2022 WL 774877, at *2–3 (2d Cir. Mar. 15, 2022).  Plaintiff, however, is not basing its claim on the nondisclosure of illegal conduct.  In *Gamm* and *Winterkorn*, the claim was that the defendants did not disclose their own unlawful or anticompetitive conduct.  Here, Plaintiff alleges that the statements were false or misleading because Defendants were "aware of," "acquiesced in," and "benefitted from" the unlawful conduct of the distributors.  They also took "affirmative steps" to assist the distributors in eliminating competition from gray market sellers.  As noted, Plaintiff need not allege that Defendants' conduct underlying their misrepresentations or omissions was "fraudulent or otherwise illegal." *Hain*, 20 F.4th at 136–37.  In any event, even if Plaintiff's claims are subject to this requirement, Plaintiff alleges that the distributors "engaged in a per se violation of Section 5 of the Federal Trade Commission Act," Complaint ¶ 81, and pleads sufficient facts to establish the basic elements of the violation, which "overlaps the scope of § 1 of the Sherman Act." *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 114 (2d Cir. 2021).

Defendants also argue that Plaintiff's theory that Defendants would benefit from the distributors' conspiracy "makes no sense," since an anticompetitive conspiracy among distributors "would likely harm" a manufacturer.  Motion 22.  At this stage, however, I am required to accept the allegations in the Complaint as true and draw all reasonable inferences in Plaintiff's favor.  Plaintiff's allegations — that the distributors' conspiracy benefitted Defendants because they could sell their products at inflated prices to the distributors — are plausible.

been misled into believing that Schein operated in a competitive environment.  Similarly, here, Plaintiff plausibly alleges that the statements regarding competition would have misled a reasonable inventor into believing that the dental and medical device supplies markets were highly competitive when, in fact, Defendants were "aware of," "acquiesced in" and "benefitted from" the distributors' anticompetitive conspiracy.  Complaint ¶¶ 85, 89.

Defendants' arguments that these statements are not actionable are unpersuasive. Defendants argue that no reasonable investor would have understood these statements as referring to competition among its distributors; rather, they argue that investors would have understood the statements as referring to competition among dental supply manufacturers.  When evaluating a Rule 12(b)(6) motion, however, I am required to credit Plaintiff's plausible reading of the statements, not Defendants' competing explanation.  *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021).  The statements speak of competition in the "market," the "dental and medical device supplies markets," and the "global dental market." Plaintiff's reading of these statements as referring to markets that included sales by Defendants' distributors is plausible.  Likewise unpersuasive is Defendants' argument that the statements were puffery.  Unlike the vague, general, and aspirational statements that characterize puffery, as discussed above, I cannot conclude, as a matter of law, that describing the dental product market as "highly competitive," while simultaneously being aware of, acquiescing in, and benefitting from a conspiracy to stifle competition, would not be taken seriously by a reasonable investor, in assessing an investment in Dentsply Sirona.  *See Schein*, 2019 WL 8638851, at *12 (rejecting argument that competition statements were puffery).

35

### iii. Statements Regarding Goodwill

Plaintiff contends that Dentsply Sirona's estimates of goodwill in the registration statement, and post-merger statements, are actionable because the goodwill calculations were inflated by sales of inventory to Patterson that were based on minimum purchase requirements, not end-user demand, and the distributors' conspiracy.  The parties agree that the challenged estimates of goodwill are statements of opinion.  *See City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67–68 (2d Cir. 2012); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110–11 (2d Cir. 2011).  A statement of opinion gives rise to liability where (1) the speaker does not hold the professed belief; (2) the supporting facts supplied are untrue; or (3) the speaker omits information whose omission makes the statement misleading to a reasonable investor.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015).

In elaborating on the third basis for finding an opinion statement actionable, the Supreme Court explained that "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view."  *Id*. at 188.  A reasonable investor expects that the opinion "fairly aligns with the information in the issuer's possession at the time."  *Id*. at 189.  But "if the real facts are otherwise, but not provided," and "if those facts conflict with what a reasonable investor would take from the statement itself," then "the opinion statement will mislead its audience."  *Id*. at 188–89.  To plead a claim under the third basis, then, the "investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not" have.  *Id*. at 194.  If such facts are identified, "the court must ask whether the alleged omission rendered . .

