**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

**IN RE DENTSPLY SIRONA, INC.**      **18 Civ. 7253 (NG)(PK)**
**SECURITIES LITIGATION**

------------------------------------------------------- x


**MEMORANDUM OF LAW IN SUPPORT OF**
**LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND**
<u>**APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL**</u>


**BARRACK RODOS & BACINE**

Michael A. Toomey
11 Times Square
640 Eighth Avenue, 10th Floor
New York, NY 10036
Telephone:  212.688.0782
Facsimile:  212.688.0783

and

Jeffrey W. Golan (*pro hac vice*)
Robert A. Hoffman (*pro hac vice*)
Chad A. Carder
Jordan R. LaPorta (*pro hac vice*)
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Telephone:  215.963.0600
Facsimile: 215.963.0838

*Attorneys for the Strathclyde Pension Fund*
*and Lead Counsel for the Putative Class*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................................................... 1

STATEMENT OF FACTS ................................................................................................................. 3

   A.  Summary of Lead Plaintiff's Claims ................................................................................. 3

      1.  Concealment of Patterson's Excess Inventory ......................................................... 4

      2.  Concealment of the Distributors' Anti-Competitive Conspiracy .............................. 5

      3.  The Truth Is Revealed, Damaging the Class .......................................................... 5

      4.  The Court Sustained the Complaint ...................................................................... 6

   B.  The Proposed Class Representative ................................................................................ 8

ARGUMENT ................................................................................................................................. 8

   A.  Standards on a Motion for Class Certification ................................................................ 8

   B.  Rule 23(a) Is Satisfied .................................................................................................. 9

      1.  Numerosity Is Established ..................................................................................... 9

      2.  Commonality Is Established ................................................................................ 10

      3.  Typicality Is Established ..................................................................................... 11

      4.  Adequacy Is Established ...................................................................................... 12

   C.  Rule 23(b)(3) Is Satisfied ........................................................................................... 13

      1.  Common Questions of Law and Fact Predominate ................................................ 14

         a.  Lead Plaintiff and the Class Are Entitled to a Presumption of Reliance .......... 15

         b.  Dentsply's Average Weekly Trading Volume during the Class Period Was Large ............................................................................................................. 16

         c.  Dentsply Common Stock Was Covered by Numerous Analysts ...................... 17

         d.  There Were Many Market Makers for Dentsply Stock ..................................... 17

e.    Dentsply Was Eligible to File Form S-3 Registration Statements ...................... 18

f.    Dentsply's Stock Price Reacted to Unexpected News ........................................ 19

g.    The Krogman and Other Factors Are Also Satisfied ......................................... 19

2.    Damages ................................................................................................................ 22

3.    Superiority Is Established ..................................................................................... 24

D.    Lead Counsel Should Be Appointed Class Counsel ........................................................ 25

CONCLUSION ....................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Cases**                                                                    **Page(s)**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ........................................................................... 14

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ........................................................................ 9, 15

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ...................................................................... 15, 17

*Billhofer v. Flamel Techs., S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) ........................................................ 21

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) .................................................. 16, 18

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ............................................. 18, 22–23

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ............................................................................ 22

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) .......................................................................... 14

*Enea v. Bloomberg, L.P.*,
    2014 WL 1044027 (S.D.N.Y. Mar. 17, 2014) ............................. 11, 12

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ............................................................................ 9

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ............................................................. 3, 15, 19

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................ 17

*In re Ashanti Goldfields Sec. Litig.*,
    2004 WL 626810 (E.D.N.Y. Mar. 30, 2004) ................................. 8, 21

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) .......................................................... 24

*In re Cooper Cos. Inc. Sec. Litig.*,
    254 F.R.D. 628 (C.D. Cal. 2009) ...................................................... 10

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    2023 WL 2682905 (E.D.N.Y. Mar. 29, 2023) ............................ 1, 6–8

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992) ................................................ 12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ................................................ 11

*In re Initial Pub. Offering Sec. Litig.*,
    260 F.R.D. 81 (S.D.N.Y. 2009) ................................................ 18

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    2013 WL 3486990 (S.D.N.Y. July 11, 2013) ................................ 10

*In re NIO, Inc. Sec. Litig.*,
    2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023) ................................ 9–12, 17, 20, 24

*In re Parmalat Sec. Litig.*,
    2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ........................ 14, 24–25

*In re Pfizer Sec. Litig.*,
    282 F.R.D 38 (S.D.N.Y. 2012) ................................................ 14, 25

*In re Transkaryotic Therapies, Inc. Sec. Litig.*,
    2005 WL 3178162 (D. Mass. Nov. 28, 2005) ............................ 10

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ................................................ 14

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ............................ 18

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ................................ 9, 16, 18

*JPMorgan*,
    2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015) ................ 11, 19, 23

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ................................ 19–21

*Marisol A. ex rel. Forbes v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) ................................ 10–11

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ................................ 8

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ........................ 20–21

*No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ................................ 15

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) .................................................................. 11, 15

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) .................................................................. 14, 23

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) .................................................................. 12

*Stevelman v. Alias Rsch., Inc.*,
    2000 WL 888385 (D. Conn. June 22, 2000), *on reconsideration sub nom.*
    *Stevelman v. Alias Rsh.*, 2000 WL 1849815 (D. Conn. Nov. 3, 2000) ........................ 17–18

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008) .................................................................. 16–17

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) .................................................................. 16

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .................................................................. 10

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) .................................................................. 23

## **Rules**

FED. R. CIV. P. 23 .................................................................. 8
FED. R. CIV. P. 23(a) .................................................................. 1–2, 9
FED. R. CIV. P. 23(a)(1) .................................................................. 9
FED. R. CIV. P. 23(a)(2) .................................................................. 10
FED. R. CIV. P. 23(a)(3) .................................................................. 11–12
FED. R. CIV. P. 23(a)(4) .................................................................. 13
FED. R. CIV. P. 23(b) .................................................................. 9, 13
FED. R. CIV. P. 23(b)(3) .................................................................. 1–3, 9, 13–14, 22–24
FED. R. CIV. P. 23(g) .................................................................. 1, 25

## **Other**

17 C.F.R. § 239.13 .................................................................. 18
104 H.R. Rep. 369 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 733 .................. 13
104 S. Rep. No. 98 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 679, 690 .............. 13

Lead Plaintiff Strathclyde Pension Fund ("Strathclyde" or "Lead Plaintiff") submits this memorandum of law in support of its motion, pursuant to FED. R. CIV. P. 23(a), 23(b)(3) and 23(g), to certify this case as a class action, to appoint Lead Plaintiff as the Class Representative, and to appoint Barrack, Rodos & Bacine ("BRB") as Class Counsel.