36

. [the] opinions misleading . . .—*i.e.,* because the excluded fact shows that [the defendants] lacked the basis for making those statements that a reasonable investor would expect." *Id.* at 196.

Here, Plaintiff has sufficiently alleged at least the third basis for an actionable opinion statement.[12]  The Complaint identifies particular facts, i.e., sales of "excess inventory" to Patterson and a lack of end-user demand and Defendants awareness of, acquiescence in and benefit from the distributors' conspiracy, going to the basis for Dentsply Sirona's goodwill calculations and alleges that, in light of those facts, Defendants lacked a reasonable basis for their statements regarding goodwill.  *See In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018).

Defendants argue that securities law claims cannot be premised on mere disagreements with "accounting judgments" or "fraud-by-hindsight."  But Defendants have not shown, as a matter of law, that this is such a claim.  Plaintiff identifies specific facts that they allege were known to Defendants at the time they calculated goodwill that rendered their goodwill calculations unreasonable.

#### iv.   Item 303 of Regulation S-K

As noted, one of the potential bases for liability under Sections 11 and 12(a)(2) and Section 10(b) and Rule 10b-5b is an omission in contravention of an affirmative legal disclosure obligation.  Item 303 of SEC Regulation S-K can "serve as the basis for claims under Sections 11 and 12(a)(2), and for a claim under" Section 10(b).  *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767, at *2 (2d Cir. Dec. 20, 2022).  "Item 303 requires that

---

[12] Because I find that Plaintiff has alleged the third *Omnicare* basis, for purposes of this motion, I do not address Plaintiff's argument that it has also sufficiently alleged that Defendants did not believe in the accuracy of the goodwill calculations.

a company disclose certain information where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations." *Id*. (internal quotation marks omitted). Plaintiff alleges that, by not disclosing the lack of end-user demand and "excess" inventory glut as well as the distributors' conspiracy's impact on their financial results, Defendants violated Item 303.

Beginning with the distributors' conspiracy allegations, Plaintiff alleges that the known trend or uncertainty that was reasonably likely to have a material effect on Defendants' financial results was the "public exposure and cessation" of the distributors' conspiracy. Complaint ¶ 248. Plaintiff alleges that it was reasonably likely to (and did) have material effects on Dentsply Sirona's financial results; its cessation contributed to Defendants' taking impairment charges in August 2017 and 2018. Plaintiff, however, must also allege that the trend or uncertainty was known to Defendants. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) (holding that Item 303 requires a plaintiff to allege that a defendant actually knew about the trend or uncertainty, and not merely should have known). While Plaintiff alleges that Defendants were aware of the conspiracy, it does not plead that Defendants knew that it ended until August 2017. At that time, Defendants "implicitly admitted" that the distributors' conspiracy "no longer existed" when they took the approximate $1.2 billion impairment charge.[13]   Complaint ¶ 174.

---

[13] Plaintiff's argument that it alleged Defendants' knowledge of the conspiracy "going back to 2014," Opp. 26, is misplaced. The trend or uncertainty that Plaintiff alleges was reasonably likely to materially impact Defendants' financial results was not the distributors' conspiracy, but its "public exposure and cessation." Complaint ¶ 248. Additionally, Plaintiff cites no authority for the proposition that knowingly deriving a benefit from unlawful conduct, with an unknown end date, constitutes a known trend or uncertainty reasonably likely to materially impact financial results. There is reason to think that it does not, either because a company does not have a duty under Second Circuit law to disclose "uncharged, unadjudicated wrongdoing" or because Item 303 should not be construed as "so broad as to require defendants to disclose

Accordingly, the Item 303 claims based on the distributors' conspiracy allegations are not actionable from the start of the Class Period until August 2017.[14]

I reach a different conclusion with respect to the excess inventory allegations. In *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94 (2d Cir. 2015), the Second Circuit held that Morgan Stanley had an Item 303 disclosure obligation when it knew, but failed to disclose, that there was a "significant downward trend in the subprime residential mortgage market" which, because of its significant exposure to that market, was "likely to cause trading losses that would materially affect the company's financial condition." *Id.* at 104. In *Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114 (2d Cir. 2012), the Second Circuit found a known "uncertainty" when Ikanos Communications Inc. knew that it "might have to accept returns of a substantial volume, if not all, of the chips it had delivered to [two] major customers," which jeopardized its relationship with the customers. *Id.* at 121–22.