## PRELIMINARY STATEMENT

This is an action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Sections 78(t)(a) (the "Exchange Act"), 15 U.S.C § 77k, 77l(a)(2), 77o Securities & Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").  Lead Plaintiff seeks certification of a plaintiff class (the "Class") pursuant to FED. R. CIV. P. 23(a) and 23(b)(3).  The Class consists of (i) all persons who purchased or otherwise acquired the common stock of Dentsply International, Inc. ("Dentsply Intl.") and its successor-in-interest Dentsply Sirona, Inc. (together "Dentsply Sirona" or the "Company")[1] between February 20, 2014 and August 7, 2018 (the "Class Period") and were damaged thereby; and (ii) all persons who acquired the common stock of Dentsply Intl. in exchange for their shares of common stock of Sirona Dental Systems, Inc. ("Sirona") in connection with the Merger (defined below) and were damaged thereby.  *See In re Dentsply Sirona, Inc. Sec. Litig.*, 2023 WL 2682905, at *5 (E.D.N.Y. Mar. 29, 2023).  Excluded from the Class are Defendants[2] and their families, directors, and officers of Dentsply Sirona and their families and affiliates.

Certification under Rule 23(a) is appropriate if:

(1) the class is so numerous that joinder of all members is impracticable, (2) there

---

[1]  "Dentsply" may hereafter refer to both Dentsply Intl. and Dentsply Sirona.

[2]  "Defendants" are Dentsply Sirona, several of its former executive officers (the Officer Defendants) and the board of directors at the time of the Merger (the Director Defendants).

> are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).  Additionally, common issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be "superior" to other methods of adjudication.  FED. R. CIV. P. 23(b)(3).  These elements are satisfied here.

*First*, the weekly trading volume in Dentsply common stock during the Class Period was 6.9 million shares.  This volume suggests there are likely thousands of Class members.

*Second*, this action involves many common issues of law and fact, including whether: (1) Defendants' alleged Class Period misstatements misrepresented or omitted material facts concerning, among other things, end-user demand for the Company's products; (2) Defendants knew or were reckless in not knowing that their statements were false and misleading; (3) the price of Dentsply's common stock was inflated as a result of Defendants' misrepresentations; and (4) the Class suffered damages.

*Third*, Lead Plaintiff's claims are typical of the claims of the Class because, like all other Class Members, it purchased Dentsply common stock during the Class Period at prices artificially inflated by Defendants' misrepresentations.  When Defendants' fraud was revealed, the price of Dentsply Sirona's common stock declined, injuring Lead Plaintiff and the Class alike.

*Fourth*, Lead Plaintiff is an institutional investor that will adequately protect the Class' interests.  No antagonism exists between Lead Plaintiff and the Class, and Lead Plaintiff's chosen counsel is one of the most experienced securities class action law firms in the country.

This action also satisfies the predominance requirement of Rule 23(b)(3).  Common issues of fact and law (e.g., falsity, materiality, and scienter) predominate over any individual issues. Further, the accompanying market efficiency Expert Report of Frank C. Torchio. ("Torchio"),

attached to the Declaration of Robert A. Hoffman ("Hoffman Decl.") as Ex. A (the "Torchio Report"), establishes that common issues predominate with respect to the element of reliance.[3] Torchio concludes that "Dentsply's common stock traded in an informationally efficient market during the Class Period."  Torchio Report ¶¶139-40.  As a result, the Class may invoke the "fraud-on-the-market" presumption of reliance, further supporting a finding of predominance.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) (*"Halliburton II"*).  Torchio also concludes that damages may be reliably assessed on a Class-wide basis through a widely accepted methodology that will quantify the artificial inflation in Dentsply's common stock during the Class Period for purposes of the Exchange Act claims and that will determine statutory damages with regard to the Securities Act claims.  *See* Torchio Report ¶¶141-96.

Finally, the "superiority" factor under Rule 23(b)(3) is satisfied because: (1) numerous investors suffered damages as a result of Defendants' alleged misconduct; (2) it is unlikely that investors who lost relatively small amounts of money would file individual actions due to litigation costs; (3) it is desirable to hear all such claims in one court; and (4) there is no difficulty in maintaining this case as a class action.

## STATEMENT OF FACTS

### A.  Summary of Lead Plaintiff's Claims

Dentsply Sirona was formed through a merger of Dentsply Intl. and Sirona, which was completed on February 29, 2016 (the "Merger").  ¶31.[4]  The merged company became the world's largest manufacturer of professional dental products and technologies.  ¶33.  The claims asserted

---

[3] As discussed below, reliance is only an element of the Exchange Act claims, not the Securities Act claims.

[4] All references to ¶__ are to the operative Complaint (ECF No. 60).  All terms not defined herein are defined in the Complaint.  Unless otherwise noted, all emphasis is added and all internal quotations and citations are omitted.

are based on alleged false and misleading statements by Defendants to investors, which concealed the fact that the Company's financial condition and purported growth had been propped up by: (1) an undisclosed massive build-up of excess inventory at Patterson Companies, Inc. ("Patterson"), the Company's exclusive distributor of certain dental imaging products, which build-up far exceeded end-user demand; and (2) anticompetitive behavior by the three major U.S. distributors of Dentsply Sirona dental consumable supplies and equipment, which the Company facilitated.