Similarly, here, and for many of the reasons discussed above in regard to Defendants' affirmative misrepresentations, Plaintiff sufficiently alleges a known trend or uncertainty under Item 303. At least as early as August 1, 2015, Sirona and, thereafter, Dentsply Sirona were aware, through the market reports that they received monthly, that the market was trending downward, i.e., that there was insufficient end-user demand.[15] This downward trend only

---

[speculative]" uncertainties. *See Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 298 (E.D.N.Y. 2021), *aff'd on other grounds sub nom. Winterkorn*, 2022 WL 774877, at *4.

[14] I express no view as to whether the Item 303 claims based on the distributors' conspiracy are actionable from August 2017 until the end of the Class Period, which can be revisited at a later stage of the litigation. The parties did not address this more specific question in their briefing, instead disputing generally whether they are actionable for the entire Class Period.

[15] Defendants argue that the "trend" was not occurring sufficiently far in advance of the SEC filings to qualify as a "trend" and was more akin to an "isolated event" that did not require disclosure under Item 303. Motion 26. But "whether a pattern or occurrence is sufficiently

continued after the merger.  Plaintiff also alleges that, as early as the registration statement, Sirona and, thereafter, Dentsply Sirona were aware of a known uncertainty relating to a relationship with an important customer, Patterson, which was in jeopardy.  At that time, according to the Complaint, the lack of end-user demand and increasing inventory glut "made it highly likely" that Patterson would start a large destocking program and "highly unlikely" that it would continue purchasing products as it had pursuant to the minimum purchase requirements. Complaint ¶ 276.

Plaintiff plausibly alleges that the trend or uncertainty was "reasonably likely to have material effects" on Sirona's and, thereafter, Dentsply Sirona's financial condition or results of operations.  It alleges that Patterson was Sirona's largest customer.  It was the exclusive distributor of certain of Sirona's and, thereafter, Dentsply Sirona's products from the time the registration statement was filed until late 2017.  Prior to the merger, Patterson represented 28% to 38% of Sirona's revenue in any given quarter.  Following the merger, Patterson accounted for 12% of Dentsply Sirona's worldwide sales in 2016.

Defendants contend that Plaintiff does not sufficiently allege that any required Item 303 disclosure obligation was "material" under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  It is true that Item 303 claims are subject to *Basic*'s test for materiality, which requires "a *balancing* of both the *indicated probability* that the event will occur and the *anticipated magnitude* of the event in light of the totality of the company activity."  *Stratte-McClure*, 776 F.3d at 102–03 (quoting *Basic*, 485 U.S. at 238).  But materiality is an "inherently fact-specific finding," which imposes a low bar on a plaintiff at the motion to dismiss stage.  *Litwin*, 634 F.3d at 718.  A "district court may not dismiss for lack of materiality unless the alleged misstatements or

lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage."  *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, *3 (S.D.N.Y. Oct. 30, 2017).

omissions 'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Moab*, 2022 WL 17815767, at *3 (quoting *Litwin*, 634 F.3d at 717). At this stage, I cannot find, as a matter of law, that no reasonable investor would find the omitted information important.[16]

### E. Plaintiff Has Pleaded Facts Supporting a Strong Inference of Scienter

The requisite "strong inference" of fraud, required by the PSLRA "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. In the absence of a cognizable motive allegation, "the strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199. "Recklessness" under this standard means "'conscious recklessness'— i.e., a state of mind approximating actual intent, and not merely a heightened form of" negligence. *Novak*, 216 F.3d at 312 (internal quotation marks omitted). Allegations that Defendants' "knew facts or had access to information suggesting that their public statements were not accurate" or that they "failed to check information they had a duty to monitor" can give rise to a strong inference of scienter. *Id*. at 308–11. The "inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). The inquiry is whether "*all* of the facts alleged, taken collectively, give rise to

---

[16] Plaintiff has also alleged that Defendants "failed to meet their disclosure obligations under Item 503 of Regulation S-K ("Item 503"), since recodified as Item 105." *Moab*, 2022 WL 17815767, at *3 n.2. No party argues that Item 503 should be treated differently from Item 303. Accordingly, the Item 503 claim, with respect to the distributors' conspiracy allegations until August 2017, is insufficient. As to the excess inventory allegations, it survives.

a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 323.