### 1.  Concealment of Patterson's Excess Inventory

Dentsply Sirona distributed certain dental equipment products through a series of exclusive distribution agreements with Patterson, which imposed certain minimum purchase and reporting requirements upon Patterson.  *See* ¶¶2, 34-50.  These Exclusive Distribution Agreements helped Dentsply Sirona maintain its dominant position in the U.S. dental products market and contributed to the Company's goodwill and intangible asset valuations.  Unknown to investors, the agreements' minimum purchase requirements forced Patterson to regularly make large minimum purchases of products that were substantially in excess of end-user demand, which created a substantial backlog of Company inventory that Patterson could not sell.  ¶¶51-55, 62.  Faced with the prospect of continuing to purchase products in excess of what it could re-sell, in November 2016 Patterson announced that it would not renew the Exclusive Distribution Agreements when they expired in September 2017.  ¶64.  Thereafter, Patterson began to purchase less products from the Company (referred to as "destocking" inventory).  ¶¶56-61.

Given the Exclusive Distribution Agreements' reporting requirements, the Company knew that there was insufficient end-user demand for the quantity of products Patterson was buying.  ¶51.  However, Dentsply Sirona failed to alert the market to these issues prior to Patterson's November 2016 announcement and thereafter.  Instead of informing investors of the full scope and

impact of the inventory backlog, Dentsply Sirona falsely assured the market that any effect of Patterson's reduced purchases and destocking on the Company's financial results would be mitigated by the addition of a new distributor, Henry Schein, Inc. ("Schein"), which began to make purchases of Company products that had been exclusively distributed by Patterson. ¶¶3-4, 57-64.

As the Company and its executives knew, these purchases of initial stocking inventory by Schein could not nearly make up for the substantial sales that Dentsply Sirona had previously been making to Patterson pursuant to the minimum purchase requirements of the Exclusive Distribution Agreements, and since there was insufficient end-user dentist demand for these products, Schein's initial stocking purchases could not be a consistent source of revenue as these purchases amplified and increased the backlog of inventory in the distribution channel. ¶64.

### 2.  Concealment of the Distributors' Anti-Competitive Conspiracy

The Company and its executives knew that its reported financial results had been further propped-up by an illegal and anti-competitive conspiracy among the three largest distributors of dental products in the United States – Patterson, Schein and Benco Dental Supply Co. ("Benco") (collectively, the "Distributors"). *See* ¶¶5, 79-91. The Distributors' conspiracy consisted of an illicit agreement to foreclose price competition for dental consumable supplies and dental equipment and, with the assistance of Dentsply, to block lower-priced distributors from entering the market. ¶¶79-83, 85-86, 88.

### 3.  The Truth Is Revealed, Damaging the Class

For years, the Company and its executives reported sales and other financial results and metrics that were boosted by these schemes. ¶¶6, 89-98. The Company's goodwill and indefinite-lived asset valuations depended in large part on the Exclusive Distribution Agreements and the Distributors' anti-competitive scheme. ¶93. The inflated results and valuations, combined with

Defendants' misleading statements and omissions regarding the impact of these factors, falsely portrayed Dentsply as a booming growth company. ¶6, 92-94, 97.

The Company's false and misleading statements led to unsustainable stock price gains. ¶¶7, 98. Investors learned the truth about Dentsply Sirona's financial condition through a series of corrective disclosures that revealed, over the course of a year: (a) the dire impact of Patterson's inventory backlog on the Company's revenues, margins and earnings; (b) that the SEC had opened an investigation into the Company's "accounting and disclosures 'relating to transactions with a significant distributor of the Company'"; and (c) billion dollar impairments to the Company's goodwill and intangible asset valuations that resulted from the inventory backlog that was substantially in excess of end-user demand as well as an increase in competition, unfavorable changes in the end-user business model, and changes in channels of distribution for the Company and its competitors following the end of the Distributors' conspiracy. ¶¶7, 99-100, 106-07.

Following the disclosures of the fraud, Dentsply Sirona's stock price declined a total of over 45% from its Class Period high. ¶7.[5]

### 4. The Court Sustained the Complaint

The Court sustained nearly every allegation in the Complaint in its Opinion & Order of March 29, 2023 (D.I. 83).[6] *See also In re Dentsply Sirona, Inc. Sec. Litig.*, 2023 WL 2682905. In

---

[5] On December 16, 2020, the SEC issued the Cease and Desist Order that comprised a settlement of its investigation of Dentsply Sirona. Compl., Appendix A. The SEC's factual findings confirm that Patterson supplied Sirona (and then Dentsply Sirona) with detailed information about its inventory and retail sales between 2013 and 2016, and that, among other things, by the end of the first quarter of 2016, Dentsply Sirona knew, but failed to disclose, that Patterson's inventory was at an all-time high and was increasing due to insufficient end-user demand, which posed a material risk to Dentsply Sirona's financial condition. *Id.* at 2-3.

[6] Other than the Section 14(a) claims that were voluntarily dismissed, the only claim the Court did not sustain was Lead Plaintiff's claim under Item 503(c) of SEC Regulation S-K with respect to the Distributors' conspiracy allegations that pre-date August 2017. *In re Dentsply Sirona, Inc. Sec. Litig.*, 2023 WL 2682905, at *20 n.16.

doing so, the Court determined that the Complaint adequately alleged Defendants made false or

misleading statements:

(1) claiming that Dentsply's products were being sold in a market with "strong demand,"
when in fact Patterson was over-buying Dentsply products to meet minimum purchase
requirements in the Exclusive Distribution Agreements between the two companies. *Id.*
at *14. The Court sustained the claims based on these statements in large part because
they were made repeatedly, in response to direct questions from analysts, and given their
importance to shareholders, *id.* at *15;

(2) regarding the source of Defendants' success being "global dental market growth,
innovation and new products launched by the Company, and continued investments in
sales and marketing" and the "highly competitive" market for company products since
– unknown to investors – the Company was benefiting from an anticompetitive
conspiracy between its distributors that kept prices for products high by boycotting state
dental associations in an effort to discourage the formation of dental buying groups. *Id.*
at *16-17. The Court held that Lead Plaintiff sufficiently alleged Defendants'
knowledge of and acquiescence in this anticompetitive conduct that benefitted Dentsply
Sirona, *id.* at *16-18; and

(3) statements regarding Dentsply Sirona's estimates of goodwill because these estimates
were inflated by the Patterson excess inventory and Distributors' anticompetitive
conspiracy. *Id.* at *18.