Plaintiff has alleged facts supporting a strong inference of scienter.  Beginning with the excess inventory allegations, the Complaint alleges that, from 2005 through September 30, 2017, the Exclusive Distribution Agreements required detailed monthly information to be relayed from Patterson to Sirona and, thereafter, Dentsply Sirona.  Those reports provided, *inter alia*, information on the market, as well as the stock of contractual products in addition to Patterson's sales for that month with respect to each product included within the contractual products.  The Complaint pleads that receipt of this information furnished the Officer Defendants with non-public knowledge that their statements and omissions concerning Patterson's inventory were false or misleading.

With regard to the distributors' conspiracy, the Complaint cites emails between Dentsply Intl. and Sirona and the distributors which raise an inference that Dentsply Intl., Sirona, and Dentsply Sirona, thereafter, not only were "aware of the conspiracy," but "acquiesced in the Distributors' boycotts of meetings of the Arizona and Texas dental associations" undertaken in an effort to block the formation of new dental buying groups.  Complaint ¶ 85.  The Complaint further alleges that Dentsply Intl. and Dentsply Sirona, thereafter, took "affirmative steps" to assist the distributors in eliminating online distributors, who sold "gray market" products at discounted prices.  *Id*. ¶ 86.

Plaintiff further relies on the following alleged facts: the resignations of Dentsply Sirona's four top executives; the fraud's impact on the core operations; and the magnitude of the company's impairment charges.  *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (explaining that "allegations of a company's core operations,

42

GAAP violations, and removal of its executives can provide supplemental support for allegations of scienter").

Defendants argue that none of the facts relied upon by Plaintiff conclusively demonstrates scienter.  But the "job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Tellabs*, 551 U.S. at 326.   Considering the Complaint's allegations as a whole, as I must, I conclude that the allegations against Dentsply Sirona and the Officer Defendants support an inference of scienter that is at least as compelling as any nonculpable inference.  Plaintiff has pleaded an inference of scienter with regard to Dentsply Sirona and the Officer Defendants sufficient to survive a motion to dismiss.

### F.  Plaintiff Has Pleaded Loss Causation

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  It concerns "the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant."  *Id*. at 174.  "If that relationship is sufficiently direct, loss causation is established," but if "the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered," the claim fails.  *Id*. (internal quotation marks omitted).  Put simply, "to establish loss causation, a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."  *Id*. at 175 (internal quotation marks omitted); *see also Vivendi*, 838 F.3d at 260–61.  Loss causation is "a fact-based" inquiry, *Lentell*, 396 F.3d at 174, and, at the pleading stage, a plaintiff's burden "is not a heavy one."  *Loreley*, 797 F.3d at 187.  "The complaint must simply give Defendants 'some indication' of the

actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Id*. (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

Plaintiff adequately alleges loss causation for both the excess inventory and distributors' conspiracy allegations. With respect to the former, Plaintiff alleges that Dentsply Sirona's August 9, 2017 and August 7, 2018 approximate $1.2 billion and $1.3 billion goodwill and intangible impairment charges, respectively, "resulted in large part," Complaint ¶ 215, from "the *subject*" of the alleged misstatements and omissions, namely, the lack of end-user demand and excess inventory build-up. Plaintiff alleges that Dentsply Sirona attributed its August 9, 2017 impairment charge to, for example, "significantly lower retail sales," "significant acceleration of sales declines," and "new distribution agreements," *id*., and its August 7, 2018 impairment charge to "destocking in both our major partners," reductions in "forecasts of current and future third-party demand" and lack of "demand creation." *Id*. ¶¶ 233–236. On Dentsply Sirona's August 7, 2018 earnings call, Mr. Casey admitted "we have a wholesale issue." *Id*. ¶ 235. On the news of Dentsply Sirona's second quarter 2017 and 2018 financial results, its common stock dropped more than 8% and 18%, respectively.