In upholding the claims in the Complaint against Dentsply Sirona and its executives, the

Court also held that the Complaint alleged a strong inference that the Company and its executives

made false or misleading statements either knowingly or with reckless disregard for the truth (i.e.,

with scienter). *Id.* at *21. Among other rulings, the Court held that the statements contrasted with

information uniquely known by the executives and not known to the public, most particularly the

detailed monthly reports by Patterson and emails with the Distributors concerning their

anticompetitive conduct. The Court further credited the Complaint's claim that when the truth

about each of these alleged misstatements came to light, there were substantial drops in the price

of Dentsply Sirona's stock, which is the basis for the damages this action is asserting on behalf of

investors in Dentsply Sirona's stock.  *Id.* at *22.  The Court also upheld the Securities Act claims concerning the Merger brought on behalf of former Dentsply Intl. shareholders.  *Id.* at *24.

### B.  The Proposed Class Representative

Strathclyde is a public pension fund in the United Kingdom, serving more than 277,000 active, inactive and retired members of 12 local authorities in the west of Scotland; Scottish Police Authority, Scottish Fire and Rescue, and Scottish Water; a number of universities and colleges; local authority subsidiary companies and contractors; and a wide range of other organizations with funding or service links to the local government sector.  With investment assets of £27.9 billion as of March 31, 2023, Strathclyde is one of the largest public pension funds in the United Kingdom. Strathclyde purchased 311,406 shares of Dentsply Intl. and Dentsply Sirona stock during the Class Period, and received 306,418 Dentsply Sirona shares in connection with the Merger.  *See* ECF 8-4 (Strathclyde's transactions in Dentsply Intl. and Dentsply Sirona common stock). It suffered a substantial loss when Dentsply Sirona's stock declined in value with the curative disclosures of August 9, 2017, October 2, 2017, May 6, 2018 and August 7, 2018.

### ARGUMENT

### A.  Standards on a Motion for Class Certification

As the Second Circuit has recognized, the class action mechanism is particularly well-suited for securities actions.  *See In re Ashanti Goldfields Sec. Litig.*, 2004 WL 626810, at *10 (E.D.N.Y. Mar. 30, 2004) ("A liberal standard is in accord with the Second Circuit's preference for the use of class actions in securities law claims."); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993) ("[T]he Second Circuit … has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country.").  Although the Rule 23 inquiry may overlap with the merits to some degree, courts should not engage in "free-ranging merits inquiries

at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). A plaintiff is not required to prove loss causation or materiality at the class certification stage. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812–13 (2011) ("*Halliburton I*"); *Amgen*, 568 U.S. at 469–70, 475.

Rule 23(a) sets four requirements for class certification: (1) the class must be so numerous that joinder of all members is impractical ("numerosity"); (2) there must be questions of law or fact common to the class ("commonality"); (3) the claims of the representative parties must be typical of the claims of the class ("typicality"); and (4) the representative parties must fairly and adequately protect the interests of the class ("adequacy"). FED. R. CIV. P. 23(a).

Once a plaintiff has shown that its proposed class meets these four requirements, the court then must determine whether the action can be maintained under one of the three subsections of Rule 23(b). FED. R. CIV. P. 23(b). Here, class certification is warranted under Rule 23(b)(3) because "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

### B. Rule 23(a) Is Satisfied

#### 1. *Numerosity Is Established*

"Numerosity is presumed for classes larger than forty members." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.,* 772 F.3d 111, 120 (2d Cir. 2014). "[C]ourts have acknowledged that numerosity in securities actions may be premised on 'a showing that a large number of shares were outstanding and traded during the relevant period.'" *In re NIO, Inc. Sec. Litig.*, 2023 WL 5048615, at *5 (E.D.N.Y. Aug. 8, 2023). The exact number of class members need not be known, so long as the class can be ascertained by objective methods. *Id.*; *see also In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443 (S.D.N.Y. 2013).

Here, while the precise number of Class members will be ascertained only when Class members are notified of the class action through a Court-approved notice program, the putative class likely contains thousands of Class members. Dentsply Intl. began the Class Period with approximately 141.8 million shares outstanding, and Dentsply Sirona concluded the Class Period with approximately 222.3 million shares outstanding. *See* Torchio Report ¶¶24, 33. The average weekly trading volume for Dentsply's common stock was 6.9 million shares during the Class Period. *Id.* ¶69. While trading as Dentsply Intl., the average weekly trading was 4.5 million shares and while trading as Dentsply Sirona, the average weekly trading was 8.9 million shares. *Id.* These facts support numerosity. *See In re Transkaryotic Therapies, Inc. Sec. Litig.*, 2005 WL 3178162, at *2 (D. Mass. Nov. 28, 2005); *see also In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009) ("The Court certainly may infer that, when a corporation has millions of shares trading on a national exchange, more than 40 individuals purchased stock over the course of more than a year."); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2013 WL 3486990, at *1 (S.D.N.Y. July 11, 2013) (finding numerosity and pointing to the fact that the average daily trading volume was over 500,000 ADSs). The numerosity requirement is satisfied.

### 2. *Commonality Is Established*

Rule 23(a)(2) requires a showing that common issues of law or fact affect all class members. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) ("Commonality requires the plaintiff to demonstrate that the class members must 'have suffered the same injury.'"). "This is a low hurdle that requires only a showing that Plaintiff's claims depend upon a common contention that is of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke…even a single common question will do…." *NIO, Inc.,* 2023 WL 5048615, at *5; *see also Marisol A. ex rel. Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir.

1997) (a single common question of law or fact may suffice to satisfy the commonality requirement); *Enea v. Bloomberg, L.P.*, 2014 WL 1044027, at *3 (S.D.N.Y. Mar. 17, 2014) (commonality requirement requires only that there is some "unifying thread among the members' claims that warrant[s] class treatment"). "The standard is particularly permissive in the context of securities fraud litigation." *NIO, Inc.*, 2023 WL 5048615, at *5.