Similarly, with respect to the distributors' conspiracy, Plaintiff alleges that after "the first few months of 2017, the effects of the Distributors' conspiracy began to dissipate," or "waned," and Dentsply Sirona's "projected sales, earnings and margins" fell. *Id*. ¶¶ 91, 124. This "fall-off . . . could no longer support the valuations of goodwill and intangible assets on its balance sheet," and Plaintiff suffered losses when Dentsply Sirona reported impairment charges for the second quarters 2017 and 2018. *Id*. ¶ 124. Defendants also attributed the August 2017 impairment charge to an "increase in competition," "implicitly admit[ing]" that the distributors'

conspiracy had ended.  *Id.* ¶ 174.  These allegations suffice to create a plausible causal link

between the alleged misconduct and the economic harm ultimately suffered.

### G.  Materiality of Misrepresentations and Omissions in Registration Statement to Sirona's Shareholders

Defendants contend that any misrepresentations or omissions asserted on behalf of

persons who acquired the common stock of Dentsply Sirona in exchange for their shares of

Sirona stock in the merger were not material.  Defendants argue that Sirona shareholders would

have exchanged Sirona stock for Dentsply Sirona stock even if the truth were known.  This is

because, their argument goes, if the truth were known about the lack of end-user demand and

Patterson's excess inventory, Sirona's stock would have been devalued, and a reasonable Sirona

shareholder would still have exchanged its shares for Dentsply Sirona stock.  But a "material fact

need not be outcome-determinative."  *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533

(2d Cir. 1991).  Rather, it is sufficient that the fact is one that "would have assumed actual

significance in the deliberations of the reasonable shareholder."  *Id.* (quoting *TSC Indus. Inc. v.

Northway, Inc.*, 426 U.S. 438, 449 (1976)); *see also Litwin*, 634 F.3d at 717 (explaining that "it

is not necessary to assert that the investor would have acted differently if an accurate disclosure

was made").  Here, the misstatements or omissions are not "so obviously unimportant to a

reasonable investor" to warrant dismissal at this stage.  Whether the truth would have "assumed

actual significance" in a reasonable investor's deliberations is a question that will be best

determined on a more developed factual record.

### H.  PSLRA Safe Harbor for Forward-Looking Statements

Defendants challenge numerous statements concerning "financial forecasts," *see, e.g.*,

Complaint ¶ 98 (relating to "EPS [presumably earnings per share] guidance") and "perceptions

about how [Sirona] would benefit from industry trends," *see, e.g.*, *id.* ¶ 282 (relating to statement

that "Sirona is uniquely positioned to benefit from several trends in the global dental industry"), which they argue are protected under the PSLRA's safe-harbor provisions for forward-looking statements. 15 U.S.C. § 78u-5(c); 15 U.S.C. § 77z-2(c). Under these provisions, a defendant is not liable if (1) "the forward-looking statement is identified and accompanied by meaningful cautionary language," (2) the forward-looking statement is "immaterial," or (3) "the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Because the safe harbor provisions are "written in the disjunctive," *id*., a forward-looking statement is protected if any of the three prongs applies. Defendants contend that the first and third prongs are applicable. For purposes of this motion, I have assumed that the statements identified by Defendants are forward-looking; however, they are not protected by the safe harbor provisions.

"To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Id*. at 772. The Second Circuit has cited with approval a decision from the Fifth Circuit, which held "that cautionary language was not meaningful where the warning was 'very vague and general' and did not 'disclose the specific risks and their magnitude.'" *Id*. (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 246–47 (5th Cir.2009)). The cautionary language employed by Defendants, which I have reviewed, was not meaningful.