Here, all Class members were injured as a result of the same misrepresentations and omissions. The case thus concerns many questions of law and fact common to the Class, including whether: (1) Defendants' alleged Class Period misstatements misrepresented or omitted material facts; (2) Defendants acted knowingly or recklessly in issuing such statements; and (3) Defendants' conduct resulted in damages to the Class. ¶111. Each of the foregoing questions focuses on Defendants' conduct and its Class-wide impact, making it subject to common proof. *NIO, Inc.*, 2023 WL 5048615, at *5 ("Common questions of law and fact are present where the alleged fraud involves material misrepresentations and omissions in documents circulated to the investing public, press releases and statements provided to the investment community and the media, and investor conference calls."); *Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011) (finding the commonality requirement satisfied where "common questions include[d], most prominently, whether Defendants made materially false and misleading statements … in any or all of the ways alleged in the Amended Complaint.").

### 3.    *Typicality Is Established*

Rule 23(a)(3)'s typicality requirement is met by demonstrating that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant[s'] liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). "The requirement is 'not demanding.'" *JPMorgan*, 2015 WL 10433433, at *3 (S.D.N.Y. Sept. 29, 2015). "When it is alleged that the same unlawful conduct was directed at or

affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met[.]" *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993); *see id*. at 937 ("minor variations in the fact patterns underlying individual claims" will not defeat class certification when the same unlawful conduct was directed at or affected both named plaintiffs and the Class).

Here, Lead Plaintiff's claims are typical of the claims of the Class because the claims all relate to Defendants' alleged material misrepresentations, and Lead Plaintiff and the Class suffered damages of a similar type when the price of Dentsply common stock was corrected.  ¶¶99-108. The proof necessary for Lead Plaintiff to prevail is the same that is required to prove the claims of the rest of the Class.  Lead Plaintiff's claims are therefore typical of the claims of the Class.  *See NIO, Inc.,* 2023 WL 5048615, at *6 (quoting *Robidoux*, 987 F.2d at 936) ("'Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'").

### 4.    *Adequacy Is Established*

Courts generally interpret the adequacy requirement to mean that "named plaintiffs must be similarly situated to the proposed class in terms of interests and injury" and "may have no interests adverse to those of the putative class[.]"  *Enea*, 2014 WL 1044027, at *5. Furthermore, "[p]art and parcel to the adequacy inquiry is the requirement that proposed counsel be able to 'fairly and adequately represent the interests of the class.'"  *Id.* at *6.  "This Circuit has interpreted this requirement to mean that class counsel must be 'qualified, experienced and generally able to conduct the litigation.'"  *Id.* (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

Lead Plaintiff is an adequate representative because it purchased Dentsply Sirona common stock during the Class Period, and also exchanged Sirona stock for Dentsply Sirona stock in the Merger, and was injured by the same wrongful conduct as the Class.  Accordingly, Lead Plaintiff

has every reason to prosecute this action vigorously. Further, Lead Plaintiff understands its role and obligation as a Class representative, and has diligently prosecuted this action for at least four years. Through counsel, Lead Plaintiff has: (1) investigated and filed two consolidated complaints; (2) successfully opposed Defendants' motion to dismiss; (3) retained and consulted experts; (4) begun to evaluate over 2 million pages of documents that have already been produced by Defendants; (5) searched for, collected, reviewed and produced documents responsive to Defendants' discovery requests; and (6) propounded document requests upon and engaged in meet and confers with Defendants. *See* Hoffman Decl. ¶2. Lead Plaintiff also has overseen counsel, receiving regular status reports concerning this action. Lead Plaintiff's actions demonstrate a clear understanding of the case, active review of the pleadings and other court filings, and full participation in discovery. Lead Plaintiff intends to continue to perform similar activities throughout this action, including preparing for and attending trial and any mediations. *See also* ECF No. 8-3 (Lead Plaintiff's Certification).

Moreover, as an institutional investor, Lead Plaintiff is especially well-qualified to serve as the Class Representative. The Private Securities Litigation Reform Act of 1995 was intended "to increase the likelihood that institutional investors will serve as lead plaintiffs." *See* 104 H.R. Rep. 369 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 733; 104 S. Rep. No. 98 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 679, 690.

Finally, Lead Plaintiff has protected the interests of the Class by retaining BRB as Class Counsel. Lead Plaintiff respectfully submits that proposed counsel satisfy the adequacy requirement of Rule 23(a)(4), as Lead Counsel is among the most experienced securities class action law firms in the country. *See* ECF No. 8-6 (BRB Resume).

### C. Rule 23(b)(3) Is Satisfied

Lead Plaintiff seeks certification under Rule 23(b)(3), which permits certification when

both: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). As set forth below, both requirements are met.

### 1. *Common Questions of Law and Fact Predominate*

The predominance prong of Rule 23(b)(3) is satisfied when the "'resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Roach v. T.L. Cannon Corp.,* 778 F.3d 401, 405 (2d Cir. 2015) (quoting *In re U.S. Foodservice Inc. Pricing Litig.,* 729 F.3d 108, 118 (2d Cir. 2013)). The Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging … securities fraud...." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Here, common issues of law and fact predominate over any individual issues. To recover under Section 10(b), all Class members must establish: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). All such elements, "other than reliance in cases that are not premised on the fraud-on-the-market, are subject to class wide proof[.]" *In re Pfizer Sec. Litig.*, 282 F.R.D 38, 52 (S.D.N.Y. 2012); *see also In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *8 (S.D.N.Y. Aug. 21, 2008). Lead Plaintiff can establish reliance on a class-wide basis through the fraud-on-the-market presumption. Moreover, damages will be determined on a class-wide basis using a widely-accepted event study-based methodology to measure the amount of artificial inflation per share attributable to Defendants' alleged misconduct during the Class Period.

a.    **Lead Plaintiff and the Class Are Entitled to a Presumption of Reliance**

"In the securities fraud context … reliance[] refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 181 n.13 (2d Cir. 2015). In securities fraud cases, plaintiffs seeking class certification may establish a class-wide presumption of reliance through the fraud-on-the-market theory. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–43 (1988) (holding that the presumption of reliance may apply in Rule 10b-5 cases).[7] "The fraud-on-the-market premise is that the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458.

To establish the *Basic* presumption, a plaintiff must show that: "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268. The second element, materiality, need not be proven at the class certification stage, since the materiality of the alleged misrepresentations is itself a question common to the class to be determined at summary judgment or trial. *See Amgen,* 568 U.S. at 469-70.