Defendants note that the "safe harbor provision also requires dismissal if the plaintiffs do not 'prove that the forward-looking statement . . . was . . . made or approved by [an executive officer] with *actual knowledge* by that officer that the statement was false or misleading.'" *Id*. at 773 (quoting 15 U.S.C. § 78u–5(c)(1)(B)). Because "the safe harbor specifies an 'actual knowledge' standard for forward-looking statements, the scienter requirement for forward-

46

looking statements is stricter than for statements of current fact." *Id.* (internal quotation marks omitted). "Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Id.* For forward-looking statements, a complaint gives rise to a strong inference of scienter when it alleges that the defendants (1) "did not genuinely believe" the statement, (2) "actually knew that they had no reasonable basis for making the statement," or (3) "were aware of undisclosed facts tending to seriously undermine the accuracy of the" statement. *Id.* at 775. As with misrepresentations of current fact, the inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent" and the "job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically." *Id.* at 773, 775 (quoting *Tellabs*, 551 U.S. at 314, 326). For the reasons set forth in the scienter section above, and considering the Complaint's allegations as a whole, I conclude that Plaintiff raises an inference that Defendants were aware of undisclosed facts tending to seriously undermine the accuracy of their forward-looking statements that is at least as compelling as any nonculpable inference.

### I. The Control Person Claims Are Pleaded Sufficiently

Under Section 20(a) of the Exchange Act, "[t]o establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Similarly, "[t]o establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 [or § 12(a)(2)] and control of the primary violator by defendants." *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d

Cir. 2011).  Control over a primary violator may be established by showing that the defendant has "the power to direct or cause the direction of the management and policies" of a primary violator.  *Id*. at 185.

As to the Officer Defendants, Plaintiff alleges that each of the Officer Defendants "possessed the power and authority to control the contents of Dentsply Sirona's reports to the SEC, press releases, and presentations to securities analysts, investment managers and investors."  Complaint ¶ 25.  The Complaint further alleges that they

> were provided with copies of the Company's reports and press releases alleged in this Complaint to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Officer Defendants knew that the adverse facts and omissions specified in this Complaint had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

*Id.*

An individual's "status as officer or committee member is generally not enough to constitute control, and thus a mere recitation of [an individual's] title as CEO along with the committees upon which he sat is not sufficient [to constitute control.]"  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 494 (S.D.N.Y. 2005).  As indicated in the quotations set forth above, however, here Plaintiff presents more.  Plaintiff's allegations provide a sufficient basis for the establishment of the Officer Defendants' control and culpable participation.  Additionally, Plaintiff alleges that false and misleading statements in Dentsply Intl.'s and Dentsply Sirona's 10-K Forms, and Dentsply Sirona's 10-Q Forms, were signed by Wise, Clark, Slovin, Michel, Casey and Alexos, and Slovin and Michel, respectively.  It "comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those

who write the report." *Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 WL 101772, at *18 (S.D.N.Y. Mar. 1, 1999).[17]

As to the Director Defendants, Plaintiff alleges that they "signed the Registration Statement." Complaint ¶ 26. "At the pleading stage, this is sufficient to make out a control claim against these individuals." *Evoqua Water*, 450 F. Supp. 3d at 428.

Last, Defendants argue that Plaintiff improperly pleads primary liability and control person liability as to the same defendants for the same conduct. However, "alternative theories of liability are permissible at the pleading stage." *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 241 (S.D.N.Y. 2009).

In sum, the control person claims arising from primary violations of the Exchange Act and Securities Act, as detailed above, survive.

---

[17] In a footnote of their motion, Defendants argue that the claims against Thierer, an Officer Defendant who served as the Interim CEO of Dentsply Sirona from September 28, 2017 through February 12, 2018, must be dismissed because Plaintiff did not identify any actionable statement made by him when Dentsply Sirona made false statements. On the contrary, while the Complaint does not assign any specific statements to Defendant Thierer, it does allege actionable statements by Dentsply Sirona during the period in which Thierer served as Interim CEO. For example, Dentsply Sirona filed its Form 10-Q for the Third Quarter of 2017 on November 11, 2017, and Plaintiff alleges that this filing contained false and misleading statements. At this stage, dismissal of the claims against Defendant Thierer is unwarranted.

## V.      Conclusion

Defendants' application to strike references to the SEC Order is denied.

Although certain of the alleged misrepresentations and omissions are found not to be actionable, Defendants' motion to dismiss is denied.

Claims 6 and 7 asserting claims under Section 14(a) and SEC Rule 14a-9 are withdrawn.

**SO ORDERED.**

_____ **/S/** _____

**NINA GERSHON**
**United States District Judge**

March 29, 2023
Brooklyn, New York