Lead Plaintiff satisfies the prerequisites to invoking the fraud-on-the-market presumption. *First*, each alleged misrepresentation was a material public statement addressed to the marketplace. *See* ¶¶116-68; 175-76; 179-80. *Second*, Lead Plaintiff purchased Dentsply common stock between

---

[7] Reliance is <u>not</u> an element of a Section 11 claim brought under the Securities Act. As a result, the Securities Act claims at issue here are also well-suited for class treatment, since the overwhelming issue for such claims is whether there were materially untrue statements in, and misleading omissions from, the registration statement on Form S-4 for the Merger. *See Pub. Employees Ret. Sys. of Miss.*, 277 F.R.D. at 105-06.

the time when at least one of these material misrepresentations was made and August 7, 2018, the end of the Class Period. *See* ECF No. 8-4.

*Finally*, the market for Dentsply common stock was efficient during the Class Period. The seminal judicial decision outlining the features of an efficient market is *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).[8] Under *Cammer* and its progeny, courts consider the following factors when assessing market efficiency: (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) eligibility to file an S-3 registration statement; and (5) reasonably prompt movement of the stock price caused by unexpected corporate events or financial releases. *See Cammer*, 711 F. Supp. at 1286-87. As set forth in the Torchio Report and discussed below, Lead Plaintiff has established each *Cammer* factor, and others, confirming that Dentsply common stock traded in an efficient market during the Class Period. *See* Torchio Report ¶¶67-102.

> **b.    Dentsply's Average Weekly Trading Volume during the Class Period Was Large**

"Average weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security." *Winstar*, 290 F.R.D. at 447 (citing *Cammer*, 711 F. Supp. at 1286); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 91-92 (2d Cir. 2017). During the Class Period, the average weekly trading volume of Dentsply's stock was 3.55% of shares outstanding. Torchio Report ¶69; *see also id.* Ex. 3. This trading volume "justif[ies] 'a strong presumption' that the market for a security is efficient" for Dentsply's common stock during the Class Period under *Cammer*. *Id.* ¶¶70-71 & n.56.

---

[8] The Second Circuit "has not adopted a test for the market efficiency of stocks or bonds," but district courts have "routinely applied" the "*Cammer* factors … [when] considering the efficiency of equity markets." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008).

### c.    Dentsply Common Stock Was Covered by Numerous Analysts

"[T]he existence of a number of financial analysts who report on a security supports a finding of market efficiency because it permits an inference that financial statements relating to a security are 'closely reviewed by investment professionals, who … in turn make buy/sell recommendations to client investors.'" *Bombardier*, 546 F.3d at 205.  During the Class Period, between 12 and 17 research analysts provided Buy/Sell/Hold recommendations for Dentsply, with an average of 15 analysts covering Dentsply, and more than 1,100 analyst reports were published, indicating that Dentsply's analyst coverage was "better than 75% of the stocks in the NYSE/Nasdaq Universe."  Torchio Report ¶¶73-74; *see also id.* Ex. 3. This is more than sufficient to support market efficiency.  *NIO, Inc.*, 2023 WL 5048615, at *11 ("five analysts following NIO during the class period, publishing 26 reports and recommendations regarding the ADS" supported a finding of market efficiency).  Courts have also held that substantial holdings by institutional investors further support a finding of market efficiency.  *E.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) ("because institutional investors held a substantial percentage of [Defendant's] securities and because these investors could easily buy and sell [Defendant's] securities on exchanges … they have likely acted as arbitrageurs and facilitated the efficiency of the market.").  Major institutional investors owned 97.15% of the total outstanding shares of Dentsply common stock during the Class Period. *See* Torchio Report ¶¶107-08; *id.* Ex. 3. Accordingly, this *Cammer* factor supports a finding of market efficiency.

### d.    There Were Many Market Makers for Dentsply Stock

With respect to the third *Cammer* factor – the number of market makers and arbitrageurs – courts within the Second Circuit have explained that "[f]or stocks … that trade on a listed exchange such as NASDAQ, th[e] reliance element of a 10b-5 cause of action is presumed."  *Stevelman v. Alias Rsch., Inc.*, 2000 WL 888385, at *4 (D. Conn. June 22, 2000) (citing *Basic*, 485 U.S. at 247),

*on reconsideration sub nom. Stevelman v. Alias Rsh.*, 2000 WL 1849815 (D. Conn. Nov. 3, 2000); *see also In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *9 (E.D.N.Y. Jan. 11, 2022) ("Securities markets like the NYSE and the NASDAQ are open and developed, and are therefore well suited for application of the fraud on the market theory. Accordingly, the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."), adopted by 2022 WL 969724, at *7 (E.D.N.Y. Mar. 31, 2022). Thus, the market for Dentsply stock is presumed efficient and no further showing is necessary. *See also* Torchio Report ¶55 ("Throughout the Class Period, Dentsply (both Dentsply Intl. and Dentsply Sirona) was listed on the Nasdaq National Market exchange, which is widely considered as a well-developed market.").

Furthermore, "[c]ourts in this Circuit have found that … six … market makers is sufficient to support a finding of market efficiency." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015); *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (14 market makers found sufficient to establish market efficiency); *Cammer*, 711 F. Supp. at 1293 (10 market makers justifies a substantial presumption that the market is efficient). Lead Plaintiff has identified an average of 54 market makers of Dentsply stock during the Class Period. *See* Torchio Report ¶78. Therefore, this *Cammer* factor is satisfied.

### e. Dentsply Was Eligible to File Form S-3 Registration Statements

A company is eligible to file a Form S-3 registration statement if it has filed SEC reports for twelve consecutive months and possesses a market capitalization of at least $75 million. *See* 17 C.F.R. § 239.13. "The ability to file this form indicates that the company is easily able to issue new securities." *Winstar*, 290 F.R.D. at 447. Dentsply satisfied the conditions for S-3 registration eligibility throughout the entire Class Period. Torchio Report ¶¶79-81.

### f.    Dentsply's Stock Price Reacted to Unexpected News

Finally, in analyzing the fifth *Cammer* factor – stock price reaction to material news – Torchio conducted event studies to examine the causal relationship between the announcement of new, Company-specific news and a response in the price of Dentsply common stock.  Torchio Report ¶¶86-102.  Event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events."  *Halliburton II*, 573 U.S. at 280.  Torchio analyzed Dentsply's stock price movements against relevant market and industry indices on days with news ("news days") and days without news ("non-news days") regarding Dentsply, and compared the results of the analyses to determine whether Dentsply's stock price reacted differently on "news days" versus "non-news days."  Torchio Report ¶¶86-100.  Torchio utilized an objective definition of "news days" in order to minimize subjectivity within the analyses: days with earnings releases.  *Id*. ¶86.

The results of these analyses indicated that "Dentsply stock was approximately 11.5 times (66.7% / 5.8%) more likely to react in a statistically significant manner on days when the Company issued earnings releases containing potentially value-relevant information than on days without."  *Id*. ¶91.  Therefore, Torchio concluded that "this analysis supports a finding of market efficiency for Dentsply common stock" during the Class Period.  *Id*. ¶93.

### g.    The *Krogman* and Other Factors Are Also Satisfied

The court in *Krogman v. Sterritt,* 202 F.R.D. 467, 477-78 (N.D. Tex. 2001), identified the following factors as relevant to market efficiency: (1) the company's market capitalization; (2) the bid-ask spreads for stock sales; and (3) the public float.  Some courts in this Circuit have utilized the *Krogman* factors along with the *Cammer* factors in assessing market efficiency.  *See JPMorgan*, 2015 WL 10433433, at *5 (collecting cases).  Torchio found that each of the *Krogman* factors, as well as three others that can be evaluated for market efficiency, also supported a finding

of market efficiency.  Torchio Report ¶¶ 103-115.

*Market Capitalization*[9] – During the Class Period, Dentsply's smallest market capitalization was $6.3 billion.  Torchio Report ¶104.  Further, Dentsply's average market capitalization was between the 90th and 95th percentiles of NYSE and Nasdaq stocks during 2013-2015 and between the 75th and 90th percentiles during 2016-2018, meaning that Dentsply's market capitalization was larger than at least 75% of stocks that traded in well-developed markets throughout the Class Period.  *Id.* ¶105; *see also NIO, Inc.*, 2023 WL 5048615, at *12 (average market capitalization of $1.33 billion supported market efficiency); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (market capitalization of $585 million supported market efficiency).

*Bid-Ask Spread*[10] – During the Class Period, the average bid-ask spread for Dentsply common stock was only 0.02%.  Torchio Report ¶110.  Dentsply's average bid-ask spread during the Class Period was lower than at least 75% of NYSE and Nasdaq traded stocks.  *Id.* ¶111; *see also NIO, Inc.*, 2023 WL 5048615, at *12 (bid-ask spread of 0.17% was indicative of market efficiency), and *McIntire*, 38 F. Supp. 3d at 433 (same for bid-ask spread of 0.27%).

---

[9] Market capitalization is an indicator of market efficiency because investors have greater incentive to invest in more highly capitalized corporations, and such companies tend to be more well-known, and closely followed.  *See Krogman*, 202 F.R.D. at 478 (citation omitted); *see also* Torchio Report ¶105 ("Dentsply's average market capitalization was between the 90th and 95th percentiles of the stocks in the NYSE/Nasdaq Universe during 2013-2015 and between 75th and 90th percentiles of the stocks in the NYSE/Nasdaq Universe during 2016-2018, meaning that Dentsply's market capitalization is larger than at least 90% of stocks that trade in well-developed markets.").

[10] The "bid-ask spread" is the difference between the prices at which investors are willing to buy shares and current stockholders are willing to sell, with a low bid-ask spread indicating a more efficient market.  *See Krogman*, 202 F.R.D. at 478; Torchio Report ¶109.

*Float*[11] – During the Class Period, Dentsply's float represented an average of over 99% of the total shares outstanding during Class Period and ranged from 139.3 million to 241.4 million shares. Torchio Report ¶113; *see also McIntire*, 38 F. Supp. 3d at 433 (finding public float of 31% and 43% of outstanding shares to be consistent with market efficiency). In addition, Dentsply's average public float of $10.7 billion was between the 90th and 95th percentiles of NYSE and Nasdaq stocks during 2013-2015 and between the 75th and 90th percentiles during 2016-2018, meaning that Dentsply's market capitalization of public float was larger than at least 75% of stocks that trade in well-developed markets. Torchio Report ¶115.

*Lack of Autocorrelation* – Some courts within the Second Circuit have also considered the level of "autocorrelation" when assessing market efficiency. *See, e.g., Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 161 (S.D.N.Y. 2012) (explaining that existence of autocorrelation "is a sign of potential market inefficiency"). Autocorrelation is "a statistical relationship between the price changes on successive trading dates" of a particular company's common stock price. *Id.* Torchio conducted two separate analyses which revealed "no statistically significant autocorrelation for Dentsply's excess returns, which means there is no statistical evidence of autocorrelation of Dentsply's excess returns" in Dentsply's stock during the Class Period. *See* Torchio Report ¶¶121-22; *see also* Exhibit 9. This provides further support for a finding that Dentsply's stock traded in an efficient market. Torchio Report ¶123.

*Short interest* – Some courts within the Second Circuit have also considered the level of short interest when assessing market efficiency. *See In re Ashanti Goldfields Sec. Litig.*, 2004 WL 626810, at *15. The level of short interest for Dentsply's common stock averaged 6.6 million

---

[11] A stock's float is the number of shares outstanding excluding shares held by insiders and affiliated corporate entities. *See Krogman*, 202 F.R.D. at 478 (citation omitted). A higher float indicates greater market efficiency. *Id.*

shares, which is 3.6% of the Company's common shares outstanding.  Torchio Report ¶124; *see also* Exhibit **Error! Bookmark not defined.**.  This was between the 50th and 75th percentiles of NYSE and Nasdaq stocks both during 2013-2015 and during 2016-2018, which Mr. Torchio viewed as a neutral factor.  Torchio Report ¶125.[12]

*Put-Call Parity* – Finally, some courts within the Second Circuit have also considered put-call parity when assessing market efficiency.  *Carpenters Pension*, 310 F.R.D. at 81 n.77 ("Arbitrageurs correct put-call disparities by engaging in short-sales. When short-selling bans restrict an arbitrageur's ability to exploit put-call disparities, these constraints may cause the stock to be overpriced. Thus, put-call parity violations and short-selling constraints may result in inefficiency.").  Torchio conducted a test to determine whether Dentsply's common stock and exchange-traded options on Dentsply's common stock violated put-call parity on any day during the Class Period.  Torchio Report ¶¶132-37.  The results of this analysis showed just one violation of put-call parity out of the 56,206 valid option pairs (or 0.002%).  *Id.* ¶138.  Thus, Dentsply's common stock and options exhibited adherence to the put-call parity theory.

The factors discussed above individually and collectively support a finding that the market for Dentsply common stock was efficient throughout the Class Period.  The fraud-on-the-market doctrine thus applies and class-wide reliance may be presumed.

## 2. *Damages*

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court "held that a model for determining class wide damages relied upon to certify a class under Rule 23(b)(3) must actually

---

[12]  The Torchio Report further notes that he average short interest coverage ratio for Dentsply common stock was approximately 5.4 days during the Class Period.  Torchio Report ¶126; *see also* Exhibit C.  **Error! Bookmark not defined.**This indicates that, on average, it would take short sellers approximately 5.4 trading days to cover their entire short position in Dentsply common stock, assuming historical trading volume remained constant.

measure damages that result from the class's asserted theory of injury[.]"  *Roach*, 778 F.3d at 407.

Courts routinely hold that damages in securities cases may be demonstrated on a class-wide basis

through use of an event study-based methodology.  *E.g., JPMorgan*, 2015 WL 10433433, at *7

(*Comcast* satisfied where "[p]laintiffs' expert proposes to calculate classwide, per-share damages

through an event study analysis of the stock price inflation caused by Defendants' alleged

misrepresentations or omissions"); *Carpenters Pension*, 310 F.R.D. at 99 ("Plaintiff's model

survives the minimal scrutiny required under *Comcast* and Rule 23(b)(3) – their theory of liability

matches their theory of damages and individualized damages issues will not predominate.");

*Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014) ("Plaintiff's proposed determination

of damages by event study appears to be a workable methodology of determining damages on a

class-wide basis that conforms to its theory of liability, thus meeting the requirements of

*Comcast*[.]").

Lead Plaintiff has put forth a methodology for determining class-wide damages for the

Exchange Act claims that is consistent with its theory of liability.  Torchio Report ¶¶141-89.

Torchio explains that by proposing to utilize a well-accepted event study methodology, which

isolates the amount of Company-specific declines that resulted from the alleged corrective

disclosures and/or the materialization of previously concealed risks, he will be able to quantify the

amount of artificial inflation that existed in Dentsply's share price on each day of the Class Period,

which can then be used to calculate damages for each member of the Class.  *Id*. ¶¶142-90.  This

methodology for computing damages, which can be applied on a Class-wide basis, "is entirely

consistent with [Lead Plaintiff's] theory of Section 10(b) liability," i.e., that Defendants' material

misstatements and omissions caused harm to Lead Plaintiff and Class members by causing the

price of Dentsply common stock to be artificially inflated, "and would be measurable on a class-wide basis." *In re Barrick Gold Sec. Litig*., 314 F.R.D. 91, 105-06 (S.D.N.Y. 2016).

For purpose of the Securities Act claims, Torchio explains that since the measures of damages are statutory, the determination of a class member's claim would be a calculation depending on when, if ever, the Class member disposed of stock obtained in the Merger and the price at which the sale was made. In addition, the statutory formulas would be common for all respective Class members. Torchio Report ¶¶190-96.

### 3.    *Superiority Is Established*

Rule 23(b)(3) identifies four factors that courts should consider in determining whether a class action is superior to other methods of adjudication: (1) the interests of members of the class in "individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) the difficulties likely to be encountered in the management of a class action. FED. R. CIV. P. 23(b)(3). Here, each of these factors supports superiority. Lead Plaintiff seeks to represent a Class consisting of a large number of purchasers whose individual damages are likely small enough to render individual litigation prohibitively expensive. Given these circumstances, the Class members have little interest in asserting separate claims. *NIO, Inc.*, 2023 WL 5048615, at \*17 ("Securities suits easily satisfy the Superiority Requirement of Rule 23(b)(3) because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake"). Concentrating this litigation in a single forum has numerous benefits, including eliminating the risk of inconsistent adjudication and promoting the fair and efficient use of the judicial system. Finally, domestic securities class actions generally raise no unusual manageability issues. *See, e.g., In re*

*Parmalat Sec. Litig.*, 2008 WL 3895539, at *11 n.95 (denial of class certification on manageability grounds is "disfavored").  Thus, superiority is established.

### D.  Lead Counsel Should Be Appointed Class Counsel

FED. R. CIV. P. 23(g) requires a court to appoint class counsel when certifying a class action.  As detailed above, and as the Court is aware, Lead Counsel have already done substantial work in investigating and prosecuting the claims in this action, are experienced in handling complex litigation, especially of the type asserted in this action, and have extensive knowledge of the applicable securities laws.  *See* Hoffman Decl. ¶2.  Further, Lead Counsel have already devoted considerable resources to this action.  These facts all support appointing BRB as Class Counsel.  *See* FED. R. CIV. P. 23(g); *Pfizer*, 282 F.R.D. at 47 (appointing class counsel that had "devoted considerable resources to th[e] case since it was first filed, and ha[d] effectively protected the interests of Plaintiffs and the putative class").

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully submits that the Class should be certified, Lead Plaintiff should be appointed as the Class Representative, and BRB should be appointed as Class Counsel.

Dated: September 29, 2023              Respectfully submitted:

**BARRACK RODOS & BACINE**

*/s/ Michael A. Toomey*
Michael A. Toomey
11 Times Square
640 Eighth Avenue, 10th Floor
New York, NY 10036
Telephone:  212.688.0782
Facsimile:  212.688.0783

and

Jeffrey W. Golan (*pro hac vice*)
Robert A. Hoffman (*pro hac vice*)
Chad A. Carder
Jordan R. LaPorta (*pro hac vice*)
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Telephone:  215.963.0600
Facsimile: 215.963.0838

*Attorneys for the Strathclyde Pension Fund
and Lead Counsel for the Putative Class*